IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

RHONDA EZELL, JOSEPH BROWN,
WILLIAM HESPEN, ACTION TARGET, INC.,
SECOND AMENDMENT FOUNDATION, INC.,
AND ILLINOIS STATE RIFLE ASSOCIATION,

Plaintiffs-Appellees/Cross-Appellants,

v.

CITY OF CHICAGO,

Defendant-Appellant/Cross-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 10 C 5135
The Honorable Virginia M. Kendall, Judge Presiding.
——————

**BRIEF AND APPENDIX OF DEFENDANT-APPELLANT**
——————

STEPHEN R. PATTON
    Corporation Counsel
        of the City of Chicago
Suite 800
30 North LaSalle Street
Chicago, Illinois 60602
(312) 744-8519

BENNA RUTH SOLOMON
  Deputy Corporation Counsel
MYRIAM ZRECZNY KASPER
  Chief Assistant Corporation Counsel
SUZANNE M. LOOSE
  Senior Counsel
  Of Counsel

# TABLE OF CONTENTS

———

Page

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

JURISDICTIONAL STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUE PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ORDINANCES INVOLVED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

THE CITY'S ZONING OF SHOOTING RANGES IS CONSTITUTIONAL. . . 17

    A.    The City's Zoning Of Shooting Ranges Imposes A Modest
           Burden On Second Amendment Rights. . . . . . . . . . . . . . . . . . 19

    B.    The M Zoning Is Substantially Related To Important Public
           Health And Safety Objectives. . . . . . . . . . . . . . . . . . . . . . . . 23

    C.    Alternatively, A Threshold Showing Of A Substantial Burden
           Should Be Required For A Second Amendment Claim. . . . . . 32

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(A)(7)(b)(i) . . 40

CERTIFICATE OF COMPLIANCE WITH SEVENTH CIRCUIT RULE 30. . 40

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

APPENDIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

# TABLE OF AUTHORITIES

—————

**CASES**          **Page**

*Abbs v. Sullivan,*
  963 F.2d 918 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Badger Catholic, Inc. v. Walsh,*
  620 F.3d 775 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Board of Trustees of State University of New York v. Fox,*
  492 U.S. 469 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Brandenburg v. Ohio,*
  395 U.S. 444 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Bullock v. Carter,*
  405 U.S. 134 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Califano v. Jobst,*
  434 U.S. 47 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Chaplinsky v. New Hampshire,*
  315 U.S. 568 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*City of Los Angeles v. Alameda Books, Inc.,*
  535 U.S. 425 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*City of Renton v. Playtime Theaters,*
  475 U.S. 41 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 29

*Civil Liberties for Urban Believers v. City of Chicago,*
  342 F.3d 752 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 34, 38

*DiMa Corp. v. Town of Hallie,*
  185 F.3d 823 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Employment Division v. Smith,*
  494 U.S. 872 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Ezell v. City of Chicago,
     651 F.3d 684 (7th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

FCC v. League of Women Voters,
     468 U.S. 364 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

G.M. Enterprises, Inc. v. Town of St. Joseph,
     350 F.3d 631 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Hall v. Garcia,
     No. 10-03799, 2011 WL 995933 (N.D. Cal. March 17, 2011) . . . . . . . . . . . . 27

Jones v. City of Springfield,
     554 F.3d 669 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Lorillard Tobacco Co. v. Reilly,
     533 U.S. 525 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

McDonald v. City of Chicago,
     561 U.S. 742 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Metropolitan Life Insurance Co. v. Massachusetts,
     471 U.S. 724 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

National Rifle Association v. Bureau of Alcohol, Tobacco, Firearms & Explosives,
     700 F.3d 185 (5th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Nordyke v. King,
     644 F.3d 776 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 37

Nordyke v. King,
     681 F.3d 1041 (9th Cir. 2012) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . 37

North Avenue Novelties v. City of Chicago,
     88 F.3d 441 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 38

Planned Parenthood of Southeast Pennsylvania v. Casey,
     505 U.S. 833 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Schall v. Martin,
     467 U.S. 253 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Sherbert v. Verner,
     374 U.S. 398 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Stephens v. Erickson,
  569 F.3d 779 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Teixeira v. County of Alameda,
  No. 12-CV-03288, 2013 WL 4804756 (N.D. Cal. Sept. 9, 2013) . . . . . . . . . 27

Turner Broadcasting System, Inc. v. FCC,
  520 U.S. 180 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 28

United States v. Decastro,
  682 F.3d 160 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

United States v. Marzzarella,
  614 F.3d 85 (3d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

United States v. Masciandaro,
  638 F.3d 458 (4th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

United States v. Salerno,
  481 U.S. 739 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

United States v. Skoien,
  614 F.3d 638 (7th Cir. 2010) (en banc) . . . . . . . . . . . . . . . . . . . . . 20, 23, 25

United States v. Stevens,
  559 U.S. 460 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

United States v. Williams,
  616 F.3d 685 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 23

Wisconsin v. Yoder,
  406 U.S. 205 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Zablocki v. Redhail,
  434 U.S. 374 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**STATUTES,  RULES, ORDINANCES, AND OTHER AUTHORITIES**

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

28 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

430 ILCS 65/4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Fed. R. Civ. P. 56(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Municipal Code of Chicago, Ill. § 4-151-170 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Municipal Code of Chicago, Ill. § 4-151-100(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Municipal Code of Chicago, Ill. § 13-96-1160 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Municipal Code of Chicago, Ill. § 13-96-1200(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . 13

Municipal Code of Chicago, Ill. § 13-96-1210(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Municipal Code of Chicago, Ill. § 13-96-1210(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Municipal Code of Chicago, Ill. § 17-1-0501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Municipal Code of Chicago, Ill. § 17-1-0502 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Municipal Code of Chicago, Ill. § 17-1-0503 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Municipal Code of Chicago, Ill. § 17-1-0508 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Municipal Code of Chicago, Ill. § 17-3-0207 . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 6, 17

Municipal Code of Chicago, Ill. § 17-5-0200 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Municipal Code of Chicago, Ill. § 17-5-0207 . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 6, 17

Municipal Code of Chicago, Ill. § 17-9-0120 . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Municipal Code of Chicago, Ill. § 17-13-0901 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Municipal Code of Chicago, Ill. § 17-13-0903 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Municipal Code of Chicago, Ill. § 17-13-0904 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Municipal Code of Chicago, Ill. § 17-13-0905 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Tracing the Guns: The Impact of Illegal Guns on Violence in Chicago,
    City of Chicago – Office of the Mayor & Chicago Police
    Department (May 27, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Mark Frasetto, Firearms & Weapons Legislation Up to the Early Twentieth
    Century (available at http://papers.ssrn.com/sol3/papers.cfm?
    abstract_id=2200991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

David Hemenway, Private Guns, Public Health (2006) . . . . . . . . . . . . . . . . . . . . . 31

Gregory P. Magarian, Speaking Truth to Firepower:  How the First Amendment
    Destabilizes the Second, 91 Tex. L. Rev. 49 (Nov. 2012) . . . . . . . . . . . . . . . 30

Michael Planty & Jennifer L. Truman, Firearm Violence, 1993-2011,
    Bureau of Justice Statistics Special Report (May 2013) . . . . . . . . . . . . . . . 31

Lawrence Rosenthal, The Limits of Second Amendment Originalism and the
    Constitutional Case for Gun Control (available at http://ssrn.com/
    abstract=2414681). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# JURISDICTIONAL STATEMENT

Plaintiffs Action Target, Second Amendment Foundation, Illinois State Rifle Association ("ISRA"), and three individuals brought this lawsuit challenging the constitutionality of provisions in the Chicago Municipal Code regulating shooting range facilities. Initially, plaintiffs challenged the City's former prohibition on shooting ranges in Chicago. The district court denied a motion for preliminary injunction, a ruling this court reversed. Ezell v. City of Chicago, 651 F.3d 684, 711 (7th Cir. 2011) ("Ezell I"). On remand, after several amendments to the Chicago Municipal Code to allow for and regulate shooting ranges, plaintiffs filed a second amended complaint challenging those regulations on First and Second Amendment grounds, and seeking declaratory and injunctive relief. The district court had jurisdiction over those claims, brought under 42 U.S.C. § 1983, pursuant to 28 U.S.C. §§ 1331 and 1343.

On September 29, 2014, the district court entered an order resolving the parties' cross-motions for summary judgment. R. 280; A1. The court granted summary judgment to plaintiffs on claims challenging two of the regulations – one pertaining to zoning, and the other a limit on hours of operation. The court granted summary judgment to the City on the remaining claims. On the same date, the court entered judgment in a separate document pursuant to Rule 58. R. 281; A33. Although the court did not rule on plaintiffs' request for injunction, the court's declaratory judgment has the same practical effect as an injunction in fixing the parties' legal entitlements, Badger Catholic, Inc. v. Walsh, 620 F.3d 775, 782 (7th

1

Cir. 2010), and is final for purposes of appeal, <u>see</u> <u>Abbs v. Sullivan</u>, 963 F.2d 918, 923 (7th Cir. 1992).

On October 20, 2014, the City filed a timely notice of appeal.  R. 285.  On October 21, 2014, plaintiffs filed a notice of cross-appeal.  R. 291.  This court has jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUE PRESENTED
_____

Whether an ordinance restricting the location of shooting ranges violates the Second Amendment when that restriction does not substantially burden the exercise of Second Amendment rights, and is substantially related to important public safety objectives.

## ORDINANCES INVOLVED
_____

Sections 17-5-0200, 17-7-0207, and 17-9-120 of the Chicago Municipal Code are set forth in the appendix to this brief.  A35-A39.

## STATEMENT OF THE CASE
_____

On August 16, 2010, plaintiffs brought this lawsuit to challenge the City's former ban on shooting ranges.  R. 1.  After this court's decision in <u>Ezell I</u>, the City amended the ordinance to allow for, and to regulate, shooting ranges.  On July 6, 2011, the Chicago City Council established a comprehensive regulatory scheme for ranges (the "Ordinance"), by amending licensing, building, environmental, fire protection, and zoning provisions in the Chicago Municipal Code.  R. 225-3 at 101. The Ordinance was designed to "put in place reasonable City-crafted restrictions

and requirements on the operation and use of shooting ranges within the City,"
with input from the City's Police and Fire Departments, as well as the departments
that oversee environmental and building regulations.  R. 225-4 at 5-6.  The
Ordinance has been amended several times, see R. 225-4 at 15 (Sept. 2011
amendments); R. 225-4 at 20 (Jan. 2013 amendments); R. 225-4 at 32 (Sept. 2013
amendments); R. 225-4 at 32 (chart comparing amended Ordinance to challenged
provisions in complaint); R. 269-1 at 3 (June 2014 amendments).  In response to
these amendments, plaintiffs twice amended their complaint, R. 126; R. 200, and
stipulated that certain of their claims had become moot, R. 278.

The claims that remained included challenges to the two zoning provisions –
one assigning shooting ranges to manufacturing districts, and one restricting them
from locating within 500 feet of residential districts and other certain uses.  R. 278
at 2.  In addition, plaintiffs challenged the requirements that: (1) ranges operate
only between 9:00 a.m. and 8:00 p.m.; (2) a range master be present during
operating hours; (3) range patrons be 18 years or older; (4) range patrons have
FOID cards, if required by law; (5) the shooting range be constructed with materials
sufficient to stop bullets or projectiles from penetrating the facility; (6) the noise
level be no more than 55 db from a distance of 100 feet, and 70 db from 10 feet; (7) a
facility that has multiple ranges must have separate ventilation and exhaust
systems for each range; (8) air supply and exhaust systems electrically interlock so
they turn on at the same time; and (9) allowed the Commissioner of the City's
Department of Health to promulgate rules and regulations regarding cleaning,

sound and air quality control, and discharge of waste from shooting ranges. R. 278 at 2. Plaintiffs further alleged that the regulations, taken together, "effectively prohibit ranges from opening and operating by unjustifiably burdening their construction, operation, and use." R. 200 at 5.

**Zoning Regulations**

Section 17-5-0207 provides that shooting ranges are allowed in manufacturing ("M") districts as a special use. Municipal Code of Chicago, Ill. § 17-5-0207; A38. A "special use" is one that involves "widely varying land use and operational characteristics" such that case-specific review is called for "in order to determine whether [the use] will be compatible with surrounding uses and development patterns." Id. § 17-13-0901. "Case-by-case review is intended to ensure consideration of the special use's anticipated land use, site design and operational impacts." Id. The Zoning Administrator reviews and makes a recommendation on each special use application. Id. § 17-13-0903. Then, the Zoning Board of Appeals holds a hearing, id. § 17-13-0904, to determine whether the use should be allowed based on specific criteria, id. § 17-13-0905; R. 227-1 at 61-62.

In addition, section 17-9-0120 provides that:

Shooting ranges may not be located in any of the following areas or locations:

**17-9-0120-A** within 100 feet of another shooting range;

**17-9-0101-B** within 500 feet of any zoning district that is zoned for residential use, including a planned development that authorizes residential use;

4

**17-9-0101-C** within 500 feet of any pre-existing school, day-care facility, place of worship, premises licensed for the retail sale of liquor, children's activities facility, library, museum or hospital.[1]

Steven Valenziano, the Assistant Zoning Commissioner in the City of Chicago's Department of Housing and Economic Development ("DHED"), R. 227-1 at 7, directed an employee to use the City's geomapping system to create a map showing the land that meets the zoning requirements of both sections 17-5-0207 and 17-9-0120, R. 227-1 at 15, 18-22; see also R. 227-1 at 49 (map); A40.[2] The areas in white on the map are either zoned for residential use ("R districts") or contain parks and forest preserves, and are not available for business, commercial, or manufacturing uses. R. 227-1 at 26-27, 31-32. There are approximately 32,000 acres (excluding streets, alleys, and expressways) in the City that are zoned as business districts, commercial business districts, manufacturing districts, planned manufacturing districts, and downtown districts. R. 227-1 at 43-44, 49. These areas are shown on the map in gray. R. 227-1 at 43-44, 49. Of those 32,000 acres, 3,386 acres of land meet the requirements of both sections 17-5-207 and 17-9-0120. R. 227-1 at 29-30. These areas are shown on the map in red. R. 227-1 at 49. Valenziano excluded all properties that were too small to be usable, as well as streets, alleys, and expressways. R. 227-1 at 30-32, 37. Valenziano determined that the 3,386 available acres include approximately 1,900 parcels of property that

[1] The Municipal Code incorrectly refers to subsections B and C by the wrong section number.

[2] At the time Valenziano was deposed, the 500-foot buffer was codified in section 4-151-120, and so his testimony refers to that provision instead of section 17-9-0120.

meet the requirements of both sections 17-5-0207 and 17-9-0120. R. 227-1 at 30, 35.

Patricia Scudiero, the City's Zoning Administrator, R. 227-1 at 56, testified that her office received three or four telephone inquiries about whether particular addresses satisfied the zoning requirements for shooting ranges, R. 235-4 at 29. Each caller was informed that the address he or she asked about was out of compliance with either the M zoning or the 500-foot buffer. R. 235-4 at 34.

Scudiero also testified that the principal purpose of the Zoning Ordinance is to promote the health, safety, and welfare of the City's communities, R. 227-1 at 68, and M districts are areas where the City puts uses "that could have an impact on the residential communities," R. 227-1 at 69. Manufacturing districts are, therefore, the "farthest away from people's homes, school children, churches, various activities." R. 227-1 at 68-69. Scudiero testified that the involvement of guns and ammunition in gun ranges, as well as the transportation of guns and ammunition to the range, could have an impact on the health, safety, and welfare of individuals near a gun range. R. 227-1 at 69. As a result, shooting ranges are considered "high impact," and like other "uses that are high impact, the [manufacturing] district affords sort of a distance away from the residential communities in most areas of the city." R. 227-1 at 69.

The buffer zone established in section 17-9-0120 similarly serves to keep shooting ranges, which involve the movement of guns and ammunition and potential for criminal activity, away from residential uses. R. 227-1 at 74-75. It also serves to separate shooting ranges that may be close to the border in M

6

districts from certain types of businesses where "multitudes of people gather[ ], whether it be to worship, to go to school, to . . . get healthcare" and "in some cases children being involved in those assembly areas." R. 227-1 at 77. Subpart C therefore helps protect assemblies of people from the impact of any criminal activity, combustion, or other hazards that could occur at a range. R. 227-1 at 78-79.

Gun violence is a serious public health and safety problem with both social and economic consequences. R. 228-2 at 64. In Chicago, there were 506 homicides in 2012, of which 87% involved a firearm. R. 228-2 at 65. And illegal guns are often obtained by theft. In 2011 and 2012, gun store thefts in the Midwest included: 33 firearms stolen from a gun range in Hammond, Indiana, R. 228-3 at 3; 26 from a gun store in Tinley Park, Illinois, R. 228-3 at 17; 21 from the Harvey, Illinois police range, R. 228-3 at 56; 15 from a Michigan gun store, R. 228-3 at 58; 20 from a gun store in Wisconsin, R. 228-3 at 59; more than 80 from one gun store in Ohio, R. 228-3 at 60; and 58 from another Ohio gun store, R. 228-3 at 72. Similar gun thefts occurred elsewhere around the country. See, e.g., R. 228-3 at 61 (43 from a North Carolina gun store); R. 228-3 at 62 (90 from a Pennsylvania gun store); R. 228-3 at 63 (22 from a Nevada gun store); R. 228-3 at 66 (19 firearms from a North Carolina gun store); R. 227-3 at 67 (26 from the Fort Irwin Army Post in California); R. 228-3 at 69 (12 from a Florida gun store (the second time in 18 months the store had been burglarized)); R. 228-3 at 74 (10 from one Nebraska gun store, and 7 from another).

Lieutenant Kevin Johnson, a supervising sergeant of the Chicago Police

Department's Anti-Gun Enforcement ("CAGE") Team from 2008 to 2012, testified about his experience investigating illegal firearms trafficking in Chicago. R. 227-1 at 99-101. He testified that shooting ranges necessarily involve the presence of weapons and ammunition, which is an "inherent public safety issue." R. 227-1 at 132. Shooting ranges and gun stores also provide the opportunity for theft of guns from gun owners who transport guns and ammunition to and from the range. R. 227-1 at 106-07, 116. Lieutenant Johnson was aware of several instances when his team traced a gun recovered in a crime and the original owner claimed it was lost or stolen from him when he went to a gun store or shooting range. R. 227-1 at 106-07. He also recalled a large number of break-ins at gun stores in recent months. R. 227-1 at 116. The 500-foot buffer in section 17-9-0120 reduces the chance that any crime associated with the range would occur near a residential area or other places where people gather for various purposes. R. 227-1 at 142.

Among other dangers at shooting ranges, fires are not uncommon in indoor ranges. R. 226-2 at 78; R. 227-3 at 35-45. And according to the National Institute for Occupational Health and Safety ("NIOSH"), shooting ranges can pose environmental risks for surrounding areas. R. 227-3 at 23. If air exhausted from a range does not properly filter lead, lead-contaminated air will be released outside a gun range building; if this is not properly managed, the exterior walls of the building and surrounding grounds and waterways can become contaminated. R. 227-3 at 23. This lead "can be re-aerosolized and result in subsequent contamination of the shooting range or other buildings, and present unwanted

hazards to humans if the range is in a populated area." R. 227-3 at 23. Used air filters from gun ranges often contain lead in sufficient quantity to classify the filter as a hazardous waste under the Resource Conservation and Recovery Act. R. 227-3 at 23-24; R. 227-2 at 40-42.

Christopher Hart is a range consultant for Action Target, which builds gun ranges, and manufactures and sells range equipment and supplies. R. 225-1 at 7. Hart has not studied whether ranges in commercial areas fare better than ranges in other areas, or what land might be available in Chicago's M zones. R. 225-2 at 98.[3] He testified that a few people had contacted him about the possibility of opening a shooting range in Chicago. R. 225-2 at 110-11. He dissuaded them with a guess about the cost of complying with regulations and the cost of real estate in Chicago. R. 225-2 at 111-12.

Deon Robuck was interested in opening a range that would be open to the public. R. 227-4 at 63-65. After discussing the idea with Hart, Robuck contacted the City and had several conversations with the zoning department as he searched for an appropriate location in an M district. R. 227-4 at 66. Through that process, he successfully found a location that satisfied the City's zoning requirements, and he was having discussions with the property owner about a lease. R. 227-4 at 67. He also began preparing a business plan, including some estimates of the cost of opening a range. R. 227-4 at 75. He put his shooting range plans on "the back

---

[3] Individual plaintiffs Joseph Brown and William Hespen, who are Chicago residents, were also unfamiliar with the location of the City's M districts. R. 232 at 6; R. 233-3 at 40.

burner" because he is working on other projects. R. 227-4 at 77-78. He believed a shooting range under Chicago's regulations could be a "profitable venture," R. 227-4 at 79, after "some years of operating," R. 227-4 at 80.

Among others who expressed interest in opening a range, one had put off shooting range plans because of the organization's priorities. R. 228-4 at 90, 92. And another, ISRA, postponed its consideration of a Chicago range because it wanted to wait for the results of this lawsuit. R. 225-3 at 56-59.

Plaintiffs hired two experts from the architectural firm of Kramer One, Inc., to evaluate the City's shooting range regulations. R. 239-1 (report). Jack Giordano, a shooting range safety and health specialist, assists range operators with safety issues at shooting ranges, including compliance with applicable federal and state health regulations. R. 239-1 at 22, 36-38. Lorin Kramer is an architect and senior principal of Kramer One, with experience designing shooting range facilities. R. 239-1 at 20. Neither Giordano nor Kramer had ever owned a shooting range, or been involved with selecting a location or the day-to-day operations of a range. R. 226-1 at 12, 16, 64-65. Kramer and Giordano have not studied the City's manufacturing districts, and do not know how much land is zoned for M, where a range could locate in Chicago, or whether the zoning ordinance makes it economically infeasible to open or operate a range. R. 226-2 at 32-33; R. 226-1 at 84-85; R. 226-4 at 85.

**District Court Decision**

On September 29, 2014, the district court ruled on the parties' cross-motions

for summary judgment.  R. 280; A1.  The court set out the framework for analyzing plaintiffs' Second Amendment claims, and stated that, for each challenged regulation, the level of scrutiny depends "on how much the ordinance affects the Second Amendment right and on whose right it affects."  R. 280 at 13; A13.  And "[t]he greater the population it affects or the heavier the burden on the right, the stricter the scrutiny."  R. 280 at 13; A13.

The court then addressed the City's two zoning restrictions.  The court found that the zoning regulations affect "the entire law-abiding adult population of [Chicago]," R. 280 at 14; A14, and "severely limit locations where firing ranges can be located," R. 280 at 15; A15.  The court stated that "the amount of acreage available" – here, 10.6% of the 32,000 acres currently zoned for business, commercial and manufacturing uses – is, "standing alone, . . . largely irrelevant." R. 280 at 15; A15.  But, considering that the City's Zoning Administrator's office had fielded three to four inquiries about opening shooting ranges at specific addresses, and determined each failed to comply with either the M zoning or the 500-foot buffer, the court believed restrictions were "closer to a 'serious encroachment on the right to maintain proficiency in firearm use' than to a 'law that merely regulate[s]' Second Amendment Activity."  R. 280 at 15; A15 (quoting Ezell I, 651 F.3d at 708).  The court ruled that the City was, therefore, required to establish "something near a 'close fit' between the zoning restrictions" and strong public interests.  R. 280 at 15; A15 (quoting Ezell I, 651 F.3d at 708-09).

The court acknowledged the dangers posed by shooting ranges, and turned

first to the requirement that shooting ranges be located in M districts. The court ruled that the City had failed to justify this restriction because the City had not shown that placing shooting ranges in M districts would "preclude theft or reduce criminal impact," or "lessen that danger." R. 280 at 16; A16. The court also ruled that the City had not presented sufficient evidence that the potential for lead contamination, fires, or explosions was a "realistic concer[n]" or "a legitimate problem." R. 280 at 17; A17.

The court then addressed the second zoning restriction, which creates a 500-foot buffer between shooting ranges and residential districts, schools, day-care, churches, liquor stores, children's activities facilities, libraries, museums and hospitals. R. 280 at 18; A18. The court compared this regulation to the laws "forbidding the carrying of firearms in sensitive places such as schools and government buildings" that the Supreme Court deemed presumptively constitutional in District of Columbia v. Heller, 554 U.S. 570, 626-27 (2008), and explained that, because the 500-foot buffer "places a meaningfully lesser burden on the exercise of the Plaintiffs' rights to maintain proficiency in the use of their firearms" than the M zoning does, it "is accordingly more easily justified." R. 280 at 18; A18. The regulation, therefore, did not need to be a "perfect fit between the City's means and its ends." R. 280 at 18; A18. Moreover, that requirement "does not strip the Plaintiffs of reasonable locations to operate a firing range." R. 280 at 18; A18.

The court also ruled that the City's regulation limiting the hours of operation

to 9:00 a.m. to 8:00 p.m. violates the Second Amendment. R. 280 at 27; A27. Although the court agreed that plaintiffs had provided "minimal evidence about any impact the regulation would impose on a range" and "that most public firing ranges utilize similar hours," R. 280 at 27; A27, the court determined that the City lacked "actual, reliable evidence" to support the hours limitation in light of secondary public safety effects because it had not shown that operating after 8:00 p.m. increased traffic, police inquiries, or crime. R. 280 at 27; A27.

The court upheld all the other challenged shooting range regulations. With respect to shooting range construction requirements, the court ruled that they pose "only a minor encumbrance on individual Second Amendment rights" and thus could be "more readily justified" under "intermediate scrutiny." R. 280 at 19; A19. Under this standard, the court upheld the requirements for ballistic-proofing walls and doors, Municipal Code of Chicago, Ill. § 13-96-1160; separate ventilation systems for each shooting range, id. § 13-96-1210(d); electrical interlocking of the supply and exhaust systems of a range, id. § 13-96-1210(e); sound limits, id. § 13-96-1200(b)(2); and the authority of the City's Commissioner of the Department of Health to promulgate rules for cleaning, sound and air quality control, and discharge of particulate matter and waste, id. § 11-4-260(b).

Similarly, the court ruled that the City's regulation of business operations posed "at most, a minor burden" on Second Amendment rights, and survived "intermediate scrutiny." R. 280 at 25; A25. The court upheld the provision barring persons under the age of 18 from gun ranges based on the dangers of lead exposure,

13

toxic fumes, noise levels, and chance of misfired or ricocheting bullets. R. 280 at 26; A26. The court also upheld the requirements that a range master be present during all operating hours of a range, Municipal Code of Chicago, Ill. § 4-151-100(b), in order to prevent harms that could occur if a range is mismanaged, R. 280 at 28; A28; and that all employees at a range have a FOID card, since that ensures that those individuals who are likely to come into contact with firearms have passed criminal history and mental illness background checks, R. 280 at 30; A30 (citing 430 ILCS 65/4).

The court rejected plaintiffs' argument that the regulations, taken together, had the cumulative impact of creating a "de facto ban on firing ranges," R. 280 at 31; A31, finding that plaintiffs had forfeited the argument by not developing it, R. 280 at 31; A31. Moreover, the City had repealed two of the regulations that plaintiffs had claimed served as the biggest impediments to gun ranges – provisions that had allowed denial of a license based on a showing of "deleterious impact," and prohibited the sale of firearms at shooting ranges. R. 280 at 31; A31.

Finally, the court rejected plaintiffs' challenge based on a First Amendment right to firearm education because the City's regulations – aimed at properly locating, constructing, and operating shooting ranges – "do not preclude or even chill" any speech involved in firearms training. R. 280 at 31-32; A31-A32.

## SUMMARY OF ARGUMENT

Under the Ordinance, those who wish to open a shooting range in Chicago have ample space in which to do so. Shooting ranges may be located on over 3,300

acres of land – more than 10% of the land zoned for all types of commercial uses – scattered around Chicago. At the same time, by keeping shooting ranges away from more populated areas, the City's zoning regulations provide a crucial measure of protection from the inherent dangers associated with firearms, including criminal and accidental misuse of firearms, as well as potential lead contamination, noise pollution, and fire hazards. Given these practical realities of shooting ranges, the City's assignment of shooting ranges to M zoning districts is constitutional.

The district court erred in ruling that the M zoning violates the Second Amendment. That zoning classification only modestly burdens Second Amendment rights, since it leaves ample space for shooting ranges. The district court, therefore, erred in applying the same degree of heightened scrutiny that this court applied to a complete ban on shooting ranges in Ezell I, which this court held was a severe burden on Second Amendment rights. 651 F.3d at 706. Intermediate scrutiny is more appropriate for a regulation such as this because it does not significantly burden Second Amendment activity. And the M zoning satisfies intermediate scrutiny. Assigning shooting ranges to M districts is substantially related to important governmental objectives. Firearms violence and illegal guns are enormous problems in Chicago. Shooting ranges, especially those that sell guns, are places where guns are kept in large quantities and therefore targeted for gun theft. They are also places with potential for flash fires, lead contamination, and noise pollution. Because of these dangers, assigning shooting ranges to M districts keeps them a safe distance from residential areas, and other places where people

congregate for social, educational, religious, and other purposes. Indeed, that is the same reason the Ordinance includes a buffer zone, which the district court agreed survives intermediate scrutiny. The M zoning serves the same purpose, and should be upheld for the same reasons.

Alternatively, the zoning regulation should be upheld on the basis that it does not substantially burden Second Amendment activity and therefore does not need to be shown to be substantially related to the City's objectives. While this court, in examining the City's former complete ban on shooting ranges in Ezell I, declined to adopt a test with a threshold inquiry into whether a regulation substantially burdens Second Amendment activity, 651 F.3d at 704 n.12; id. at 707, we urge the court to reconsider that holding and to apply that test here. A threshold substantial burden approach is particularly appropriate for firearms regulation because the standard ensures ample opportunity to exercise Second Amendment rights, while affording the government latitude to guard against the dangers of firearms activity. The government should be free to regulate in the interest of public safety to reduce firearms violence and environmental concerns, even when studies are not available to prove the efficacy of the regulations, so long as the regulations present no serious obstacle to the exercise of Second Amendment rights. Limiting shooting ranges to M districts represents just such an effort.

## ARGUMENT

——

Firearms are inherently dangerous. Accordingly, in Chicago, firearms activity at shooting ranges is regulated to ensure the safety of Chicago residents

and visitors.  Here, the district court properly upheld the vast majority of Chicago's shooting range regulations in light of the minimal burden they impose on Second Amendment activity and the important governmental objectives they advance.  The court, however, erred by invalidating the zoning regulation that assigns shooting ranges to M districts.

A summary judgment ruling is reviewed de novo.  <u>Stephens v. Erickson</u>, 569 F.3d 779, 786 (7th Cir. 2009).  Summary judgment is proper when "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In reviewing a motion for summary judgment, courts construe all facts in the light most favorable to the non-movant.  <u>Jones v. City of Springfield</u>, 554 F.3d 669, 671 (7th Cir. 2009).  Under these standards, the district court's judgment invalidating the M district zoning regulation should be reversed.

**THE CITY'S ZONING OF SHOOTING RANGES IS CONSTITUTIONAL.**

Under the Zoning Ordinance, shooting ranges may locate in M districts with a special use permit, Municipal Code of Chicago, Ill. § 17-5-0200; <u>id.</u> § 17-5-0207, at a location at least 500 feet away from residential districts, schools, day-care facilities, places of worship, museums, libraries, or hospitals, and 100 feet away from any other shooting range, <u>id.</u> § 17-9-0120.  Even in combination, the two zoning provisions leave 3,386 acres of property, and approximately 1,900 parcels, where ranges can locate.  R. 227-1 at 29-30.  Those who wish to operate or use a shooting range thus have ample space in which to do so.  And the M zoning serves

important public safety objectives by keeping shooting ranges at a distance from residential areas and other places where people congregate. The zoning regulation does not, therefore, run afoul of the Second Amendment.

As we explain below, because the M zoning regulation imposes only a modest burden on Second Amendment rights, the appropriate standard of review under Ezell I was intermediate scrutiny. The district court believed there was a "substantial encumbrance on individual Second Amendment rights" and demanded a "close fit" between the M zoning and the public interests it serves. R. 280 at 15 (citing Ezell I, 651 F.3d at 708-09). This was legal error. And the zoning regulation easily passes muster under intermediate scrutiny because assigning shooting ranges to M districts is substantially related to the City's important governmental objectives of keeping high impact, potentially dangerous firearms activity away from residential and more densely populated commercial areas.

Alternatively, this court should reconsider its rejection of a test that rules out Second Amendment challenges at the threshold when the regulations do not substantially burden the exercise of Second Amendment rights. That approach is appropriate for laws that merely regulate, rather than completely ban, firearms activity because it affords latitude to the government to vigorously regulate in the interests of public safety – even when studies and empirical evidence may not be available to prove the effect of the specific regulation – when such regulation does not prevent, or even seriously hamper, the exercise of Second Amendment rights. The zoning regulation that assigns shooting ranges to M districts easily passes

muster under this substantial burden test.

## A. The City's Zoning Of Shooting Ranges Imposes A Modest Burden On Second Amendment Rights.

As this court set forth the analytical framework for Second Amendment claims in <u>Ezell I</u>, there is a two-step inquiry to assess the constitutionality of regulation. 651 F.3d at 701-03. The first step – which requires a determination whether the regulated activity is within the Amendment's "scope" based on a "textual and historical inquiry" into the Amendment's "original meaning," <u>id.</u> – is not at issue here. This court determined in <u>Ezell I</u> that target practice is within the scope of Second Amendment protection. <u>Id.</u> at 706.

If the activity falls within the Amendment's scope, the court moves on to the second step: selecting, and then applying, "an appropriate standard of review." <u>Ezell I</u>, 651 F.3d at 706. This court takes a sliding-scale approach to the level of scrutiny for Second Amendment claims. A "severe burden" on the core Second Amendment right of armed self-defense "will require an extremely strong public-interest justification and a close fit between the government's means and its ends." <u>Id.</u> at 708. On the other hand, laws "restricting activity closer to the margins" of the right, "laws that merely regulate rather than restrict," or that impose "modest burdens" on the right, "may be more easily justified." <u>Id.</u> How much more easily justified depends on "the relative severity of the burden and its proximity to the core of the right." <u>Id.</u>

This court applied a standard of "not quite 'strict scrutiny'" to a complete ban on all shooting ranges. <u>Ezell I</u>, 651 F.3d at 708. In light of the ruling in <u>Ezell I</u>, the

City amended the Ordinance to permit shooting ranges, subject to regulations to protect the public health, safety and welfare. The level of scrutiny should be adjusted accordingly. As a mere regulatory measure and not a ban, the Ordinance is in the category that the court described as "more easily justified," id. This court should apply, at most, the form of intermediate scrutiny this court has applied to other firearms restrictions that regulate but do not ban activity falling within the Second Amendment. See, e.g., United States v. Skoien, 614 F.3d 638, 641 (7th Cir. 2010) (en banc); United States v. Williams, 616 F.3d 685, 692-93 (7th Cir. 2010). Other circuits, too, have routinely applied intermediate scrutiny to laws that regulate Second Amendment activity. National Rifle Association v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 700 F.3d 185, 206-07 (5th Cir. 2012) (applying intermediate scrutiny to age restriction on gun sales); United States v. Masciandaro, 638 F.3d 458, 470-71 (4th Cir. 2011) (applying intermediate scrutiny to prohibitions on loaded guns in national parks); United States v. Marzzarella, 614 F.3d 85, 96-97 (3d Cir. 2010) (applying intermediate scrutiny to laws prohibiting guns with obliterated serial numbers).

The district court applied a more stringent level of scrutiny, stating that the combined effect of the two zoning provisions was to "ban[ ] firing ranges from nearly 90% of the land zoned for business, commercial, and manufacturing uses," which the court believed was a "serious encroachment on the right to maintain proficiency in firearm use." R. 280 at 15; A15. But on that theory, every regulation is a ban on the conduct that the regulation does not permit. A law that allows an activity in

one location and not another is, instead, properly characterized as a regulation of

the place of the activity, which is a time, place, and manner regulation.  See, e.g.,

City of Renton v. Playtime Theaters, 475 U.S. 41, 46 (1986).  And, regardless of the

terminology, the focus should remain on whether the regulation leaves sufficient

opportunity to exercise Second Amendment rights – and a regulation that does

cannot be considered a severe burden.

As the district court acknowledged, the City's zoning restrictions, taken

together, allow shooting ranges to locate on more than 10% (3,386 of the 32,000

acres) of land zoned for all business, commercial, and manufacturing uses, and

approximately 1,900 parcels of property.  R. 224 at 7; R. 280 at 15; A15.[4]  This is six

times as much as much as the land available for adult uses in Renton, 475 U.S. at

54 (520 acres), and twelve times as much as the land available for adult uses in

North Avenue Novelties v. City of Chicago, 88 F.3d 441, 445 (7th Cir. 1996) (270

acres); and both of those zoning regulations were upheld against First Amendment

challenges.  Moreover, the percentage of all the land in Chicago land that is

available for shooting ranges – 2.2 %, R. 232 at 16 ¶ 30 – falls within the same

range as the percentage available for adult uses in North Avenue Novelties –

according to different experts, somewhere between "less than one percent" and 3%,

88 F.3d at 445.  Like the ordinances at issue in Renton and North Avenue

Novelties, the M zoning allows for reasonable opportunity to engage in

---

[4]  These figures exclude land used for streets, alleys, and expressways, as
well as properties that are too small to be usable.  R. 227-1 at 30-32, 37.

constitutionally protected activity.

Indeed, the district court itself appeared to recognize that what it characterized as a "ban[ ] from nearly 90% of the land" did not alone demonstrate a severe burden. R. 280 at 15; A15 (ruling that amount of acreage is "largely irrelevant"). The court looked to other evidence – namely, Scudiero's testimony that, between July 6, 2011 and October 5, 2012, the Zoning Administrator's office fielded approximately three to four inquiries about opening a shooting range at specific addresses, and each caller was informed that the particular address he asked about did not comply with the zoning requirements. R. 280 at 15; A15 (citing R. 231 ¶ 77); see also R. 235-4 at 34. This testimony cannot bear the significance the court gave it. As a matter of law, a few phone inquiries about non-compliant locations do not even demonstrate that anyone made a serious effort to find property that would comply with the zoning requirements, much less that the compliant locations that do exist in M districts are not suitable. Indeed, one of Action Target's potential customers, Robuck, testified that he called the Zoning Administrator's office several times to check the zoning of potential locations for a shooting range and that he found a place that "fit within the ordinance." R. 227-4 at 67. Robuck's testimony is the only evidence of anyone who actually tried to find an appropriate location. Plaintiffs identified no one else who even searched for property in the 3,386 acres of land available for ranges in M districts and could not find a suitable location.

Under these circumstances, the district court erred in determining that the

Ordinance imposed a "substantial encumbrance" on Second Amendment rights. The Ordinance does not severely burden Second Amendment rights, but "merely regulates rather than restricts" and imposes "modest burdens on the right," Ezell I, 651 F.3d at 708. It is therefore "more easily justified," id., under some form of intermediate scrutiny, id. at 706. And it easily survives such an analysis, as we now explain.

### B. The M Zoning Is Substantially Related To Important Public Health And Safety Objectives.

The M zoning easily passes intermediate scrutiny. As this court has articulated the standard for intermediate scrutiny in Second Amendment cases, firearms regulations are justified so long as they are "substantially related to an important government objective." Skoien, 614 F.3d at 641; see also Williams, 616 F.3d at 692. In applying this standard, this court recognized that "Heller did not suggest that [a regulation] would be effective only if the statute's benefits are first established by admissible evidence." Skoien, 614 F.3d at 641. Similarly, there is no requirement that the government supply "proof, satisfactory to a court," that a regulation is "vital to the public safety." Id. And in the First Amendment context, the Supreme Court has explained that intermediate scrutiny requires that the fit between a regulation and the government's objectives be, not "perfect, but reasonable," and that the regulation "represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served.'" Board of Trustees of State University of New York v. Fox, 492 U.S. 469, 480 (1989) (citation omitted). See also Turner Broadcasting System, Inc. v. FCC, 520 U.S. 180, 211

(1997) (government not required to prove that it is "correct as an objective matter" but "whether the legislative conclusion was reasonable and supported by substantial evidence."). The government may instead rely on "studies and anecdotes pertaining to different locales altogether," as well as "history, consensus, and simple common sense." Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 555 (2001).

The purposes of the City's zoning ordinance include "promoting the public, health, safety and general welfare," Municipal Code of Chicago, Ill. § 17-1-0501; "preserving the overall quality of life for residents and visitors," id. § 17-1-0502; "protecting the character of established residential neighborhoods," id. § 17-1-0503; and "maintaining orderly and compatible land use and development patterns," id. § 17-1-0508. It is beyond dispute that the City's public health and safety objectives are important governmental interests. State and local governments "traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." Metropolitan Life Insurance Co. v. Massachusetts, 471 U.S. 724, 756 (1985) (citations omitted). And "[t]he legitimate and compelling state interest in protecting the community from crime cannot be doubted." Schall v. Martin, 467 U.S. 253, 264 (1984) (citation omitted). See also United States v. Salerno, 481 U.S. 739, 750 (1987) (government's interest in protecting community from crime "compelling"); Skoien, 614 F.3d at 642 ("No one doubts that the goal of . . . preventing armed mayhem is an important governmental objective."). The City also has an interest in regulating the use of its

land to allow for the compatible arrangement of uses of all kinds.  <u>Civil Liberties for</u> <u>Urban Believers v. City of Chicago</u>, 342 F.3d 752, 765 (7th Cir. 2003) ("There is no question that Chicago – like any population center – has a substantial interest in regulating the use of its land and that [the zoning code] promotes that interest.").

The M zoning designation for shooting ranges promotes public health and safety in several ways.  That is, high-intensity uses are placed in manufacturing districts, which are typically located significant distances from residential and attendant uses.  R. 227-1 at 60.  Because ranges necessarily involve the use of firearms and ammunition – and their transportation to and from the range – the City classifies ranges in a manner similar to other uses, like manufacturing, that may heavily impact people in the area, and treats them like those similar, high-impact uses.  R. 227-1 at 69.

Indoor shooting ranges are properly treated like other high-impact uses because they pose a variety of dangers beyond their four walls that justify distancing them from residential areas, and other places where people gather, or which draw pedestrian traffic.  For starters, fires, lead hazards, and noise pollution from a shooting range can affect the surrounding area, especially if the range is poorly constructed or not operated properly.  R. 226-2 at 78; R. 227-3 at 23, 35-45; R. 227-2 at 45; R. 227-3 at 23-24.  As publicized in a NIOSH alert, lead-contaminated air can pollute surrounding areas if lead is not properly filtered from a range ventilation system, and thus will "present unwanted hazards to humans if the range is in a populated area." R. 227-3 at 23.  The NIOSH notice is sufficient to

alert the government to the potential for such harm, and to justify placing shooting ranges away from more populated areas to prevent it.

In addition, shooting ranges and gun stores that store a large number of firearms are often targeted for theft. R. 228-3 at 3-75; R. 227-1 at 116. And shooting ranges in Chicago are permitted to sell guns. Municipal Code of Chicago, Ill. § 4-151-170. When break-ins occur at shooting ranges or gun stores, dozens of guns may be obtained at a time. See, e.g., R. 228-3 at 17 (26 guns stolen), 60 (80 guns stolen), 61 (43 guns stolen), 62 (90 guns stolen), 67 (26 guns stolen), 72 (58 guns stolen). In 2012, for example, 16,667 guns were reported lost or stolen from dealers across the country. Tracing the Guns: The Impact of Illegal Guns on Violence in Chicago, City of Chicago – Office of the Mayor & Chicago Police Department (May 27, 2014), at 10 (available at http://www.cityofchicago.org/dam/ city/depts/mayor/Press%20Room/Press%20Releases/2014/May/05.27.14TracingGuns .pdf) (citing ATF 2012 Summary: Firearms Reported Lost or Stolen, at 4) (available at https://www.atf.gov/sites/default/files/assets/Firearms/2012-summary-firearms-reported-lost-and-stolen-2.pdf)) (last visited Jan. 2, 2015). Patrons at shooting ranges may also be targeted for theft. R. 227-1 at 106-07. In short, there is substantial evidence that gun ranges and stores attract criminals who will illegally obtain firearms. The M zoning guards against the prospect of criminals with large caches of firearms being immediately present in residential and more densely populated commercial areas.

The district court agreed that these concerns justify the other zoning

restriction on shooting ranges – the provision that creates a 500-foot buffer between shooting ranges and residential uses, schools, day-care facilities, places of worship, premises licensed for the retail sale of liquor, children's activities facilities, libraries, museums, and hospitals. R. 280 at 17-18; A17-18. The M zoning and the buffer zone are but two ways to get at the same objective – putting distance between shooting ranges and residential or more populated commercial areas. The zoning provision assigning shooting ranges to M districts, therefore, survives intermediate scrutiny for the same reason as the 500-foot buffer does.

In a facial challenge to a similar regulation of zoning of gun stores in California, the district court upheld the regulation based on the same sort of public safety objectives. See Teixeira v. County of Alameda, No. 12-CV-03288, 2013 WL 4804756 (N.D. Cal. Sept. 9, 2013). There, the regulation required gun stores to be 500 feet away from any residential district, school, other gun store or establishment that sells liquor. Id. at *1. The court explained that the regulation served the governmental objectives of "public safety and preventing harm in populated, well-traveled, and sensitive areas," as well as "preserving the character of residential zones." Id. at *7. See also Hall v. Garcia, No. 10-03799, 2011 WL 995933, *4-*5 (N.D. Cal. March 17, 2011) (upholding 1000-foot gun-free zone around school).

The opinion of plaintiffs' experts, Giordano and Kramer, that nearby uses "would be unaffected by the shooting range operations" because they are "fully enclosed," R. 239-1 at 15, does not change this. They lacked relevant experience to opine on the adverse effects of shooting ranges on the surrounding community,

since neither had ever owned a shooting range, or been involved with selecting a location for or the day-to-day operations of a range.  R. 226-1 at 64-65; R. 226-1 at 12, 16.  Being fully enclosed does not eliminate the possibility of fire, lead hazards, and noise pollution in the surrounding community, particularly when gun ranges are mismanaged or fall into disrepair.  Nor does enclosure eliminate the potential for gun thefts.  And, in any event, under intermediate scrutiny, the government satisfies its burden even when one can "draw[ ] two inconsistent conclusions from the evidence."  Turner, 520 U.S. at 211.  For instance, in DiMa Corp. v. Town of Hallie, 185 F.3d 823 (7th Cir. 1999), this court ruled that the plaintiff's counter-evidence about the relationship between hours of operation of an adult bookstore and crime was "irrelevant to the question of whether there is some evidence that does support the Board's conclusion," id. at 831.  The court explained that its task was not to "discover the objective truth," but only to ensure that there was evidence to support the government's position.  Id.; see also G.M. Enterprises, Inc. v. Town of St. Joseph, 350 F.3d 631, 639 (7th Cir. 2003) (affirming summary judgment for town even though plaintiff's evidence "arguably undermin[ed] the Town's inference of the correlation of adult entertainment and adverse secondary effects").

The district court ruled that, in order to justify the zoning based on criminal activity or environmental impact, the City would have to meet an evidentiary standard similar to the one used in cases involving First Amendment challenges to zoning of adult uses, which are typically justified based on the secondary effects of those businesses.  R. 280 at 17; A17 (citing City of Los Angeles v. Alameda Books,

Inc., 535 U.S. 425, 438 (2002)).  Thus, the court believed that the City was required to prove that "any criminal impact would occur due to the presence of a firing range or that it would be lessened by placing ranges in manufacturing districts," R. 280 at 16; A16, and supply "actual reliable evidence that showed" any potential environmental hazards were "a legitimate problem," R. 280 at 17; A17.  That is incorrect.  The City was not required to prove that the M zoning "would lessen the danger."  R. 280 at 6.  In the First Amendment context, the Supreme Court has rejected the idea that the government must prove, "with empirical data, that its ordinance will successfully lower crime."  Alameda Books, 575 U.S. at 439.  As the Court explained, "A municipality considering an innovative solution may not have data that could demonstrate the efficacy of its proposal because the solution would, by definition, not have been implemented previously."  Id. at 439-40.  Evidence that "fairly support[s] the municipality's rationale" for its ordinance is all that is required.  Id. at 438.  And here the City's evidence of gun thefts, lead contamination, and fires fairly supports placing shooting ranges away from more populated areas.

To be sure, in cases involving zoning of adult uses, zoning ordinances have been upheld on the strength of studies showing the effect of such uses on crime in the surrounding community.  See, e.g., Alameda Books, 535 U.S. at 430; Renton, 475 U.S. at 51-52.  But that does not mean the same kind of studies should be required in the Second Amendment context.  Adult books and entertainment, unlike guns, are not inherently dangerous.  Indeed, speech that does present an immediate

threat of violence, such as fighting words, Chaplinsky v. New Hampshire, 315 U.S. 568, 473-74 (1942), or words inciting imminent lawless action, Brandenburg v. Ohio, 395 U.S. 444, 447-49 (1969), are categorically excluded from First Amendment protection, see United States v. Stevens, 559 U.S. 460, 468 (2010). Speech that is protected has a "far more tenuous relation to concrete harms inflicted on others than the right to keep and bear arms." Lawrence Rosenthal, The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control 42 (available at http://ssrn.com/abstract=2414681) (last visited Jan. 2, 2015). See also Gregory P. Magarian, Speaking Truth to Firepower:  How the First Amendment Destabilizes the Second, 91 Tex. L. Rev. 49, 70 (Nov. 2012) ("Speech and guns cause different sorts of harms," which "justifies, indeed compels, distinct sorts of procedural restrictions on government regulation."). Thus, the reason the secondary effects of adult uses need to be shown through some evidence is that it is not readily apparent that adult uses have the potential to endanger the surrounding community.  Because it is apparent that guns do, empirical analysis is less important.  Indeed, the Court cautioned that its opinion in Heller should not be read to "cast doubt" on various "longstanding" restrictions, which are "presumptively lawful," id. at 626-27 & n.26, including laws prohibiting the carrying of firearms in "sensitive places such as schools and government buildings," and "laws imposing conditions and qualifications on the commercial sale of arms," 554 U.S. at 626-27 & n.26.  The Court could not have presumed these laws to be constitutional if the government were required to first provide studies and

empirical proof that those measures would serve to reduce gun violence. The presumption, instead, is easily explained by substantial deference to common-sense laws designed to protect people from death and injury, particularly when those laws do not substantially burden Second Amendment rights.

The quantum of evidence necessary to justify firearms regulations should, therefore, be informed by the nature of Second Amendment activity. Firearms are inherently dangerous. Guns are designed to kill, and they do so every day. See, e.g., Michael Planty & Jennifer L. Truman, Firearm Violence, 1993-2011, Bureau of Justice Statistics Special Report (May 2013), at 1 (available at http://www.bjs.gov/content/pub/pdf/fv9311.pdf) (last visited Jan. 2, 2015) (reporting 11,101 firearms homicides in 2011). People are shot on purpose, see id., and accidentally, see, e.g., David Hemenway, Private Guns, Public Health 27 (2006) (between 1965 and 2000, more than 60,000 Americans died from unintentional shootings). And it happens at shooting ranges, too. See Ezell I, 651 F.3d at 714 (Rovner, J., concurring) ("gun owners manage to shoot themselves and others" in "myriad ways" at shooting ranges). And shootings frequently involve stolen and illegally purchased guns. R. 228-2 at 70-71.

Whether shootings are the result of crimes or accidents, firearms violence is a serious problem, and the solution is complicated. Given the ever-present potential for either intentional or accidental misuse of firearms, the government should be afforded wide latitude in regulating commercial firearms activity, even before it is able to conduct studies to show that a firearms regulation will definitively reduce

firearms violence.  As the Court held in <u>Heller</u>, the Second Amendment "leaves
[cities] a variety of tools for combating" gun violence.  554 U.S. at 636.  <u>See also</u>
<u>McDonald v. City of Chicago</u>, 561 U.S. 742, 784-85 (2010) (Second Amendment "by
no means eliminates" the ability of cities "to devise solutions to social problems that
suit local needs and values" but allows "state and local experimentation with
reasonable firearms regulations [to] continue").

It is thus wholly appropriate for the City to rely on the numerous examples of
firearm theft and fires at gun ranges.  It is also proper to rely on federal
government alerts about potential lead hazards.  This evidence, combined with the
reality that exposure to these dangers can be reduced by placing shooting ranges at
a distance from residential and more densely populated commercial areas,
demonstrates that assigning shooting ranges to M districts is reasonable and
supported by substantial evidence.  The zoning regulation, therefore, is justified
under intermediate scrutiny.

## C.     Alternatively, A Threshold Showing Of A Substantial Burden Should Be Required For A Second Amendment Claim.

As we explain above, the zoning regulation restricting shooting ranges to M
districts imposes only a modest burden on Second Amendment rights.  Other courts
considering Second Amendment challenges have rejected them based on that
showing alone.  For example, as this court observed in <u>Ezell I</u>, the Ninth Circuit in
<u>Nordyke v. King</u>, 644 F.3d 776 (9th Cir. 2011), applied a "gatekeeping 'substantial
burden' test" before applying "some form of heightened judicial review," <u>Ezell I</u>, 651

F.3d at 704 n.12.  In <u>Ezell I</u>, this court differentiated its approach for analyzing

laws affecting Second Amendment rights, <u>id.</u>, and also declined to adopt the similar

"undue burden" test from abortion cases, finding "First Amendment analogues are

more appropriate," <u>id.</u> at 706.  <u>Ezell I</u>, however, involved a very different restriction

on Second Amendment activity – a complete ban on shooting ranges, which this

court held was "a serious encroachment on the right to maintain proficiency in

firearm use." <u>Id.</u> at 708.  Since this case involves mere regulation of the location of,

rather than a ban on, target practice, we urge this court to adopt instead a

threshold requirement of a showing of a substantial burden on the exercise of

Second Amendment rights before the government must justify its regulatory

measure.

The substantial burden test has been applied in a variety of constitutional

contexts.  For example, the Supreme Court applied that test under the Free

Exercise Clause in <u>Wisconsin v. Yoder</u>, 406 U.S. 205 (1972).  There, the Court first

determined that a law requiring compulsory education until age 16 "would gravely

endanger if not destroy the free exercise of respondents' religious beliefs," <u>id.</u> at 219,

before considering the State's justifications and ultimately holding the law

unconstitutional, <u>id.</u> at 219-35.  <u>See also</u> <u>Sherbert v. Verner</u>, 374 U.S. 398, 403-04

(1963) (inquiring first whether facially neutral law imposes undue pressure on

religious adherence before requiring justification).[5]  Moreover, only when a law

---

[5]  In <u>Employment Division v. Smith</u>, 494 U.S. 872 (1990), the Court ruled
that this standard is not appropriate for neutral laws of general applicability, but
did not question its continued application in areas where the Court had applied it,

"necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable" is there a substantial burden. <u>Civil Liberties for Urban Believers</u>, 342 F.3d at 761. In <u>Zablocki v. Redhail</u>, 434 U.S. 374 (1978), the Court applied strict scrutiny only after first determining that the law there "clearly does interfere directly and substantially with [a fundamental] right" to marry, <u>id.</u> at 387, and explained that "reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed," <u>id.</u> at 386-87 (citations omitted). Consistent with this, the Court has held that laws imposing less severe burdens on marriage are constitutional for that reason alone. <u>See</u> <u>id.</u> at 387 n.12 (distinguishing <u>Califano v. Jobst</u>, 434 U.S. 47 (1977)). The Court has applied a similar standard in cases involving voting rights. <u>See</u> <u>Bullock v. Carter</u>, 405 U.S. 134, 144 (1972) ("not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review," but statutes with "a real and appreciable impact on exercise of the franchise" are subject to close scrutiny). And, in <u>Planned Parenthood of Southeast Pennsylvania v. Casey</u>, 505 U.S. 833 (1992), the Court adopted a similar approach for legislation regulating abortions. Such regulation is judged by "the undue-burden standard," <u>id.</u> at 876, and under that standard, "not every law which makes a right more difficult to exercise is, ipso facto, an infringement of that right," <u>id.</u> at 873. Instead, an undue burden exists only where the "purpose or

namely, to state unemployment compensation rules allowing individualized determinations, <u>see</u> <u>id.</u> at 883.

effect" of a law is to place "a substantial obstacle in the path" of a woman exercising the constitutional right to an abortion.  Id. at 877.

In each context, courts recognize that competing and legitimate government interests may make the exercise of a constitutional right more difficult.  But, so long as the constitutional right is not substantially restricted, the regulation is upheld without a showing of justification by the government.

The substantial burden test is wholly appropriate for firearms regulations. As this court observed in Ezell I, the Supreme Court has developed an array of tests short of strict scrutiny that will apply in the First Amendment context depending on the type of speech at issue, as well as the extent, location, and nature of the restriction.  See 651 F.3d at 707 (discussing Supreme Court's various tests for content-based regulations, speech in public forums, political speech, commercial speech, voting rights, and adult bookstores).  And the precise test is informed by the tradition and the fundamental purpose of the First Amendment – to "preserve an uninhibited marketplace of ideas in which truth will ultimately prevail," FCC v. League of Women Voters, 468 U.S. 364, 377 (1984).  An appropriate test for judging Second Amendment claims should likewise be tailored to its own tradition and purpose.  After all, the Second Amendment protects the right to have firearms for particular, defensive purposes, see Heller, 554 U.S. at 635, and is not grounded on a principle, similar to the First Amendment, that encourages as much firearms activity as possible.  Otherwise, Heller's presumptive approval of keeping guns out of schools and government buildings, 554 U.S. at 626-27, would be impermissible.

Certainly, under the First Amendment, the government could not presumptively jettison all speech in schools or government buildings the way that the Court suggested all guns could be prohibited at those places.

Historically, a host of stringent restrictions on firearms activity, including on target practice in particular, have co-existed with the right to keep and bear arms. See, e.g., Ezell I, 651 F.3d at 705 (citing 1746 Boston statute limiting target practice to "lower End of the Common" or "Several Batteries in" Boston with certain official's permission); id. at 705 n.13 (listing other 18th- and 19th-century ordinances requiring licenses or permission for target practice).[6]  Indeed, 18th- and 19th-century regulations included several statutes that broadly prohibited the discharge of firearms altogether, for fire-suppression and other public safety purposes.  Id. at 706.  The substantial burden test is a good match with this historical acceptance of rigorous regulation of firearms activity, including restrictions on the location of target practice, because it allows the government latitude to regulate in the interest of public safety while simultaneously ensuring that no serious obstacles prevent the exercise of Second Amendment rights.

The substantial burden test has been applied to firearms regulations in two other circuits.  As this court observed in Ezell I, the Ninth Circuit applied this test to an ordinance that restricted gun shows on county property in Nordyke, 644 F.3d

---

[6] For a compilation of firearms laws enacted before the 20th century, see Mark Frasetto, Firearms & Weapons Legislation Up to the Early Twentieth Century (available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2200991) (last visited Jan. 2, 2015).

at 780.  In that case, the court rejected Second Amendment challenges based solely on its conclusion that the gun show restrictions did not "substantially burden the right to keep and bear arms."  Id. at 786.  The panel decision was later vacated and, after the appeal was heard en banc, the en banc majority similarly upheld the ordinance because the ordinance regulated gun shows "only minimally and only on county property."  Nordyke v. King, 681 F.3d 1041, 1044 (9th Cir. 2012) (en banc). The court rejected the Second Amendment claim on that basis alone, id., without requiring any empirical support justifying the regulation.

The Second Circuit followed the same approach in United States v. Decastro, 682 F.3d 160 (2d Cir. 2012).  That court upheld a federal statute prohibiting the transportation of a firearm bought in one state into the purchaser's state of residence, explaining that the statute "does not substantially burden the fundamental right to obtain a firearm for self-defense, and attempts only to assist states in enforcement of their own gun laws," and so "it does not infringe the Second Amendment right to keep and bear arms."  Id. at 168-69.  The court emphasized that, in Heller, the Supreme Court had cautioned that its opinion did not cast doubt on "laws prohibiting the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."  Id. at 165 (quoting Heller, 554 U.S. at 626-27).  And, as the court further explained, "the natural explanation" for the presumptive lawfulness of such regulations is that time, place and manner restrictions may not significantly impair the right to possess a firearm for self-defense, and may impose

no appreciable burden on Second Amendment rights."  <u>Id.</u>

We urge the court to follow the same approach as these courts and adopt a test under which regulations that do not substantially burden activity at the core of the Second Amendment are upheld without requiring evidence of justification by the government.  And here, as we explain in Part A, the M zoning places no substantial burden on target practice, much less makes the exercise of a constitutional right "effectively impracticable," <u>Civil Liberties for Urban Believers</u>, 342 F.3d at 761.  Potential shooting range operators have more than 3,300 acres of property to set up their businesses for use by those wishing to develop, maintain, or improve their shooting proficiency.  And Robuck's experience demonstrates that appropriate locations can be found within that space.  R. 227-4 at 67.  As in <u>North Avenue Novelties</u>, a zoning restriction should be upheld where "[t]here was no evidence that any person has attempted to open [a business], but was prevented from doing so by Chicago's ordinance."  88 F.3d at 445.

## CONCLUSION

The district court's invalidation of the City's M zoning for shooting ranges should be reversed and judgment entered for the City.

Respectfully submitted,

STEPHEN R. PATTON
Corporation Counsel
 of the City of Chicago

 /s/Suzanne M. Loose
SUZANNE M. LOOSE
Senior Counsel
30 North LaSalle Street, Suite 800
Chicago, IL 60602
(312) 744-8519

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)(B)(i)

In accordance with Fed. R. App. P. 32(a)(7)(C)(i), I certify that the Brief and Appendix of the Defendant-Appellant complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 10,198 words, beginning with the words "JURISDICTIONAL STATEMENT" on page 1 and ending with the words "Respectfully submitted" on page 39. In preparing this certificate, I relied on the word count of the word-processing system used to prepare the brief, which was WordPerfect 12.

/s Suzanne M. Loose
SUZANNE M. LOOSE, Attorney

## CERTIFICATE OF COMPLIANCE WITH SEVENTH CIRCUIT RULE 30

In accordance with Seventh Circuit Rule 30(d), I certify that of the materials required by parts (a) and (b) of that rule are included in appendix to this brief.

/s Suzanne M. Loose
SUZANNE M. LOOSE, Attorney

## CERTIFICATE OF SERVICE

I certify that on January 2, 2015, I electronically filed the attached Brief and Appendix of Defendant-Appellant with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. Participants in this appeal are registered CM/ECF users who will be served by the CM/ECF system on January 2, 2015.

/s Suzanne M. Loose
SUZANNE M. LOOSE, Attorney

---

# APPENDIX

---

# TABLE OF CONTENTS TO THE APPENDIX

———————

Memorandum Opinion & Order,
     September 29, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1

District Court Judgment,
     September 29, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A33

Ordinances Involved . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A35

Use Table for M districts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A36

Zoning Map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A40

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| RHONDA EZELL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | 10 C 5135 |
| | ) | |
| CITY OF CHICAGO, | ) | Judge Virginia M. Kendall |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Chicago residents Rhonda Ezell, Joseph Brown, and William Hespen, along with
organizations, Action Target, Inc., Second Amendment Foundation, Inc., and the Illinois State
Rifle Association brought this action against the City of Chicago, alleging that various
regulations within the Municipal Code of Chicago ("MCC") regarding firing range facilities are
unconstitutional. The Plaintiffs claim that the challenged regulations burden the installation of a
range and therefore violate their Second Amendment right to acquire and maintain proficiency in
the use of firearms. *See Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("The right to
possess firearms for protection implies a corresponding right to acquire and maintain proficiency
in their use; the core right wouldn't mean much without the training and practice that make it
effective."). The Plaintiffs specifically challenge eleven remaining regulations[1] generally falling

---

[1] A number of the Plaintiffs' claims were mooted by the City's amendments to its regulations, including the
June 25, 2014 passage of the Authorizing Amendment of Municipal Code Titles 2, 4, 8, 13, 15, and 17 Concerning
Sale and Transfer of Firearms. *See* Dkt. 278; *see also Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F.
Supp.2d 928, 947 (N.D. Ill. 2014) (holding City's banning of gun sales and transfers unconstitutional). The
Plaintiffs' claims regarding MCC §§ 4-151-030(f) ("deleterious impact" standard for denying firing range
application); 8-20-100(a) (ban on firearm sales at ranges); 13-96-1190(c)(2)(d) (hazardous storage facility
requirement); 13-96-1200(b)(2) (smooth yet also sound absorbing construction requirement); 13-96-1200(b)(7)

into three categories: (1) zoning restrictions; (2) construction requirements; and (3) business operations. The Plaintiffs maintain that each challenged regulation is unconstitutional by itself, but alternatively argue that the cumulative effect of the regulations creates a *de facto* ban on firing ranges within the City. Additionally, the Plaintiffs allege that the regulations unconstitutionally infringe upon their First Amendment right to free speech. Both parties have moved for summary judgment. For the following reasons, the Plaintiffs' Motion for Summary Judgment (Dkt. 230) is granted in part and denied in part and the City's Motion for Summary Judgment (Dkt. 222) is granted in part and denied in part. The City's Motion to Dismiss Claims as Moot (Dkt. 269) is itself dismissed as moot pursuant to the parties' joint statement regarding remaining claims (Dkt. 278).

## FACTS

### A. Parties

Rhonda Ezell, Joseph Brown, and William Hespen are Chicago residents who want access to a firing range within the city. (Def. 56.1 St. ¶¶ 1-3; Pl. 56.1 St. ¶¶ 1, 2, 4). Action Target designs, builds, and furnishes firing ranges throughout the United States. (Def. 56.1 St. ¶ 4). The Second Amendment Foundation and the Illinois Rifle Association are nonprofit organizations that advocate for Second Amendment rights and the members of the organizations are firearms enthusiasts. (Def. 56.1 St. ¶¶ 5-6). The Illinois Rifle Association is interested in bringing a mobile firing range to Chicago; however, it is concerned with the current state of regulations and has yet to determine what a range in Chicago would cost. (*Id.*; Pl. 56.1 St. ¶ 5).

After the Seventh Circuit concluded that the Plaintiffs had a strong likelihood of success on their claim that a blanket ban on firing ranges within the City was unconstitutional, *see Ezell*

---

(sloped floor requirement); 13-96-1220(b) and (c) ("wet cleaning" requirement); and 4-151-170(b) (ammunition retention requirement) are no longer at issue.

*v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), the City enacted a comprehensive regulatory scheme encompassing licensing provisions, construction requirements, environmental regulations, and zoning restrictions for firing ranges on July 6, 2011. (Def. 56.1 St. ¶ 9). The regulations were amended on September 8, 2011, January 17, 2013, September 11, 2013, and June 25, 2014. (*Id.*; *see also* Dkt. 278). While short of a complete ban on ranges, the Plaintiffs challenge the constitutionality of a number of the City's regulations.

### B. Zoning Restrictions

Under MCC § 17-5-0207, firing ranges may only be located in a manufacturing district as a special use. (Def. 56.1 St. ¶ ¶ 12, 16). The special use process requires a public hearing before the City's Zoning Board of Appeals to determine whether the use should be allowed. (Def. 56.1 St. ¶ 16; Pl. 56.1 St. ¶ 75). Section 17-9-0120 further provides that shooting ranges may not be located within 100 feet of another shooting range; 500 feet of any residential zoning district; or 500 feet of any pre-existing school, day-care facility, place of worship, premises licensed for the retail sale of liquor, children's activities facility, library, museum, or hospital. (*Id.*). Of the 32,000 acres zoned for business, commercial, and manufacturing uses, 3,386 acres of property meet the requirements of Sections 17-5-207 and 17-9-0120. (Def. 56.1 St. ¶ 14).

Patti Scudiero, the City's Zoning Administrator, testified that the City imposes zoning restrictions because the transportation and use of guns and ammunition could have an impact on the health, safety, and welfare of individuals surrounding a gun range. (Def. 56.1 St. ¶ 16). As a result, the City considers firing ranges to be "high impact," and restricting range locales to manufacturing districts offers "a distance away from the residential communities in most areas of the city." (*Id.*). The parties do not dispute that lead-contaminated air released outside a firing range and left unmanaged can contaminate waterways and pose hazards to people if the range is

located in a populated area. (Def. 56.1 St. ¶ 20; Dkt. 227, Ex. 24, Nat. Inst. for Occ. Health and Safety ("NIOSH") Alert Apr. 2009 at 15). Accordingly, the parties agree that ranges are compatible with industrial use, but the Plaintiffs maintain that ranges are also compatible with commercial use. (Def. 56.1 St. ¶ 19; Pl. Resp. ¶ 19). Plaintiffs' experts Lorin Kramer and Jack Giordano testified that they are aware of other jurisdictions where ranges are considered a commercial use and generally placed in commercial zones where there is retail traffic. (Pl. 56.1 St. ¶¶ 33, 57).

Scudiero further testified that because the movement of guns and ammunition creates a potential for criminal activity, the restrictions are intended to keep any criminal activity away from residential areas or areas where large assemblies of people gather. (Def. 56.1 St. ¶ 17). Sergeant Kevin Johnson of the Chicago Police Department testified that the presence of weapons and ammunition inherently endangers public safety. (Def. 56.1 St. ¶ 18). Specifically, Johnson testified that firing ranges provide criminals with an opportunity to steal firearms and the zoning requirements reduce the chance that any crime associated with a range would impact other areas. (Def. 56.1 St. ¶ 18). However, both Scudiero and Johnson testified that they had no data or empirical evidence that such a criminal impact would occur or that placing a range a certain distance away from any other use would affect any secondary effects. (Pl. 56.1 St. ¶ 76; Dkt. 227, Ex. 21, Johnson Dep. at 169). Johnson further testified that although the governmental purpose for disallowing firing ranges within 500 feet of a residential zone is public safety and that the safety issue is heightened in residential areas, any risk is due to the range's existence and is the same regardless of where the range is located. (Pl. 56.1 St. 72; Johnson Dep. at 146-48). Similarly, Kramer is unaware of any location where crime increased as a result of the addition of a gun range. (Pl. 56.1 St. ¶ 42). Richard Pearson, the Executive Director of the Illinois Rifle

Association, testified that he is unaware of any other range in the country that has to comply with similar zoning requirements. (Pl. 56.1 St. ¶ 6).

From July 6, 2011 to October 5, 2012, the Zoning Administration fielded approximately three to four inquiries regarding opening a firing range at specific addresses. (Pl. 56.1 St. ¶ 77). The Zoning Administration denied all the requests because the addresses were either not in manufacturing districts or were located within 500 feet of a restricted area. (*Id.*).

### C. Construction Requirements

Range designers, including Kramer, consult the National Rifle Association ("NRA") Source Book and NIOSH guidelines for information on construction. (Def. 56.1 St. ¶ 29; Pl. 56.1 St. ¶¶ 27, 45). Firing ranges carry with them the risk for contact with lead, fumes, dust, and ricocheting bullets. (Def. 56.1 St. ¶ 23). Among other things, these safety concerns make firing range construction significantly more expensive than typical construction. (Def. 56.1 St. ¶ 24). Indoor ranges can be particularly costly. (*Id.*). Although ranges are inherently expensive, one of Action Target's managers, Christopher Hart, guessed that opening a range in Chicago would cost two to three times more than elsewhere, partially due to a number of the City's regulations. (Hart Dep. at 164).

### 1. Ballistic-Proof Walls and Doors

Section 13-96-1160 of the MCC requires a firing range to be constructed with materials sufficient to stop all bullets or projectiles from penetrating beyond the enclosure, including the walls, floor, ceiling, and doors. (Def. 56.1 St. ¶ 27). The only exception to the requirement is the rear wall, which need only be constructed of materials capable of stopping the ricochet or fragment of a bullet from penetrating the wall. (*Id.*). According to Robert Fahlstrom, the

5

Manager of Regulatory Review in the City's Department of Buildings, the provision's purpose is to reduce the risk of injury to individuals congregating near a firing range. (Def. 56.1 St. ¶ 28).

The NRA Source Book states that indoor ranges must be "built of impenetrable walls, floor, and ceiling." (Def. 56.1 St. ¶ 30; Dkt. 227, Ex. 23, NRA Source Book at I-3-22). Hart admitted that all ranges should have ballistic walls and it is not uncommon for the rear wall to have "some kind of ballistic controls," although many do not. (*Id.*). The Plaintiffs estimate the cost of an armored door to be $7,000 to $10,000 and making the rear wall ballistic around $200 per linear foot of length in an existing building. (Def. 56.1 St. ¶ 32; Pl. 56.1 St. ¶ 35).

### 2. Separate Ventilation Systems

Section 13-96-1210(d) provides that "[w]here a shooting range facility contains multiple shooting ranges, each shooting range shall be provided with a separate ventilation and exhaust system." (Def. 56.1 St. ¶ 33). The stated purpose behind the provision is to minimize the potential lead exposure at firing ranges as much as possible. (Def. 56.1 St. ¶ 34). The NIOSH maintains that "[v]entilation is the most important engineering control for protection against primary lead exposure in indoor firing ranges." Additionally, the New Jersey Public Employees Occupational Safety and Health Act requires that each range have its own ventilation system. (Def. 56.1 St. ¶ 35). The Plaintiffs estimate the costs of an additional ventilation system to be between $65,000 and $75,000. (Def. 56.1 St. ¶ 37).

### 3. Interlocked Ventilation Systems

Section 13-96-1210(e) requires a range's supply and exhaust systems to be electrically interlocked so both systems turn on at the same time. (Def. 56.1 St. ¶ 38). Failure to operate both systems simultaneously increases the risk of toxic fumes within the range, and the City's purpose behind the provision is to eliminate this possibility. (Def. 56.1 St. ¶ 39). Interlocking the two

systems is standard practice in the industry. (Def. 56.1 St. ¶ 40). Both the NIOSH and the New Jersey Act mandate the interlocking of supply and exhaust fan systems. (*Id.*).

### 4. Sound Limit

Section 13-96-1200(b)(2) limits the maximum noise emanating from the range facility to 55 decibels when measured 100 feet or further from the range, or 70 decibels when measured 10 feet or further from the source. (Def. 56.1 St. ¶ 47). The noise limitations for any business in the City, including ranges, apply only between 8:00 p.m. and 8:00 a.m. (*Id.*; Def. Resp. Mem. at 9). If a shooting range is only open between 9:00 a.m. and 8:00 p.m., the noise ordinance does not apply. (Pl. St. Add'l Facts ¶ 69). Additionally, noise restrictions on businesses, including ranges, in manufacturing districts only apply if the noise spills into areas contiguous to the district. (Dkt. 228, Ex. 38, Schnoes Dep. at 27-28). Kevin Schnoes, a former Assistant Commissioner of the City's Department of Public Health, testified that the provision is meant to prevent Chicago residents from being disturbed by noise that is outside their control. (Def. 56.1 St. ¶ 48). The NRA Source Book states that existing laws commonly specify sound levels for particular land uses. (Def. 56.1 St. ¶ 48). Jack Giordano, a shooting range safety and health specialist, testified that it is unlikely that any sound emanating from a properly-designed range would exceed the limit proposed in the regulation. (Def. 56.1 St. ¶ 49; Dkt. 226, Ex. 16, Giordano Dep. at 204).

### 5. Promulgation of Rules by Commissioner

Section 11-4-260(b) provides that "[t]he commissioner [of the Department of Health] is authorized to promulgate rules and regulations for the cleaning of, sound and air quality control at, and discharge of particulate matter and waste from shooting ranges and shooting range facilities." (Def. 56.1 St. ¶ 59). The Plaintiffs concede that gun ranges are highly regulated because of the potentially dangerous activity conducted, and Giordano agreed that someone

should have the authority to establish new rules to address unforeseen health and safety concerns. (Def. 56.1 St. ¶¶ 60, 62).

### D. Business Operations

The City enacted a variety of ordinances directed at regulating the operation of a range because the manner in which a range is operated has "a very dramatic effect" on its overall safety. (Def. 56.1 St. ¶ 63; Giordano Dep. at 52). Because even a properly designed range can become a health or safety hazard if operated improperly, the NRA states that "[f]iring range safety implies ... strict regulations on use coupled with strict enforcement." (*Id.*; NRA Source Book at I-4).

#### 1. Age Requirement

Under section 4-151-100(d), "[n]o person under the age of 18 shall be permitted in the shooting range facility." (Def. 56.1 St. ¶ 64). The City's offered purpose behind the provision is to protect the safety of minors. (Def. 56.1 St. ¶ 65). Although ranges commonly prohibit children under age six from visiting, Julianne Versnel of the Second Amendment Foundation testified that she is unaware of any other range in the country prohibiting those under the age of eighteen. (Def. 56.1 St. ¶ 66, Pl. 56.1 St. ¶ 18).

#### 2. Hours of Operation

Section 4-151-090 permits ranges to operate only between the hours of 9:00 a.m. and 8:00 p.m. (Def. 56.1 St. ¶ 68). Rosemary Krimbel, the Commissioner of the Department of Business Affairs and Consumer Protection, testified that the hours ordinance is related to the impact of ranges on communities, neighborhoods, and public health and safety while also reducing the number of hours that the Chicago Police Department would be called to a range. (Def. 56.1 St. ¶ 69). Krimbel testified that because crime is more frequent at night and guns are

often involved in crimes, the provision lessens any risk. (*Id.*). However, Krimbel also testified that although she based her opinion on her experience in licensing, any criminal impact is entirely speculative. (Pl. 56.1 St. ¶ 60; Dkt. 228, Ex. 39, Krimbel Dep. at 147). Krimbel additionally stated that she is unaware of any negative impact from ranges being open past 8:00 p.m. in any other city. (Krimbel Dep. at 149).

The City limits the hours of operation on businesses aside from ranges, including sidewalk cafes and outdoor patios, mobile food establishments, and liquor establishments. (Def. 56.1 St. ¶ 69). Pearson testified that he is aware of other ranges that operate similar hours to those in the provision. (Def. 56.1 St. ¶ 70). Hart testified that although he has customers whose ranges operate outside of the provision's mandated hours, public ranges are typically open from 9:00 a.m. to 9:00 p.m. (Pl. 56.1 St. ¶ 10; Def. 56.1 St. ¶ 70).

### 3. Range Master Presence

Section 4-151-100(b) requires a range master to be present during all operating hours of a range. (Def. 56.1 St. ¶ 82). A range master is responsible for insuring adherence to all regulations and the safety within the range. (*Id.*). Hespen testified that "sometimes people don't read [the rules]" at firing ranges, while Hart testified that supervision by a qualified range master is essential to minimize any risk of danger. (Def. 56.1 St. ¶ 83). The Plaintiffs agree that the City properly requires a range master during periods of live fire; they only object to requiring a range master's presence when there is no live fire. (Def. 56.1 St. ¶ 84; Pl. 56.1 St. ¶ 30).

### 4. Firearm Owners Identification ("FOID") Card Requirement

Section 4-151-030(b)(6) requires all range employees to have FOID cards. (Pl. 56.1 St. ¶ 59). The regulation mandates that any employee, whether he or she handles firearms, works

retail, or is a janitor, must have a FOID card. (Krimbel Dep. at 64-66). Only Illinois residents are eligible for the State's FOID card.

## LEGAL STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Thayer v. Chiczewski*, 705 F.3d 237, 246 (7th Cir. 2012). Summary judgment is particularly appropriate in this case because the disputed facts are not "adjudicative facts," or "simply the facts of the particular case." Fed. R. Evid. 201(a) Advisory Committee's Note. Instead, the parties dispute the facts and data justifying the City's Municipal Code ordinances. These "legislative facts" are facts "which have relevance to … the lawmaking process … in the enactment of a legislative body." *Id.* "Only adjudicative facts are determined in trials, and only legislative facts are relevant to the constitutionality of the [Chicago] gun law." *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012). Accordingly, "the constitutionality of the challenged statutory provisions does not present factual questions for determination in a trial." *Id.*

## DISCUSSION

The Plaintiffs mount a facial attack on each of the City's regulations listed above, generally contending that none of the ordinances can survive heightened constitutional scrutiny. *See* Dkt. 232, Pl. Mem. at 10. In response, the City moves for summary judgment as well, and asks the Court to hold the ordinances to intermediate scrutiny. *See* Dkt. 223, Def. Mem. at 9. The parties do not dispute that the Second Amendment historically protected the right to maintain proficiency in the use of firearms, and for good reason. The Seventh Circuit has already concluded during the course of this case that the core right "to possess firearms for protection

implies a corresponding right to acquire and maintain proficiency in their use." *Ezell*, 651 F.3d at 704. So although the parties agree that the activity at issue falls within the scope of the Second Amendment, they differ on the level of constitutional scrutiny to be applied. The Plaintiffs want this Court to apply the same level of scrutiny the Seventh Circuit used originally to each of the newly challenged ordinances, *see id.* at 708 (severe burden on the core Second Amendment right of armed self-defense requires extremely strong public-interest justification and a close fit between the government's means and its end), while the City urges the Court to examine the regulations through an intermediate scrutiny lens because they no longer constitute an outright ban on firing ranges. *See id.* (laws that merely regulate rather than restrict may be more easily justified). Before addressing these arguments and selecting the appropriate standard of review, the Court first lays out the general analytical framework applied to Second Amendment challenges.

**I. Second Amendment Analytical Framework**

The Supreme Court recognized the right to keep and bear arms for self-defense under the Second Amendment in *District of Columbia v. Heller*, 554 U.S. 570 (2008). The Supreme Court extended that protection against state and local government infringement through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 130 S. Ct. 3020 (2010). The issue presented here is whether a number of City ordinances that restrict and regulate, but do not categorically ban, the operation of firing ranges within the City conflict with the Plaintiffs' Second Amendment rights.

The framework for analyzing a Second Amendment challenge is two-fold. First, a district court must make a threshold inquiry into whether the restricted activity is protected by the Second Amendment. If so, the Court must then determine the level of scrutiny applicable to the

prohibition. *Ezell*, 651 F.3d at 700-03. Here, the first step is not in dispute: the Second Amendment's core right to bear arms for self-defense carries with it an important corollary right to maintain proficiency in the use of those firearms. Proceeding to the next step, the Court must examine the strength of the City's justifications for regulating that activity by evaluating the regulations the City has chosen to enact and the public-benefits ends it seeks to achieve. *Id.* at 703. The Seventh Circuit instructed, using First Amendment jurisprudence as an appropriate analogue, *see Heller*, 554 U.S. at 582; *McDonald*, 130 S. Ct. at 3045, that this means-end inquiry is a sliding scale and not fixed or static:

> First, a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end. Second, laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified. How much more easily depends on the relative severity of the burden and its proximity to the core of the right.

*Ezell*, 651 F.3d at 708. Of utmost importance in this inquiry is the fact that no matter where the burden or challenged ordinance falls on the spectrum, the scrutiny to be applied is always stricter than rational basis review. *See Heller*, 554 U.S. at 628 n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."); *Ezell*, 651 F.3d at 701 ("[T]he Court specifically excluded rational-basis review."); *see also, e.g., Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp.2d 928, 934 (N.D. Ill. 2014).

The breadth and burden of a challenged restriction is not only based on what activity is affected, but also who is affected. *Compare Moore*, 702 F.3d at 940 (State held to a higher standard where curtailment of gun rights affected the entire law-abiding adult population of Illinois); *with United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (intermediate scrutiny

applied to Second Amendment challenge to provision of statute criminalizing possession of firearm by convicted felon) *and United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (intermediate scrutiny applied to Second Amendment challenge of law restricting gun ownership from domestic violence misdemeanants). Accordingly, laws that affect a greater proportion of the population or those that affect law-abiding citizens will be more closely scrutinized. *See Ezell*, 651 F.3d at 708 ("Here ... the plaintiffs *are* the 'law-abiding, responsible citizens' whose Second Amendment rights are entitled to full solicitude under *Heller*").

This, then, is the framework that the Seventh Circuit has crafted for Second Amendment litigation. For each challenged MCC ordinance, the City must proffer sufficient evidence to justify the ordinance's burden on Second Amendment rights. In this means-end analysis, the quantity and persuasiveness of the evidence required to justify each ordinance varies depending on how much the ordinance affects the Second Amendment right and on whose right it affects. The greater the population it affects or the heavier the burden on the right, the stricter the scrutiny. If the City fails to sufficiently justify an ordinance, the ordinance is unconstitutional.

## II. Analysis

As a preliminary matter, the City makes much of the Plaintiffs' alleged lack of individualized evidence demonstrating a severe burden on their Second Amendment rights caused by the challenged ordinances. Accepting this proposition would improperly shift the burden of proof in this case. The Plaintiffs have challenged the various ordinances on their faces, not merely as applied in their particular circumstances. In a facial constitutional challenge, individual application facts do not matter. *Ezell*, 651 F.3d at 697. Because standing is not disputed, the Plaintiffs' personal situation is irrelevant. *Id.* "It is enough that '[w]e have only the [statute] itself' and the 'statement of basis and purpose that accompanied its promulgation.' " *Id.*

(citing *Reno v. Flores*, 507, U.S. 292, 300-01 (1993)). In facial constitutional challenges, the alleged constitutional violations are found in the terms of the ordinances, not their application. *See Ezell*, 651 F.3d at 698-99 ("That is, the City Council violated the Second Amendment when it made this law; its very existence stands as a fixed harm to every Chicagoan's Second Amendment right to maintain proficiency in firearm use by training at a range."). With this in mind, the Court turns to each of the challenged ordinances. Because some of the provisions entail a greater burden on Second Amendment rights than others, this Court will not apply a uniform level of scrutiny across the board.

### A. Zoning Restrictions: MCC §§ 17-5-0207 and 17-9-0120

The Plaintiffs challenge MCC § 17-5-0207, which permits firing ranges to be located only in manufacturing districts with special use approval, and MCC § 17-9-0120, which requires firing ranges to be located at least 500 feet from residential zones, schools, day-care facilities, places of worship, museums, libraries, or hospitals, and 100 feet from any other firing range. Before embarking on a review of the City's justifications for its zoning restrictions, the Court must determine the appropriate level of scrutiny to apply to each ordinance.

Without conceding its appropriateness, the City argues for the application of intermediate scrutiny, citing *Skoien*, 614 F.3d at 641, rather than the "close fit" required by the Seventh Circuit. *See Ezell*, 651 F.3d at 708. The City contends that because it has repealed its blanket ban on firing ranges within the city, any alleged burden on the Plaintiffs is lessened, and strict scrutiny is inapplicable. Although the City no longer enforces a universal ban on firing ranges, the individuals affected by the current regime are still "the entire law-abiding adult population of [Chicago]." *See Moore*, 702 F.3d at 940. Given who is impacted by the current MCC ordinances, intermediate scrutiny may still be insufficient depending on the severity of the encroachment.

With regard to the other variable on the sliding scale, the scope of the right affected, although the zoning ordinances no longer exile firing ranges to outside of City limits, they still severely limit locations where firing ranges can be located. Sections 17-5-0207 and 17-9-0120, taken in tandem, allow for the placement of a firing range in approximately 10.6% of the 32,000 acres currently zoned for business, commercial, and manufacturing uses. Def. 56.1 St. ¶ 14; Def. Mem. at 12. Put differently, the City still bans firing ranges from nearly 90% of the land zoned for business, commercial, and manufacturing uses. Although the amount of acreage available, standing alone, is largely irrelevant, zoning schemes must provide a "reasonable opportunity" to conduct the protected activity. *See North Ave. Novelties, Inc. v. City of Chicago*, 88 F.3d 441, 445 (7th Cir. 1996) (analyzing zoning challenge within First Amendment context) (internal citation and quotations omitted). Here, from July 6, 2011 to October 5, 2012, the City's Zoning Administration fielded approximately three to four inquiries regarding opening a firing range at specific addresses. Pl. 56.1 St. ¶ 77. All were denied for failing to comply with the zoning ordinances. *Id.* So even though the zoning ordinances do not categorically ban firing ranges from the City, the restrictions taken together are still closer to a "serious encroachment on the right to maintain proficiency in firearm use" than to a "law that merely regulate[s]" Second Amendment activity. *Ezell*, 651 F.3d at 708. Accordingly, to carry its burden, the City must establish something near a "close fit" between the zoning restrictions and the actual public interests it serves, and prove that the public's interests are strong enough to justify a substantial "encumbrance on individual Second Amendment rights." *Id.* at 708-09.

Here, the City fails to justify its ordinance restricting firing ranges to manufacturing districts only. Patti Scudiero testified that the manufacturing district ordinance is imposed primarily to avoid two secondary effects associated with the health, safety, and general welfare

of Chicago residents. Def. 56.1 St. ¶ 16. Specifically, the City's bases for relegating ranges to manufacturing districts are that (1) firing ranges attract thieves wanting to steal firearms; and (2) lead-contaminated air released outside a firing range and left unmanaged can contaminate waterways and pose hazards to people if the range is located in a populated area. Def. 56.1 St. ¶¶ 17, 20. While these are undoubtedly important governmental interests, *see United States v. Salerno*, 481 U.S. 739, 748 (1987) (government has obvious significant interest in protecting the safety of its citizens), the City has not sufficiently substantiated a connection between these interests and the ordinance.

Kevin Johnson of the Chicago Police Department testified that the presence of weapons and ammunition inherently endangers public safety; however, both he and Scudiero admitted that they had no data or empirical evidence that any criminal impact would occur due to the presence of a firing range or that it would be lessened by placing ranges in manufacturing districts. Pl. 56.1 St. ¶ 76; Johnson Dep. at 169. Neither Scudiero nor anyone from her department researched zoning ordinances on firing ranges in other cities. Pl. 56.1 St. ¶ 76. And although the City provided a list of sixteen instances of thefts from gun stores and firing ranges around the country since 2010, it provided no rationale tending to demonstrate that placement within a manufacturing district would preclude theft or reduce criminal impact. Def. 56.1 St. ¶ 78. Additionally, plaintiffs' expert Lorin Kramer testified that he was unaware of any location throughout the country where crime increased as a result of a gun range in a that location. Pl. 56.1 St. ¶ 42. The City's general proposition that firing ranges may pose a danger does not justify restricting ranges only to manufacturing districts without evidence that such a restriction would lessen that danger.

Regarding the City's issues with the environmental effects of ranges through lead residue disbursement, fires, or explosions, it produced no evidence to establish that these are realistic concerns. Of course, lead-contaminated air emanating from a firing range would be an environmental hazard, but the City needed to supply actual, reliable evidence that showed such a hazard is a legitimate problem. *See City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002) (in First Amendment context, municipality defending zoning restrictions could not "get away with shoddy data or reasoning. The municipality's evidence must fairly support the municipality's rationale for its ordinance."). Because the City failed to "provide [the Court] with more than merely a rational basis for believing" that its restriction limiting firing ranges to manufacturing districts is "justified by an increase in public safety," it does not survive review. *See Moore*, 702 F.3d at 942.

The Plaintiffs maintain that firing ranges are entirely compatible with commercial zones as well as manufacturing districts, and in fact, Plaintiffs' experts Kramer and Jack Giordano both testified that they are aware of other jurisdictions where ranges are considered a commercial use and generally placed in commercial zones where there is retail traffic. Pl. 56.1 St. ¶¶ 33, 57. Because the City failed to present sufficient evidence that firing ranges are uniquely suited to manufacturing districts, the current incantation of the zoning ordinance is not supported by the record and section 17-5-207 is unconstitutional.

However, because section 17-9-0120, standing alone, is significantly less burdensome than section 17-5-0207, it survives this Court's review. The provision, which requires firing ranges to be at least 500 feet away from areas such as residential zoning districts, schools, day-care facilities, places of worship, premises licensed for the retail sale of liquor, children's activities facilities, libraries, museums, or hospitals is substantially similar to a "law forbidding

the carrying of firearms in sensitive places such as schools and government buildings." *See Heller*, 554 at 626-27 (opinion did not cast doubt on "longstanding prohibitions on the carrying of firearms in sensitive places"); *see also, e.g, Illinois Ass'n of Firearms Retailers*, 961 F. Supp.2d at 947 (although flat ban on gun sales was held unconstitutional, "nothing in [the] opinion prevents the City from considering other regulations"). Here, section 17-9-0120 places a meaningfully lesser burden on the exercise of the Plaintiffs' rights to maintain proficiency in the use of their firearms than section 17-5-0207, and is accordingly more easily justified. *See Ezell*, 651 F.3d at 708; *see also Moore*, 702 F.3d at 940 ("In contrast, when a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places; since that's a lesser burden, the state doesn't need to prove so strong a need."). Because this provision seeks to protect the same important interests listed above and is less burdensome on individual Second Amendment rights, there need not be a perfect fit between the City's means and its ends. Furthermore, enforcement of section 17-9-0120 does not strip the Plaintiffs of reasonable locations to operate a firing range. *See, e.g., Ben's Bar, Inc. v. Vill. of Somerset*, 316 F.3d 702, 727 (7th Cir. 2003) (in First Amendment analogue, Constitution requires "reasonable opportunity" to disseminate speech at issue ) (internal citation and quotation marks omitted). Therefore, the City's regulation requiring ranges to be located at least 500 feet away from residential zoning districts, schools, day-care facilities, places of worship, premises licensed for the retail sale of liquor, children's activities facilities, libraries, museums, or hospitals is constitutional.

## B. Construction Requirements

The Plaintiffs challenge a number of the City's regulations concerning construction standards for firing ranges: MCC § 13-96-1160 (mandating a range be totally enclosed by

penetration-proof materials and that a rear wall be able to stop a ricochet of a bullet from penetrating beyond the wall); MCC § 13-96-1210(d) (requiring that where a facility contains multiple firing ranges, each range must be provided with a separate ventilation and exhaust system); MCC § 13-96-1210(e) (supply and exhaust systems must be electrically interlocked to turn on each system at the same time); MCC § 13-96-1200(b)(2) (limiting the maximum noise emanating from a range facility to 55 decibels when measured from a distance of 100 feet or more of from the source, or 70 decibels when measured from a distance of 10 feet or more from the source); and MCC § 11-4-260(b) (authorizing the relevant commissioner to promulgate rules and regulations for the cleaning of, sound and air control at, and discharge of particulate matter and waste from ranges). The Plaintiffs attack these provisions because they may impose additional start-up or operational costs.

The City's construction standards do not restrict any Second Amendment activity whatsoever. Instead, they are laws that "merely regulate" the construction of firing ranges, and subsequently, create only a minor encumbrance on individual Second Amendment rights to maintain proficiency in the use of firearms. *See Ezell*, 651 F.3d at 708 ("laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified"). Because the City's construction requirements restrict no Second Amendment activity and place only a minor burden on the construction of a range, they are more readily justified. *Id.* Although the Plaintiffs are still the "law-abiding, responsible citizens" entitled to full Second Amendment rights, because the construction regulations do not come close to implicating the core of their rights, intermediate scrutiny is appropriate. *See id.* ("the [City] must show at least that the statute directly advances a substantial governmental interest and that the measure is drawn to achieve that interest"). The City satisfies intermediate scrutiny if its "legislative conclusion was

reasonable and supported by substantial evidence in the record." *See Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 211 (1997). Substantial evidence is found not only in the form of hard data. *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (holding that challenged ordinances can be justified based on history, consensus, and simple common sense).

The City fares better in justifying its construction requirements for firing ranges not only because they impose a substantially lesser burden on individual Second Amendment rights, but also because the rationales for the requirements are significantly supported by the record. The universal purpose behind the City's challenged construction regulations is to ensure the safety of individuals within a range facility or congregated around a facility. *See Salerno*, 481 U.S. at 748 (interest in protecting the safety of citizens is substantial). The record justifies the City's means of attaining this interest.

### 1. Section 13-96-1160(a): Ballistic-Proof Walls and Doors

Section 13-96-1160 of the MCC requires a firing range to be constructed with materials sufficient to stop all bullets or projectiles from penetrating beyond the enclosure, including the walls, floor, ceiling, and doors. The only exception to the requirement is the rear wall, which need only be constructed of materials capable of stopping the ricochet or fragment of a bullet from penetrating the wall. The Plaintiffs object to these requirements, alleging that they impose thousands of dollars in additional costs unnecessarily.

While there is no dispute that the regulations increase costs, any burden is supported by the record. The NRA Source Book, an undisputed guide for firing range construction, states that "indoor ranges must be ... built of impenetrable walls, floor, and ceiling." NRA Source Book at I-3-22. Additionally, Christopher Hart admitted that all ranges should have ballistic walls and that it is not uncommon for the rear wall of a range to have "some kind of ballistic controls."

Dkt. 233, Ex. 5, Hart Dep. at 82-83. Although Hart additionally testified that many ranges do not utilize a ballistic rear wall, the City researched the issue and reasonably concluded that impenetrable walls and doors most effectively protected the safety of people outside, but near, the range. The Court does not second-guess this decision. *See Turner Broad.*, 520 U.S. at 195 (as long as predictions reflect "reasonable inference based on substantial evidence," a government's predictions about the effect of a gun regulation is entitled to significant deference). Section 13-96-1160(a) is sufficiently supported and therefore constitutional.

## 2. Section 13-96-1210(d): Separate Ventilation Systems

Section 13-96-1210(d) provides that "[w]here a shooting range facility contains multiple shooting ranges, each shooting range shall be provided with a separate ventilation and exhaust system." The stated purpose behind the provision is to minimize the potential lead exposure at firing ranges as much as possible. Def. 56.1 St. ¶ 34. The Plaintiffs contend that because ventilation takes up a sizable portion of construction costs, requiring multiple ventilation systems in a facility with multiple ranges could make a facility unaffordable.

The Plaintiffs' objection is again belied by the record. The parties agree that exposure to lead is one of the most significant hazards in an indoor firing range and that the NIOSH has stated that "ventilation is the most important engineering control" against lead exposure. NIOSH Alert Apr. 2009 at 13. The National Institute of Building Sciences has similarly stressed that "the supply and exhaust system is critical to the operation of an indoor range and the health of building inhabitants." Dkt. 227, Ex. 29, Whole Building Design Guide at 1. Additionally, the New Jersey Public Employees Occupational Safety and Health Act requires that each range have its own ventilation system. *See* Dkt. 228, Ex. 34, N.J.A.C. § 12:100-8.5(e). Hart even told a potential customer that "it is good to have a separate [ventilation] system for each range bay."

Def. 56.1 St. ¶ 36. The City has therefore presented a plethora of evidence demonstrating the importance of separate ventilation systems. Because health organizations and industry guidelines support the City's legitimate concern of lead exposure in an indoor firing range, section 13-96-1210(d) is supported by substantial evidence and is therefore constitutional.

### 3. Section 13-96-1210(e): Interlocked Ventilation Systems

Section 13-96-1210(e) requires a range's supply and exhaust systems to be electrically interlocked so both systems turn on at the same time. Failure to simultaneously operate both systems increases the risk of toxic fumes within the range, and the City's purpose behind the provision is to eliminate this possibility. Def. 56.1 St. ¶ 39. The Plaintiffs object to requiring interlocking supply and exhaust systems, alleging that linking the systems would burden the power grid and potentially cause a grid failure.

To the extent that a power failure could theoretically impinge any individual Second Amendment rights, any burden is thoroughly justified by the City's evidence. The National Institute of Building Sciences states that "supply and exhaust fans must have control interlocks to ensure simultaneous operation." Whole Building Design Guide at 1. Similarly, the New Jersey Public Employees Occupational Safety and Health Act requires a firing range's ventilation systems to be interlocked, "thereby eliminating an error in turning one system on and not the other." N.J.A.C. § 12:100-8.5(f). In fact, Kramer's expert report stated that interlocking is standard practice in the industry. Dkt. 226, Ex. 15, KramerOne Report at 8. Both logic and data support the City's decision to require interlocking ventilation systems in indoor firing ranges. Accordingly, the regulation is justified.

#### 4. Section 13-96-1200(b)(2): Sound Limit

Section 13-96-1200(b)(2) limits the maximum noise emanating from the range facility to 55 decibels when measured 100 feet or further from the range, or 70 decibels when measured 10 feet or further from the source. The Plaintiffs object to the ordinance not because it creates a burden on the construction of a range, but because it allegedly singles out firing ranges as the only business subject to a noise restriction in Chicago prior to 8:00 p.m. and the only business subject to a noise regulation in a manufacturing district. Pl. Mem. at 11-12. But the ordinance states that "the noise emanating from the shooting range to areas outside the shooting range facility is subject to Chapter 8-32" of the MCC. Section 8-32-150 provides that noise limitations apply only between 8:00 p.m. and 8:00 a.m., while section 8-32-170(h) explicitly states that sound limits apply to businesses found in manufacturing districts only if the noise bleeds outside the manufacturing boundary. Additionally, the City unequivocally agreed that the noise regulation does not apply to ranges before 8:00 p.m. *See* Def. Mem. at 22. Because the sound ordinance leaves no room for confusion in concluding that firing ranges are not uniquely subject to a noise regulation that other businesses are not, the Plaintiffs' objection is meritless and the ordinance is upheld.

#### 5. Section 11-4-260(b): Promulgation of Rules by Commissioner

Section 11-4-260(b) provides that "[t]he commissioner [of the Department of Health] is authorized to promulgate rules and regulations for the cleaning of, sound and air quality control at, and discharge of particulate matter and waste from shooting ranges and shooting range facilities." The Plaintiffs argue that the ordinance impermissibly burdens range owners because these issues are already the subject of federal regulations and the City could potentially make contradictory rules. However, the Plaintiffs concede that their objection is hypothetical and that

the provision does not impact the design, construction, or installation of a range. Giordano Dep. at 178-79; Hart Dep. at 76. Giordano also acknowledged that someone should have the authority to establish new rules to address unforeseen health and safety concerns. Giordano Dep. at 187. The City was entitled to agree. Because the ordinance is drawn to achieve the City's important interest in addressing future public health or environmental concerns as they arise, it does not violate the Plaintiffs' Second Amendment rights.

All the information above leads to the conclusion that the City reasonably determined that the construction standards were necessary based on substantial evidence. The fact that the Plaintiffs disagree with the City's rationales or offer different opinions does not diminish the City's reliance on evidence in promulgating its construction requirements. *See Turner Broad.*, 520 U.S. at 211 ("the possibility of drawing two inconsistent conclusions from the evidence" does not prevent a finding from being supported by substantial evidence). The City's construction regulations are reasonable, drawn to directly advance its interest in protecting the safety of its citizens, and substantiated by evidence. Accordingly, they universally survive review.

### C. Business Operations

The Plaintiffs oppose a number of the City's ordinances regulating the day-to-day business operations of firing ranges: MCC § 4-151-100(d) (requiring range patrons to be 18 years or older); MCC § 4-151-090 (hours of operation limit); MCC § 4-151-100(b) (requiring range master to be present during all operating hours); and MCC §§ 4-151-100(g)(1), 4-151-030(b)(6), and 4-151-040(d) (FOID card requirements). As with the construction requirements, the City's provisions affecting the business operations of ranges do not restrict either the Plaintiffs' protected interest in maintaining proficiency in the use of firearms or their core right

to armed self-defense. The provisions regarding age requirements, FOID card requirements, hours of operation, and range master presence are laws that "merely regulate" the affairs of firing ranges and place, at most, a minor burden on the Second Amendment rights of the "the entire law-abiding adult population of [Chicago]," *see Moore*, 702 F.3d at 940. Because the laws do not involve the "central self-defense components of the right," they are subject to intermediate scrutiny. *See Ezell*, 651 F.3d at 708.

### 1. Section 4-151-100(d): Age Requirement

Under section 4-151-100(d), "[n]o person under the age of 18 shall be permitted in the shooting range facility." The City's purpose behind the provision is to protect minors from the potential dangers of lead exposure and firearm accidents. The safety of minors is undoubtedly an important governmental interest. *See Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2767 (2011) (Supreme Court has consistently recognized "a compelling interest in protecting the physical and psychological well-being of minors.") (internal citation and quotation marks omitted). Without disputing the City's interest, the Plaintiffs offer two arguments against the ordinance: (1) range owners will lose business if minors are not allowed in a range; and (2) on behalf of the minors themselves, the City cannot justify the exclusion.

The Plaintiffs' argument that barring minors from ranges would negatively impact profitability fails because any minute burden is justified by the City's rationales for the provision. Hart admitted that the ordinance does not impact Action Target's interest in building a gun range in Chicago. Hart Dep. at 50. The parties do not dispute that ranges can be dangerous due to lead exposure, toxic fumes, exposure to high noise levels, and the ever-present chance of a misfired weapon or a ricocheting bullet. Def. 56.1 St. ¶ 23. Nor do the parties dispute that lead contamination is a significantly higher problem in indoor ranges or that children are most

susceptible to lead poisoning. *Id.* The City's rationale, although primarily comprised of common sense, is sufficient to justify the small burden that range owners may experience. *See Lorillard Tobacco*, 533 U.S. at 555 (challenged ordinances can be justified based on history, consensus, and simple common sense). Again, the Plaintiffs' contention that the Illinois Department of Natural Resources allows minors to hunt does not lead to the conclusion that the City failed to justify the regulation. *See Turner Broad.*, 520 U.S. at 211 ("the possibility of drawing two inconsistent conclusions from the evidence" does not prevent a finding from being supported by substantial evidence). The City logically determined that indoor firing ranges pose risks not found in an outdoor hunting setting, and the Court will not disturb that reasoned decision.

To the extent the Plaintiffs argue on behalf of Chicago minors, the argument fails because minors are not guaranteed Second Amendment rights. *See, e.g., Nat'l Rifle Ass'n of America v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 203 (5th Cir. 2012) (historically, Second Amendment protection was afforded to the virtuous citizen, and regulation or prohibition of firearms for those who were incapable of civic virtue, like minors, would have been supported); *United States v. Rene E.*, 583 F.3d 8, 16 (1st Cir. 2009) (law prohibiting juvenile possession of handguns did not violate Second Amendment in light of longstanding tradition of prohibiting juveniles from both receiving and possessing handguns); *Horsley v. Trame*, No. 13 CV 321, 2014 WL 3720933, at *3 (S.D. Ill. July 28, 2014) (FOID Card age restriction provision fell outside the scope of the Second Amendment). The City's ban is similarly "consistent with a long-standing tradition of age- and safety-based restrictions on the ability to access arms." *See Nat'l Rifle Ass'n of America*, 700 F.3d at 203 ("if a representative citizen of the founding era conceived of a 'minor' as an individual who was unworthy of the Second Amendment guarantee … then it stands to reason that the citizen would have supported

restricting a[] [minor's] right to keep and bear arms."). Because minors have no guaranteed Second Amendment core right to armed self-defense, they similarly have no right to maintain proficiency in the use of firearms.

### 2. Section 4-151-090: Hours of Operation

Section 4-151-090 permits ranges to operate only between the hours of 9:00 a.m. and 8:00 p.m. The City maintains that the ordinance is meant to reduce pedestrian and vehicle traffic and disturbances at night, reduce the number of hours that Chicago police officers would be called to a range in response to a firearm misuse or injury, and protect the safety of the range patrons because crime is more frequent at night. *See* Def. Mem. At 28. Although the Plaintiffs provide minimal evidence about any impact the regulation would impose on a range and agree that most public firing ranges utilize similar hours, the ordinance still does not survive scrutiny because the City fails to present substantial evidence that the ordinance's means lead to the desired effects.

Drawing on First Amendment jurisprudence, the Seventh Circuit has instructed that "government[s] must supply actual, reliable evidence to justify restricting protected [activity] based on secondary public-safety effects." *Ezell*, 651 F.3d at 709. Here, the City's hours of operation regulation falls short for the same reasons as the zoning ordinance restricting ranges to manufacturing districts does. Regarding the City's first two rationales, the City has provided no evidence tending to show that a range has a greater impact on traffic or police inquiries than any other business or location. Similarly, the City offered no proof that criminal activity involving a firing range can be expected to increase after 8 p.m. Krimbel testified that although she based her opinion on her experience in licensing, any criminal impact is entirely speculative. Pl. 56.1 St. ¶ 60; Krimbel Dep. at 147. Krimbel additionally stated that she is unaware of any negative impact

from ranges being open past 8:00 p.m. in any other city. Krimbel Dep. at 149. The City has presented no evidence other than speculation that firing ranges uniquely create an inordinate amount of traffic, that police officers can expect to be called to a range more often than any other location, or that allowing a range to remain open after 8 p.m. will lead to increased criminal activity. *See Annex Books, Inc. v. City of Indianapolis*, 624 F.3d 368, 369 (7th Cir. 2010) (affirming preliminary injunction where a city's "empirical support for [an] ordinance [limiting the hours of operation of an adult bookstore] was too weak."). Additionally, the City's argument that it similarly limits the hours of operation for other establishments like sidewalk cafes, outdoor patios, mobile foods, and liquor establishments is misplaced because none of those activities involve constitutional rights. Even though the City's interests in enacting the ordinance are legitimate, the City failed to sufficiently justify its means.

### 3. Section 4-151-100(b): Range Master Presence

Section 4-151-100(b) requires a range master to be present during all operating hours of a range. A range master is responsible for insuring adherence to all regulations and the safety within the range. Def. 56.1 St. ¶ 82. According to Giordano, the operation of a range has "a very dramatic effect" on its safety, and even a properly designed range can become a hazard if improperly operated. Giordano Dep. at 52. Accordingly, the City's purpose behind the provision is to minimize safety risks associated with the operation of a firing range. The Plaintiffs agree that the City properly requires a range master during periods of live fire; they only object to requiring a range master's presence when there is no live fire. The Plaintiffs maintain that the requirement unnecessarily adds costs to the operation of a range, but they failed to quantify what these costs would be.

The evidence presented by the parties does not allow for a finding of severe or even moderate burden. Furthermore, the City's evidence and rationale survive intermediate scrutiny. Plaintiff William Hespen, a range safety officer at an Illinois Rifle Association range, conceded that "sometimes people don't read [the rules] and sometimes people will forget certain things" while at a range. Dkt. 233, Ex. 3, Hespen Dep. at 18. Similarly, Hart testified that he prefers a range have a qualified safety program to minimize risks to gun range patrons and that "a qualified range master to supervise" is essential. Hart Dep. at 76, 183. This testimony establishes not only the importance of range master supervision, but also that issues can arise at ranges unexpectedly. Only requiring a range master's presence when live fire is present fails to account for this possibility. Because any burden on the operation of a firing range is minimal and the City's justifications are substantiated both by common sense and Hespen's own testimony, the ordinance survives review. *See Skoien*, 614 F.3d at 642 (where "logic and data" establish a substantial relation between an ordinance and an important governmental interest, intermediate scrutiny is satisfied).

### 4. Sections 4-151-100(g), 4-151-030(b)(6), and 4-151-040(d): FOID Card Requirements

Section 4-151-100(g) requires all firing range patrons to have a FOID Card, "if required to do so." In their briefs, the parties agree that this ordinance does not apply to out-of-state residents, who may patronize a firing range without a FOID Card. *See* Dkt. 263, Pl. Reply at 13. Accordingly, the issue is moot.

Section 4-151-030(b)(6), however, presents a different issue. The section requires all managers, range masters, and employees working at a range to possess FOID Cards. The City states that the purpose behind the law is to ensure that any individuals who may come into contact with firearms at a range are subject to criminal history and mental illness background

checks, two requirements to obtaining a FOID Card. *See* 430 ILCS 65/4 (applicant for a FOID Card must submit evidence that he or she has not been convicted of a felony nor been a patient in a mental health facility for the past five years). The Plaintiffs object to this ordinance, contending that it is overbroad and unjustifiably bans potential employees from out of state.

Whether the Plaintiffs raise this objection on behalf of themselves or hypothetical out-of-state employee applicants, it fails. The Plaintiffs' objection on behalf of themselves falls short because they have not asserted a burden on their Second Amendment rights whatsoever. Even accepting a theoretical burden on range owners by limiting the pool of employee applicants to Illinois residents, the City justifies the ordinance. The Plaintiffs "do not object to making sure one has no disqualifying criminal record or history of mental illness" before working at a firing range. Pl. Reply at 14. Application for a FOID Card requires those criteria be satisfied. Additionally, the City's contention that it is impossible to know which employees will come into contact with firearms and which will not, in mandating that every employee have a FOID Card, is entirely reasonable and based on common sense. Because the ordinance is drawn to achieve the City's substantial governmental interest in ensuring the safety of firing ranges, it survives review.

To the extent the Plaintiffs argue that the ordinance discriminates against out-of-state residents in violation of some principle of the Constitution, though they mention none, they have not demonstrated that they have standing to assert the rights of these hypothetical out-of-state residents. *Cf. Marin-Garcia v. Holder*, 647 F.3d 666, 670 (7th Cir. 2011) ("a person may litigate another's rights in his own cause so long as three criteria are satisfied: (1) the litigant must have suffered an injury in fact; (2) the litigant must have a close relation to the third party; and (3)

there must exist some hindrance to the third party's ability to protect his or her own interest"). The Plaintiffs have presented no evidence or argument that these elements are present here.

Finally, section 4-151-040(d) provides that no firing range license shall be issued if the applicant, the manager, range master, or any employee does not possess a valid FOID Card. The Plaintiffs take particular exception to the requirement that an applicant for a license must hold a FOID Card, arguing that this mandates even owners of a firing range to hold a FOID Card. In response, the City unequivocally maintains that owners are not required to have FOID Cards to own a range within Chicago, claiming that the September 11, 2013 amendment of the MCC did away with the requirement. Dkt. 247, Def. Resp. at 21. Because the City agrees that owners need not have FOID Cards, section 4-151-040(d) must be stricken to the extent it requires firing range license applicants to possess a FOID Card.

**D. Cumulative Effect**

The Plaintiffs seem to contend that even if the regulations are constitutional individually, their cumulative impact creates a *de facto* ban on firing ranges within Chicago. *See* Pl. Mem. at 1. The Court dismisses this argument because the Plaintiffs failed to adequately develop the contention with either facts or case law. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (7th Cir. 2006) ("passing reference to an issue … will not suffice to bring that issue before this court") (internal citation omitted); *see also Kramer v. Bank of America Sec., LLC*, 355 F.3d 961, 964 n.1 (7th Cir. 2004) ("perfunctory and undeveloped arguments that are un-supported by pertinent authority are waived (even where those arguments raise constitutional issues)") (quoting *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir, 1991)). The Court's decision is further bolstered by the fact that the City has repealed its "deleterious impact" ordinance and its ordinance restricting ammunition and firearms sales at ranges: two ordinances

that the Plaintiffs stated were "high on the list of 'dealbreaker' ordinances." *See* Pl. 56.1 St. ¶¶ 47, 57.

### E. First Amendment Analysis

The Plaintiffs additionally maintain, albeit superficially, that their First Amendment rights are also infringed upon by the City's firing range regulations. While there is no dispute that the right to hear and learn are protected by the First Amendment, *see Kleindienst v. Mandel*, 408 U.S. 753, 771 (1972), the ordinances do not preclude the Plaintiffs from participating in firearms training. Pursuant to the Court's analysis above, because the remaining regulations do not ban firing ranges within Chicago, they have no impact on gun education. The City's ordinances are aimed at locating firing ranges in suitable locations, ensuring proper construction, and guaranteeing safe operations; they do not preclude or even chill the Plaintiffs' desire or ability to participate in firearms training. *Contra, e.g., Edwards v. City of Goldsboro*, 178 F.3d 231, 246-47 (4th Cir. 1999) (individual stated a valid First Amendment claim after he was suspended from his employment for teaching concealed handgun safety courses). The Court accordingly grants the City's Motion for Summary Judgment on this point.

### CONCLUSION

For the foregoing reasons, the Plaintiff's Motion for Summary Judgment is granted in part and denied in part. Similarly, the City's Motion for Summary Judgment is granted in part and denied in part.

Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: September 29, 2014

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Ezell et al,

Plaintiff(s),

v.

City of Chicago,

Defendant(s).

Case No.  10 c 5135
Judge Virginia M. Kendall

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐     in favor of plaintiff(s)
and against defendant(s)
in the amount of $     ,

      which ☐ includes     pre–judgment interest.
            ☐ does not include pre–judgment interest.

      Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

      Plaintiff(s) shall recover costs from defendant(s).

---

☐     in favor of defendant(s)
and against plaintiff(s)

      Defendant(s) shall recover costs from plaintiff(s).

---

☒     other: For the foregoing reasons, the Plaintiff's Motion for Summary Judgment is granted in part and denied in part. Similarly, the City's Motion for Summary Judgment is granted in part and denied in part. The City's motion to dismiss claims as moot [269] is itself dismissed as moot pursuant to the parties' joint statement regarding remaining claims.

---

This action was *(check one)*:

☐ tried by a jury with Judge Virginia M. Kendall presiding, and the jury has rendered a verdict.
☐ tried by Judge Virginia M. Kendall without a jury and the above decision was reached.
☒ decided by Judge Virginia M. Kendall on a motion

Date:  9/29/2014            Thomas G. Bruton, Clerk of Court

Tresa Abraham, Deputy Clerk

# ORDINANCES INVOLVED

**Municipal Code of Chicago, Ill. § 17-9-0120 (2014):**

**Shooting ranges.**  Shooting ranges may not be located in any of the following areas or locations:

> **17-9-0120-A** within 100 feet of another existing shooting range;

> **17-9-0101-B** within 500 feet of any zoning district that is zoned for residential use, including a planned development that authorizes residential use;

> **17-9-0101-C** within 500 feet of any pre-existing school, day-care facility, place of worship, premises licensed for the retail sale of liquor, children's activities facility, library, museum or hospital.

**Municipal Code of Chicago, Ill. § 17-5-0200 (2014):**

**Allowed uses.**

Uses are allowed in the "M" Zoning Districts in accordance with the Use Table of this section.

**17-5-0207 Use Table and Standards.**

| USE GROUP | District | | | Use Standard | Parking Standard |
|---|---|---|---|---|---|
| **Use Category** | **M1** | **M2** | **M3** | | |
|     **Specific Use Type** | | | | | |
| P= permitted by-right   S = special use approval required   PD = planned development approval required   - = Not allowed | | | | | |
| **RESIDENTIAL** | | | | | |
| A. Group Living | | | | | |
|   1. Temporary Overnight Shelter | S | S | | § 17-9-0115 | § 17-10-0207-Q |
|   2. Transitional Shelters | S | S | | § 17-9-0115 | § 17-10-0207-Q |
| **PUBLIC AND CIVIC** | | | | | |
| B. Day Care | P | P | | § 17-9-0105.5 | § 17-10-0207-E |
| C. Detention and Correctional Facilities | S | S | S | | § 17-10-0207-E |
| D. Parks and Recreation (except as more specifically regulated) | P | P | P | | § 17-10-0207-E |
|   1. Community Centers, Recreation Buildings and Similar Assembly Use | - | - | - | | § 17-10-0207-E |
|   2. Community Garden | - | - | - | | |
| * **Editor's note** – The text of Coun. J. 9-8-11, p. 7541, § 4, amended item I (Parks and Recreation) in an apparent typographical error. This item "D" has been amended at the discretion of the editor.  Future legislation will correct the provision if needed. | | | | | |
| E. Postal Service | P | P | P | | § 17-10-0207-E |
| F. Public Safety Services | P | P | P | | § 17-10-0207-E |
| G. Utilities and Services, Minor | P | P | P | | § 17-10-0207-E |
| H. Utilities and Services, Major | S | S | S | | § 17-10-0207-E |
|   1. Wind Energy Meteorological Testing Tower | - | - | P | § 17-9-0117.7 | None required |
| **COMMERCIAL** | | | | | |
| I. Adult Use | S | S | S | § 17-9-0101 | § 17-10-0207-J |
| J. Animal Services | | | | | |
|   1. Shelters/Boarding Kennels | P | P | P | | § 17-10-0207-K |
|   2. Veterinary | P | P | P | | § 17-10-0207-K |
|   3. Stables | P | P | P | | § 17-10-0207-K |
| K. Building Maintenance Services | P | P | P | | § 17-10-0207-N |
| L. Business Support Services | | | | | |
|   1. Copying and Reproduction | P | P | P | | § 17-10-0207-M |
|   2. Business/Trade school | P | P | P | | § 17-10-0207-E |
|   3. Day Labor Employment Agency | P | P | P | | § 17-10-0207-Q |
|   4. Employment Agencies | P | P | P | | § 17-10-0207-L |

| USE GROUP | District | | | Use Standard | Parking Standard |
|---|---|---|---|---|---|
| Use Category | M1 | M2 | M3 | | |
|   Specific Use Type | | | | | |
| P= permitted by-right   S = special use approval required   PD = planned development approval required   - = Not allowed | | | | | |
| **COMMERCIAL** (continued) | | | | | |
| M. Urban Farm | | | | | |
|   1.  Indoor Operation | P | P | P | § 17-9-0103.3 Accessory sale of goods produced on site shall not exceed 3000 square feet | § 17-10-0207-U |
|   2.  Outdoor Operation | - | P | P | § 17-9-0103.3 Accessory sale of goods produced on site shall not exceed 3000 square feet | § 17-10-0207-U |
|   3.  Rooftop Operation | P | P | P | § 17-9-0103.3 Accessory sale of goods produced on site shall not exceed 3000 square feet | § 17-10-0207-U |
| N. Communication Service Establishments | P | P | P | | § 17-10-0207-L |
| O. Construction Sales and Service | | | | | |
|   1.  Building Material Sales | - | P | P | Customer-accessible retail sales areas may not exceed 20% of total floor area | § 17-10-0207-O |
|   2.  Contractor/Construction Storage Yard | - | P | P | | § 17-10-0207-O |
| P. Drive-Through Facility | S | S | S | § 17-9-0106 | |
| Q. Eating and Drinking Establishments | | | | | |
|   1.  Restaurant, Limited | P | P | P | Max GFA: 4,000 sq ft; no entertainment allowed | § 17-10-0207-M |
|   2.  Restaurant, General | P | P | P | Max GFA: 4,000 sq ft; no entertainment allowed | § 17-10-0207-M |
|   3.  Tavern | P | P | P | Max GFA: 4,000 sq ft; no entertainment allowed | § 17-10-0207-M |
| R. Entertainment and Spectator Sports | | | | | |
|   1.  Indoor Special Event Class A or B (see Sec. 4-156-550) including incidental liquor sales | P | P | P | | |
|   2.  Inter-Track Wagering Facility | S | S | S | § 17-9-0110 | § 17-10-0207-P |

| USE GROUP | District | | | Use Standard | Parking Standard |
|---|---|---|---|---|---|
| Use Category | M1 | M2 | M3 | | |
| Specific Use Type | | | | | |
| P= permitted by-right　S = special use approval required　PD = planned development approval required　- = Not allowed | | | | | |
| **COMMERCIAL** (continued) | | | | | |
| S.  Financial Services (except as more specifically regulated) | P | P | P | Max GFA: 3,000 sq ft | § 17-10-0207-L |
| 1.  Consumer Loan Establishment | S | S | S | Max GFA: 3,000 sq ft | § 17-10-0207-L |
| 2.  Payday/Title Secured Loan Store | S | S | S | Max GFA: 3,000 sq ft § 17-9-0125 | § 17-10-0207-L |
| 3.  Pawn Shop | S | S | S | Max GFA: 3,000 sq ft § 17-9-0127 | § 17-10-0207-L |
| T.  Food and Beverage Retail Sales | P | P | P | Max GFA: 3,000 sq ft | § 17-10-0207-M |
| U.  Gas Stations | S | S | S | § 17-9-0109 | § 17-10-0207-R |
| V.  Medical Service | P | - | - | | § 17-10-0207-T |
| W.  Office (except as more specifically regulated) | P | P | P | In M2 and M3, max GFA: 9,000 sq ft or accessory use to allowed industrial use | § 17-10-0207-L |
| 1.  High Technology Office | P | P | P | | § 17-10-0207-L |
| 2.  Electronic Data Storage Center | P | P | P | | § 17-10-0207-U |
| X.  Parking, Non-Accessory | S | S | S | | |
| Y.  Personal Service | P | P | | Max GFA: 3,000 sq ft | § 17-10-0207-M |
| Z.  Repair or Laundry Service, Consumer | P | P | P | | § 17-10-0207-N |
| AA.  Residential Storage Warehouse | P | P | P | | § 17-10-0207-Q |
| BB.  Retail Sales, General | P | P | P | Accessory sales of goods produced on-site: not to exceed 20% of on-site GFA | § 17-10-0207-M |
| CC.  Sports and Recreation, Participant | S | S | S | | § 17-10-0207-M |
| 1.  Shooting range facility | S | S | S | § 17-9-0120 Accessory sales of firearms and ammunition; not to exceed 20% of total floor area | § 17-10-0207-M |
| DD.  Vehicle Sales and Service | | | | | |
| 1.  Car Wash or Cleaning Service | P | P | P | | § 17-10-0207-N |
| 2.  Heavy Equipment Sales/Rental | - | P | P | § 17-9-0107 | § 17-10-0207-N |
| 3.  Light Equipment Sales/Rental, including automobile, motorcycle or boat sales | - | P | P | § 17-9-0107 | § 17-10-0207-N |
| 4.  Motor Vehicle Repair Shop | P | P | P | | § 17-10-0207-N |
| 5.  Vehicle Storage and Towing | P | P | P | | § 17-10-0207-N |
| 6.  RVs or Boat Storage | - | P | P | Sales allowed as accessory use only | § 17-10-0207-N |

| USE GROUP | District | | | Use Standard | Parking Standard |
|---|---|---|---|---|---|
| Use Category | M1 | M2 | M3 | | |
|    Specific Use Type | | | | | |
| P= permitted by-right   S = special use approval required   PD = planned development approval required   - = Not allowed | | | | | |
| **COMMERCIAL** (continued) | | | | | |
| EE.  Manufacturing, Production and Industrial Service | | | | | |
|    1.  Artisan | P | P | P | | § 17-10-0207-U |
|    2.  Limited | P | P | P | | § 17-10-0207-U |
|    3.  General | P | P | P | | § 17-10-0207-U |
|    4.  Intensive | - | - | P | | § 17-10-0207-U |
| FF.  Mining/Excavation | - | - | S | § 17-9-0117 | § 17-10-0207-U |
| **INDUSTRIAL** | | | | | |
| GG.  Recycling Facilities | | | | | |
|    1.  Class I | P | P | P | | § 17-10-0207-U |
|    2.  Class II | S | P | P | | § 17-10-0207-U |
|    3.  Class III | - | S | P | § 17-9-0117 | § 17-10-0207-U |
|    4.  Class IVA | - | S | S | § 17-9-0117 | § 17-10-0207-U |
|    5.  Class IVB | - | - | S | § 17-9-0117 | § 17-10-0207-U |
|    6.  Class V | - | - | S | § 17-9-0117 | § 17-9-0117-U |
| HH.  Warehousing, Wholesaling and Freight Movement (except as more specifically regulated) | P | P | P | | § 17-10-0207-U |
|    1.  Container Storage | - | S | S | § 17-9-0105 | § 17-10-0207-U |
|    2.  Freight Terminal | | P | P | | § 17-10-0207-U |
|    3.  Outdoor Storage of Raw Materials as a Principal Use | - | - | P | | § 17-10-0207-U |
| II.  Waste-Related Use | | | | | |
|    1.  Hazardous Materials Disposal or Storage | - | - | S | § 17-9-0117 | § 17-10-0207-U |
|    2.  Incinerators | - | - | S | § 17-9-0117 | § 17-10-0207-U |
|    3.  Incinerators, Municipal | - | - | S | § 17-9-0117 | § 17-10-0207-U |
|    4.  Liquid Waste Handling Facilities | - | - | S | § 17-9-0117 | § 17-10-0207-U |
|    5.  Reprocessable Construction/Demolition Material Facility | - | - | S | § 17-9-0117 | § 17-10-0207-U |
|    6.  Resource Recovery Facilities | - | - | S | § 17-9-0117 | § 17-10-0207-U |
|    7.  Sanitary Landfills | - | - | S | § 17-9-0117 | § 17-10-0207-U |
|    8.  Transfer Stations | - | - | S | § 17-9-0117 | § 17-10-0207-U |
|    9.  Modified Transfer Stations | - | - | S | § 17-9-0117 | § 17-10-0207-U |
| **OTHER** | | | | | |
| JJ.  Wireless Communication Facilities | | | | | |
|    1.  Co-located | P | P | P | § 17-9-0118 | None required |
|    2.  Freestanding (Towers) | P | P | P | § 17-9-0118 | None required |
| KK.  Coke & Coal Bulk Material | - | - | - | § 17-9-0117-B | None required |
| LL.  Medical Cannabis | | | | | |
|    1.  Cultivation Center | S | S | S | § 17-9-0129 | § 17-10-0207-U |
|    2.  Dispensing Organization | - | - | - | | |





City of Chicago
Shooting Range Analysis



Business Districts "B"

Commercial Business Districts "C"

Manufacturing Districts "M"

Planned Manufacturing Districts "PMDs"

Downtown Districts "DX, DC, DS"

Potential area for shooting range facility
3,366 acres within existing Zoning Districts

City of Chicago Boundary

* The area(s) shown on the map has/have been defined
after deducting any prohibited areas outlined
in the Chicago Municipal Code.
* For reference purposes only
* Further detailed studies should be performed
to justify whether or not a site
can be used as a shooting range facility
* 2012 City of Chicago - All Rights Reserved

Author: Luis Monterrubio DHED
Date Saved: 9/28/2012 12:19:20 PM

CITY 000708