IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

RHONDA EZELL, JOSEPH BROWN,
WILLIAM HESPEN, ACTION TARGET, INC.,
SECOND AMENDMENT FOUNDATION, INC.,
and ILLINOIS STATE RIFLE ASSOCIATION,

Plaintiffs-Appellees/Cross-Appellants,

v.

CITY OF CHICAGO,

Defendant-Appellant/Cross-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 10 C 5135
The Honorable Virginia M. Kendall, Judge Presiding.

_____

**REPLY/RESPONSE BRIEF OF
DEFENDANT-APPELLANT/CROSS-APPELLEE**

_____

STEPHEN R. PATTON
  Corporation Counsel
    of the City of Chicago
Suite 800
30 North LaSalle Street
Chicago, Illinois 60602
(312) 744-8519

BENNA RUTH SOLOMON
  Deputy Corporation Counsel
MYRIAM ZRECZNY KASPER
  Chief Assistant Corporation Counsel
SUZANNE M. LOOSE
  Senior Counsel
Of Counsel

# TABLE OF CONTENTS

———

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ORDINANCES INVOLVED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I.     THE CITY'S ZONING OF SHOOTING RANGES IS
       CONSTITUTIONAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

       A.     The City's Zoning Of Shooting Ranges Is Subject To
              Intermediate Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

       B.     The Zoning Restrictions For Shooting Ranges Are
              Substantially Related To Important Public Health
              And Safety Objectives. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

       C.     Alternatively, The Zoning Provisions Should Be
              Upheld Because They Do Not Substantially Burden
              Second Amendment Rights. . . . . . . . . . . . . . . . . . . . . . . . . . . 23

II.    THE AGE RESTRICTION FOR SHOOTING RANGES IS
       CONSTITUTIONAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

       A.     The Age Restriction Does Not Violate The Second
              Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

              1.     The Right Of Minors To Use Firearms Is
                     Outside The Scope Of The Second
                     Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**2.** **At Most, Intermediate Scrutiny Applies, Which The Age Restriction Readily Passes.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

**B.** **The Age Restriction Does Not Violate The First Amendment.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

# TABLE OF AUTHORITIES

———

**CASES**                                                              **Page**

Albrechtsen v. Board of Regents of the University of Wisconsin System,
    309 F.3d 433 (7th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26-27

Bellotti v. Baird,
    443 U.S. 622 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Birmingham Boys' Club, Inc. v. Transamerica Co.,
    325 So. 2d 167 (Ala. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Board of Trustees of State University of New York v. Fox,
    492 U.S. 469 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Bucholz v. City of Sioux Falls,
    91 N.W.2d 606 (S.D. 1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Bullock v. Carter,
    405 U.S. 134 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

City of Los Angeles v. Alameda Books, Inc.,
    535 U.S. 425 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

City of Renton v. Playtime Theaters,
    475 U.S. 41 (7th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Clancy v. Office of Foreign Assets Control,
    539 F.3d 595 (7th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Dionne v. City of Trenton,
    261 N.W.2d 273 (Mich. App. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . 38

District of Columbia v. Heller,
    554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Edwards v. City of Goldsboro,
    178 F.3d 231 (4th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Ezell v. City of Chicago,
    651 F.3d 684 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Ginsberg v. New York,
    390 U.S. 629 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Hall v. Garcia,
    No. 10-03799, 2012 WL 995933 (N.D. Cal. March 17, 2011). . . . . . . . . . . . . 20

Hancock v. Train,
    426 U.S. 167 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Hoffmeyer v. Hoffmeyer,
    869 S.W.2d 667 (Ct. App. Tex. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Holder v. Humanitarian Law Project,
    561 U.S. 1 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

James v. Dravo Contracting Co.,
    302 U.S. 134 (1937). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

LaShawn A. v. Barry,
    87 F.3d 1389 (D.C. Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Lorillard Tobacco Co. v. Reilly,
    533 U.S. 525 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Messinger v. Anderson,
    225 U.S. 436 (1912). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

New York v. Ferber,
    458 U.S. 747 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Nordyke v. King,
    681 F.3d 1041 (9th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

North Avenue Novelties v. City of Chicago,
    88 F.3d 441 (7th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

NRA v. BATFE,
    700 F.3d 185 (5th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

NRA v. McCraw,
    719 F.3d 338 (5th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Parker v. Franklin County Community School Corp.,
    667 F.3d 910 (7th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

People v. Aguilar,
2 N.E.3d 321 (Ill. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

People v. Mosley,
No. 115872, 2015 WL 728095 (Ill. Feb. 20, 2015) . . . . . . . . . . . . . . . . . . . . 30

Planned Parenthood of Southeast Pennsylvania v. Casey,
505 U.S. 833 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Rumsfeld v. Forum for Academic & Institutional Rights,
547 U.S. 47 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Shepard v. Madigan,
734 F.3d 748 (7th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Sherbert v. Verner,
374 U.S. 398 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

State v. Callicutt,
69 Tenn. 714 (1878). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

State v. Sieyes,
225 P.3d 995 (Wash. 2010).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Teixeira v. County of Alameda,
No. 12-CV-03288, 2013 WL 4804756 (N.D. Cal. Sept. 9, 2013). . . . . . . . . . . 20

United States v. Decastro,
682 F.3d 160 (2d Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

United States v. O'Brien,
391 U.S. 367 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

United States v. Thomas,
11 F.3d 732 (7th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

United States v. Robinson,
724 F.3d 878 (7th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

United States v. Skoien,
614 F.3d 638 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 23

United States v. Yancey,
621 F.3d 681 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Wanyek v. McMullin,
    209 N.E.2d 223 (Ohio Ct. App. 1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Wisconsin v. Yoder,
    406 U.S. 205 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Zablocki v. Redhail,
    434 U.S. 374 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**STATUTES, RULES, ORDINANCES, AND OTHER AUTHORITIES**

Fed. R. Civ. P. 56(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

225 ILCS 447/50-25. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

520 ILCS 5/3.1-9. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Municipal Code of Chicago, Ill. § 4-151-010. . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Municipal Code of Chicago, Ill. § 4-151-100(d). . . . . . . . . . . . . . . . . . . . . . . . . . 27

Municipal Code of Chicago, Ill. § 8-24-050. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Municipal Code of Chicago, Ill. § 15-24-220. . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Municipal Code of Chicago, Ill. § 15-24-910. . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Municipal Code of Chicago, Ill. §§ 15-24-920 to 980. . . . . . . . . . . . . . . . . . . . . . 18

Municipal Code of Chicago, Ill. § 17-9-0120-A. . . . . . . . . . . . . . . . . . . . . . . . . . 12

Municipal Code of Chicago, Ill. §17-15-103. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Municipal Code of Chicago, Ill. § 17-15-301. . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Atlanta, Georgia Code of Ordinances § 14-5(e). . . . . . . . . . . . . . . . . . . . . . . . . . 20

Baton Rouge Unified Development Code, Appendix H. . . . . . . . . . . . . . . . . . . . . 21

Zoning Ordinance of Charleston, South Carolina § 54-207(s) . . . . . . . . . . . . . . . . .

Cleveland, Ohio Code of Ordinances § 695.07(e). . . . . . . . . . . . . . . . . . . . . . . . . 21

City of Lawton Municipal Code § 7-29-1-2904 . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Minneapolis Code of Ordinances §§ 267.1630, 267.1750. . . . . . . . . . . . . . . . . . . . . . 21

Zoning Ordinance, City of New Haven § 42, T. 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Code of the City of Orlando, Florida, Part 1B, Tables 2B.LDC; 2D.LDC § 58.861. . 21

Municipal Code of the City of Rochester § 99-11(E). . . . . . . . . . . . . . . . . . . . . . . . . . 21

Rochester, New York Zoning Code § 120-83(Q). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Rochester, New York Zoning Code §120-148.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

St. Paul, Minnesota Legislative Code § 65.520. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

St. Paul, Minnesota Legislative Code § 66.521. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

City of Worcester Zoning Ordinance § 3-2, Table 4.1, No. 22. . . . . . . . . . . . . . . . . . 21

Mark Berman, <u>Girl Who Accidentally Shot her Instructor with an Uzi Said the
Gun Was Too Much for Her</u>,
     Wash. Post, Sept. 2, 2014, available at www.washingtonpost.com. . . . . . . . . 38

Thomas M. Cooley, <u>Treatise on the Constitutional Limitations</u>
     740 n.4 (5th ed. 1883) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Saul Cornell, <u>"Don't Know Much About History": The Current Crisis in Second
Amendment Scholarship</u>,
     29 N. Ky. L. Rev. 657 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Mark Anthony Frassetto, <u>Firearms and Weapons Legislation Up to the Early
Twentieth Century</u> (2013),
     available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2200991 . . 29

The Letters of Thomas Jefferson, <u>To Peter Carr</u>, Paris, Aug. 19, 1785,
     available at http://avalon.law.yale.edu/18th_century/let31.asp. . . . . . . . . . . 32

Glenn Harlan Reynolds, <u>A Critical Guide to the Second Amendment</u>,
     62 Tenn. L. Rev. 461 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Adam Ortiz, <u>Adolescence, Brain Development, and Legal Culpability</u>,
     American Bar Association, Juvenile Justice Center (Jan. 2004),
     available at http://www.americanbar.org/content/dam/aba/publishing/
     criminal_justice_section_newsletter/crimjust_juvjus_Adolescence.
     authcheckdam.pdf (last visited May 13, 2015) . . . . . . . . . . . . . . . . . . . . . . . . 36

Cheryl B. Preston, <u>Zoning the Internet: A New Approach to Protecting Children Online</u>,
    2007 B.Y.U. L. Rev. 1417. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

# ISSUES PRESENTED

———————————

In addition to the issue presented in the City's opening brief, the following issues are presented in the cross-appeal:

1.  Whether an ordinance requiring a shooting range to be 500 feet from residential districts and certain other places where people congregate, and 100 feet from another shooting range, violates the Second Amendment, when that restriction does not substantially burden the exercise of Second Amendment rights and is substantially related to important public safety objectives.

2.  Whether an ordinance that prohibits individuals under 18 years old from entering shooting ranges violates the Second Amendment, when minors are outside the scope of the Second Amendment; the restriction does not substantially burden Second Amendment activity; and the restriction is substantially related to important public safety objectives.

3.  Whether an ordinance that prohibits individuals under 18 years old from entering shooting ranges violates the First Amendment, when it restricts conduct that is not inherently expressive, and the restriction is substantially related to important public safety objectives that are wholly unrelated to the suppression of speech.

## ORDINANCES INVOLVED

—————

Municipal Code of Chicago, Ill. § 17-9-0120:

**Shooting ranges.**  Shooting ranges may not be located in any of the following areas or locations:

**17-9-0120-A** within 100 feet of another existing shooting range;

**17-9-0101-B** within 500 feet of any zoning district that is zoned for residential use, including a planned development that authorizes residential use;

**17-9-0101-C** within 500 feet of any pre-existing school, day-care facility, place of worship, premises licensed for the retail sale of liquor, children's activities facility, library, museum or hospital.

Municipal Code of Chicago, Ill. § 4-151-100(d):

No person under the age of 18 shall be permitted in the shooting range facility. The licensee shall require every shooting range patron to provide a driver's license or other government-issued identification showing the person's name, date of birth, and photograph.

## STATEMENT OF THE CASE

**The Age Restriction at Gun Ranges**

The Ordinance restricts anyone "under the age of 18" from entering a shooting range facility. Municipal Code of Chicago, Ill. § 4-151-100(d).[1] This provision precludes minors from being patrons at a shooting range. Separate Appendix of Appellees/Cross-Appellants ("Ezell SA") 64. It also guards against "kids running around unsupervised" while guns are being fired. Id. at 65.

The "'biological' age of maturity" is around "age 21 or 22." Adam Ortiz, Adolescence, Brain Development, and Legal Culpability, American Bar Association, Juvenile Justice Center, at 2 (Jan. 2004), available at http://www.americanbar.org/

---

[1] This statement of the case includes facts pertaining only to the age restriction, since the procedural history of the case and facts pertaining to the zoning provisions are set forth in the City's opening brief.

content/dam/aba/publishing/criminal_justice_section_newsletter/crimjust_juvjus_Ad olescence.authcheckdam.pdf.  That is because "the brain does not cease to mature until the early 20s in those relevant parts that govern impulsivity, judgment, planning for the future, foresight of consequences, and other characteristics that make people morally culpable."  Id. at 3.

Shooting range patrons are exposed to lead, and such exposure can result in elevated blood lead levels.  R. 227-3 at 10.  Lead can be inhaled from the air, or picked up on the skin, especially hands, from the ground or other lead-contaminated surfaces.  R. 227-3 at 11-12; R. 227-2 at 62.  Exposure to lead is particularly dangerous for children under the age of seven because lead is toxic to the brain and can cause permanent damage, and children are more susceptible to ingesting lead particles by touching contaminated surfaces and transferring the lead to their mouths.  R. 227-4 at 97.

Deon Robuck, Paul Kuczmierczyk, and Richard Pearson testified about their interest in opening a shooting range in Chicago and the extent to which they had pursued plans for doing so.  Each gave reasons, other than the age restriction, for why their plans for opening a range had stalled.  Robuck testified that his range plans were stalled because he was working on other projects.  R. 227-4 at 77-78.  He believed that a shooting range in Chicago could be profitable after some years despite the City's regulations.  R. 227-4 at 80.

As for Kuczmierczyk, youth programs were not a part of his plans for making a profit at a shooting range.  His "primary market" would be "males age 18 to 54."

3

Ezell SA 54.  He would like to include youth programs "free of charge" if that were possible, including events such as the "First Shots" program sponsored by National Shooting Sports Foundation, as well as programs for Boy Scouts of America and other youth groups.  Id. at 56.  He had to "figure out how to work it in" because it raises some problems with "the business plan," by which he meant that he needs "people to give [him] money."  Id.  Kuczmierczyk's plans for a range were stalled because he could not get the pricing information he needed for a business plan without a federal firearms license, which he did not yet have.  R. 234-3 at 56-58. Kuczmierczyk had searched for a location in some neighborhoods on Chicago's north side – Lakeview, Lincoln Park, North Center, and Ravenswood and neighborhoods "west from there," but not near O'Hare.  R. 234-3 at 44.  He has also considered property in the suburb of Lincolnwood.  R. 234-3 at 33.

Pearson, the Executive Director of the Illinois State Rifle Association ("ISRA"), R. 233-4 at 3, explained that ISRA had stopped exploring the possibility of opening a range in Chicago because it wanted to wait and "see how [this lawsuit] turned out."  R. 233-4 at 43.  Pearson also testified during the preliminary injunction hearing that many aspects of firearms safety and use can be taught elsewhere besides a shooting range.  R. 74 at 162.  During firearms training, "numerous types of information about gun handling and gun safety are communicated to students before they ever hold a gun in their hand."  R. 74 at 162.  Those topics include how to safely store, load, hold, and aim a gun.  R. 74 at 162-63.  At ISRA's outdoor range in Bonfield, Illinois, instructors often provide students with a plastic replica of a gun,

4

called a "blue gun," to practice holding, aiming, and holstering.  R. 74 at 163.

Plaintiffs' experts, Kramer and Giordano, were concerned about the economic impact of the age restriction, but had no idea how much revenue is generated from youth programming; how many patrons, if any, could not go to a range if they were not allowed to bring children; or the impact of not permitting minors to work at a range.  R. 226-1 at 66-71; R. 226-2 at 6-10.  They had not studied those issues, reviewed relevant data, or discussed the impact of the provision with any potential range owners.  R. 226-1 at 66-68; R. 226-2 at 9-13.  Giordano admitted he had "no figures to back . . . up" his concern that parents would not come to a range if they could not bring their children, R. 226-2 at 10, and he had "no idea" what the effect on revenue would be, R. 226-2 at 11.

## SUMMARY OF ARGUMENT
─────────────

Chicago regulates shooting ranges for the safety of its residents.  That includes zoning and age restrictions – the only regulations at issue on appeal. Under the Ordinance, those who wish to open a shooting range in Chicago have more than 3,300 acres of land to search for a location.  And law-abiding residents who would like to patronize a shooting range may do so when they reach the age of 18.  At the same time, these restrictions promote safety by keeping shooting ranges away from more populated areas, ensuring that patrons have reached an appropriate level of maturity before handling firearms, and protecting children from lead contamination.

The district court erred in ruling that the M zoning violates the Second

Amendment, but then correctly upheld the constitutionality of the buffer between the ranges and more populated areas. Both the M zoning classification and the buffer impose only a modest burden on Second Amendment activity and leave ample space for shooting ranges. Intermediate scrutiny is appropriate for such a modest burden, and both zoning provisions satisfy that standard. Shooting ranges are places were firearms theft, flash fires, lead contamination, and noise pollution may occur. Because of these dangers, the City Council properly determined shooting ranges should be distanced from residential areas and other places where people congregate for social, educational, religious, and other purposes.

Alternatively, this court could revisit, and adopt, a Second Amendment test that includes a threshold inquiry into whether a regulation substantially burdens Second Amendment activity. This court's consideration of the substantial-burden threshold test is not barred by the law-of-the-case doctrine because <u>Ezell v. City of Chicago</u>, 651 F.3d 684 (7th Cir. 2011) ("<u>Ezell I</u>"), involved a shooting range ban, while this appeal involves far less intrusive shooting range regulations. Firearms are inherently dangerous and result in thousands of deaths and injuries each year. The substantial burden test would afford the government latitude to guard against the dangers of firearms activity while ensuring that regulations leave ample opportunity to exercise Second Amendment rights. Since the zoning restrictions only modestly burden target practice, they should be upheld under that test.

The age restriction does not violate the Constitution either. It does not violate the Second Amendment because a minor's right to possess or use firearms lies

outside the scope of Second Amendment protection.  In addition, even if within the scope of Second Amendment protection, the restriction does not substantially burden those rights, since it is only a temporary prohibition for children, and it does not interfere with adults' ability to target practice.  Moreover, the restriction is substantially related to the important interest of ensuring that minors are mature enough to exercise the proper judgment necessary to operate a deadly weapon, as well as an interest in minimizing the exposure of children to the lead inside a shooting range.

Finally, the age restriction does not violate the First Amendment because shooting at a target is conduct that is not inherently expressive, and it is therefore not protected by the Free Speech Clause.  Even if such shooting were considered to be expressive, the age restriction passes scrutiny.  The restriction is not aimed at speech, but at protecting minors from lead poisoning and protecting range patrons from the irresponsible conduct of minors at shooting ranges.  And by limiting the restriction to minors, the regulation restricts First Amendment freedoms no greater than necessary to further the City's important safety objectives.  For these reasons, the district court's ruling upholding the age restriction should be affirmed.

## ARGUMENT
———

Chicago's zoning restrictions and age restriction at gun ranges were enacted to protect the health, safety, and welfare of its residents and visitors.  These provisions leave ample opportunity for the exercise of a Second Amendment right to maintain proficiency in the use of firearms.  And they serve important public safety

objectives by guarding against the dangers of crime, fires, lead contamination, and noise pollution that could impact areas close to shooting ranges, as well as providing safeguards against harm from and to minors at the range.

The zoning and age restrictions are the only issues that remain in this case. Plaintiffs have abandoned all other challenges to various construction and operational requirements for shooting ranges. Appellees/Cross-Appellants' Brief ("Ezell Br.") 2-3. Yet plaintiffs spend pages discussing former versions of the ordinance, purportedly for "context," id. at 4, and characterizing those earlier versions as a "complete resistance" to Ezell I, id. at 2, allegedly "calculated to destroy or discourage firearms use and ownership," id. at 61. Plaintiffs' blustering about regulations they no longer challenge, including repealed regulations, is nothing but a smoke screen to deflect from the narrow issues that remain, and should be ignored. The history of the City's shooting range regulations demonstrates that the City has been amenable to fine tuning its regulations, amending them several times to reduce the size of the buffer from 1,000 feet to 500 feet, R. 225-4 at 17, and to eliminate myriad other requirements that plaintiffs considered problematic, see R. 278 at 1-2 (listing seven claims mooted by ordinance amendments). In addition, the City's Zoning Administrator, Patricia Scudiero, discussed how her office works with developers to help them find an appropriate location, answering questions and explaining how to use the City's online zoning map. R. 234-4 at 31-33. Plaintiffs' suggestion that the City's regulations are designed to punish, instead of regulate for safety reasons, is wholly unfounded, and

should be flatly rejected.

As for the zoning regulations, virtually the same reasons show that the district court erred in holding the M zoning unconstitutional, even as it correctly ruled that the buffer zones are constitutional. That is, neither restriction substantially burdens Second Amendment rights, and both are substantially related to important public safety objectives, including protecting Chicago residents and visitors from crime, fires, lead contamination, and noise pollution.

The age restriction is constitutionally sound, as well. Neither the Second Amendment, nor the First Amendment, protects a minor's right to fire a gun. And, even if the age restriction affects any activity within the scope of Second Amendment rights, it does not substantially burden those rights because it is a temporary restriction for minors and has no appreciable impact on adults' ability to engage in Second Amendment activity. It is also substantially related to the important governmental objectives of protecting minors and adult range patrons from irresponsible firearms use by minors, and protecting children from lead contamination. And, even if the First Amendment protected the activity of shooting at a range, the age restriction does not violate the Free Speech Clause, precisely because the age restriction furthers those important safety objectives – which are unrelated to the suppression of speech – and does so in a manner that is no greater than is essential to serve those interests.

I.      THE CITY'S ZONING OF SHOOTING RANGES IS
        CONSTITUTIONAL.

As we explain in our opening brief, assigning shooting ranges to M districts no

more than modestly burdens Second Amendment rights, and so the district court should have applied the same, less rigorous intermediate scrutiny it applied to other shooting range regulations that do not severely burden the exercise of those rights. Brief and Appendix of Defendant-Appellant ("City Br.") 14.  For the same reason, the court correctly applied that standard to the buffer zones in section 17-9-120.  Id.  at 26-27.  The zoning regulations easily pass muster under that standard because they keep ranges at a safe distance from populated areas.

A.    **The City's Zoning Of Shooting Ranges Is Subject To Intermediate Scrutiny.**

As we explain in our opening brief, under this court's sliding scale approach, Chicago's zoning regulations should be more easily justified than the broad prohibition on shooting ranges at issue in Ezell I.  City Br. 19-20.  This court should apply, at most, the form of intermediate scrutiny used for firearms restrictions that do not completely ban Second Amendment activity.  The district court properly applied that level of intermediate scrutiny to uphold the buffers in section 17-9-0120, id. at A18, but went awry when it applied a more stringent level of scrutiny to the M zoning.

The burden on Second Amendment rights imposed by even the combined effect of the M zoning and the buffer, is modest.  The zoning restrictions, taken together, still allow for shooting ranges to locate on more than 10% of the land zoned for all types of commercial use in Chicago, for a total of 3,386 acres of land, or 1,900

parcels of property. R. 227-1 at 30, 35.[2] As we explain in our opening brief, that is considerably more space than was available for adult uses in <u>City of Renton v. Playtime Theaters</u>, 475 U.S. 41, 54 (1986), or in <u>North Avenue Novelties v. City of Chicago</u>, 88 F.3d 441, 445 (7th Cir. 1996). City Br. 21. Likewise, the total number of parcels available is far greater than the 22-56 locations available for new adult uses in <u>North Avenue Novelties</u>, 88 F.3d at 445.

Plaintiffs attempt to avoid the unfavorable comparison to <u>Renton</u> and <u>North Avenue Novelties</u> by calling it an "an apples-to-oranges exercise" based on the special "construction standards" for shooting ranges that may "require different types of locations" than books stores, which can operate on "just about any parcel of land" and "may not rely on retail traffic in much the same way as do gun ranges." Ezell Br. 40. This makes no sense. There is no reason to believe that the "types of locations" needed for gun-range construction cannot be found in M districts. Nor is there any basis to assume that ranges are more likely to benefit from being located near retail traffic than adult bookstores and theaters are. Certainly, plaintiffs adduced no evidence on these issues. Nor did any of the individuals who explored the possibility of opening a range in Chicago testify that they could not find locations near retail areas, or that, if a range were removed from retail traffic, it could not attract enough patrons to be profitable.

---

[2] Plaintiffs argue that "Chicago resisted disclosing the total number of parcels in the city." Ezell Br. 41. That vague accusation is wholly unsupported by the record. Valenziano was asked if he knew that number, and he did not. R. 227-1 at 35. Plaintiffs made no written request for that information; nor did they move to compel production of it.

Plaintiffs argue that the zoning requirements amount to "a complete destruction of the ability to open a range." Ezell Br. 38. That is nothing more than inflated rhetoric, and it is sharply undermined by the record. Indeed, while plaintiffs complain that shooting ranges must be 100 feet apart from each other, Municipal Code of Chicago, Ill. § 17-9-0120-A, plaintiffs' own expert admitted that this requirement is not a problem, R. 234-5 at 166. And plaintiffs' argument that "[r]ange owners often avoid locating in manufacturing districts," Ezell Br. 19, is undercut by two concrete examples. For starters, SAF picked two properties in M districts when it was planning to park a mobile range in Chicago in 2010. R. 74 at 93.[3] In addition, Robuck testified that he found a place that would meet the zoning requirements that he considered appropriate, and for which he was negotiating with the owners of the property. Robuck told Hart that he found the search for a location "challenging," but he "work[ed] with the City," R. 233-5 at 211, until he found a location that "fit within the ordinance," R. 227-4 at 67.[4] So plaintiffs are simply

_____

[3] The two addresses were 3333 West 36th Street and 6331 South Bell Street. R. 74 at 93. A search of the City's zoning map shows that the 36th Street location is in an M3-3 district and the Bell Street location is in an M1-2 district. https://gisapps.cityofchicago.org/zoning/. Whether or not those locations would comply with the 500-foot buffer, they still preclude any argument that range owners are averse to manufacturing zones.

[4] Plaintiffs note Robuck's statement that property "owners are not as receptive to the idea . . . because it poses a challenge maybe to what the City wants," Ezell Br. 20 n.4, and suggest that this has something to do with the City's "deposition techniques" when the City deposed the owner of property where SAF wanted to park a mobile gun range in 2010, id. That is baseless. Robuck did not say anything about depositions of other property owners. And any concerns about "what the City wants" have nothing to do with zoning since Robuck believed those requirements to be satisfied.

wrong to describe Robuck's range plans as "frustrated" by the zoning requirements. Ezell Br. 19. And Robuck's experience is consistent with the testimony of plaintiffs' expert, Giordano, who testified that "a lot of ranges . . . are located in industrial parks," and that a shooting range can be "compatible with [an] industrial use." R. 234-5 at 304.

Plaintiffs rely on the Zoning Administrator's testimony about a few phone calls to her office about non-compliant locations as evidence that the zoning requirements have kept shooting ranges out of Chicago. Ezell Br. 19.[5] A few phone inquiries do not show that. Indeed, some or even all of those phone calls could have come from Robuck, who testified that he made several calls to the City before he successfully found a place that "fit within the ordinance." R. 227-4 at 67.

Plaintiffs identify no one who searched for property in the 3,386 acres of land in M districts and could not find a suitable location. The closest they come is Kuczmierczyk's testimony about his search for a range location. Ezell Br. 35. But Kuczmierczyk testified about a search he conducted when the buffer zone was 1,000 feet. R. 234-3 at 41-42. The Ordinance was amended on September 8, 2011 to reduce the buffer to 500 feet, R. 225-4 at 17, and Kuczmierczyk had not renewed the search after that. Moreover, he did not conclude, as plaintiffs claim, that even the 1,000 feet buffer resulted in "few, if any, places" in Chicago that "would fit within

---

[5] Plaintiffs misstate Scudiero's testimony on these calls. They claim that perhaps "three to ten individuals" contacted the Zoning Administrator's office. Ezell Br. 19. Scudiero actually testified that the number was "three give or take a couple," R. 235-4 at 29, and she was referring to the number of "inquiries" made, not the number of "individuals" who called, R. 235-4 at 28.

the distance requirements." Ezell Br. 21. Kuczmiercyzk's search was not Chicago-wide. He searched part of Chicago's north side, including the neighborhoods of Lakeview, Lincoln Park, North Center, Ravenswood, and some others to the west, but not as far west as O'Hare. R. 234-3 at 43. Kuczmierczyk's limited search – including some densely populated areas – hardly indicates that the zoning was a serious barrier to locating anywhere in Chicago.

And plaintiffs' reliance on the mere fact that no shooting range has opened yet, Ezell Br. 2, 41, is wholly unpersuasive because there are other obvious explanations. One reason is the uncertainty of this litigation. Plaintiffs filed an amended complaint just three months after Chicago's original shooting range regulations were enacted, challenging eleven Ordinance provisions. R. 126. In February 2013, plaintiffs filed a second amended complaint challenging more than 20 provisions. R. 200. Given the uncertainty about what regulations will ultimately apply when the litigation is over, it is not surprising that those interested in opening a range would wait until final judgment. Indeed, that was precisely the reason Pearson gave – ISRA would wait for the results of this lawsuit before it would further consider whether to pursue plans for a Chicago range. R. 233-4 at 43.

Beyond the uncertainty of this litigation, opening a shooting range is expensive. In Chicago, the cost of real estate alone is expensive. R. 225-2 at 111. On top of that, it costs "millions of dollars to build an indoor shooting range," and that is "regardless of where it is." R. 234-5 at 286; see also R. 234-4 at 297 (range costs between $3 and 20 million); R. 234-3 at 56 (Kuczmierczyk estimates $12

million for a range). And it takes time to raise that sort of money. As Robuck explained, before moving forward with a range, he would need to develop a comprehensive business plan, and then persuade investors to invest. R. 227-4 at 77. The time and expense involved, along with the uncertainty of this litigation, explains why no shooting ranges have opened yet.

Plaintiffs express concern over Scudiero's inability "to commit to grandfathering ranges . . . against incompatible land uses that might move within 500 feet of their property." Ezell Br. 52. That is not a fair characterization of Scudiero's testimony. Scudiero testified that she "d[id not] know what the process would be" if someone proposing a use listed in section 17-9-120(c) applied for a license to operate at a location within 500 feet of an existing firing range. Ezell SA 51-52. Whatever that process is, under the plain language of the Ordinance, an existing use that was "lawfully established in accordance with zoning regulations" but is "no longer allowed" is a "nonconforming use," Municipal Code of Chicago, Ill. § 17-15-301, and such nonconforming uses "may be continued" subject to certain regulations, id. §17-15-103. So a "lawfully established" shooting range would not be affected by later land use developments. Considering this grandfather provision, it is not surprising that none of the witnesses who discussed their plans for opening a range in Chicago testified that they would be deterred by a fear of non-renewal of their license if a business listed in section 17-9-0120 would later open within 500 feet.

**B.    The Zoning Restrictions For Shooting Ranges Are
Substantially Related To Important Public Health
And Safety Objectives.**

Both the M zoning classification and the buffer zones promote public health

and safety in several ways.  As we explain in our opening brief, City Br. 18, a

shooting range is a high impact use and, like other high impact uses, it is properly

kept at a distance from residential districts and uses involving gatherings of people.

The dangers that justify such distancing include firearms theft, fires, noise

pollution, and lead hazards.  We cited numerous examples of fires at shooting

ranges, and of the theft of multiple guns at a time from shooting ranges and gun

stores, id. at 25-26, and relied on a NIOSH report addressing the potential for lead

contamination outside the range, id. at 25.  Such reports and anecdotes, along with

simple common sense, are sufficient to satisfy the requirement that the regulation is

reasonable and supported by substantial evidence.  Id. at 23-24 (citing Board of

Trustees of State University of New York v. Fox, 492 U.S. 469, 480 (1989); and

Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 555 (2001)).  Keeping shooting ranges

at a distance from residential areas and other places where people gather helps

avoid exposing more people than necessary to firearms theft, fires, lead

contaminated soil or water, and noise that may occur at a shooting range.

Plaintiffs' only argument against such evidence is to repeat, over and over,

that "data" and "empirical" evidence are lacking, Ezell Br. 10, 11, 13, 14, 44, and so

the concerns raised by the City's witnesses are just speculation, id. at 32, 44, 47.

They completely ignore the Supreme Court's holding that such empirical data is not

required, City Br. 29 (citing <u>City of Los Angeles v. Alameda Books, Inc.</u>, 535 U.S. 425, 439 (2002)), as well as the Court's approval of reliance on anecdotal evidence and common sense, <u>id.</u> at 24 (citing <u>Lorillard</u>, 533 U.S. at 555). Under these standards, the City's evidence about firearms' theft, fires, and lead exposure at gun ranges, and the experience of Chicago police in tracing illegal guns to shooting ranges and gun stores, amply support placing shooting ranges away from more populated areas. Plaintiffs attack the City's concern about fire hazards by facetiously recharacterizing it as a concern about "spontaneous combustion," Ezell Br. 12, and "blowing up . . . surrounding neighborhoods," <u>id.</u> at 43, rather than address the simple facts that ammunition is combustible and that fires are not uncommon at shooting ranges, City Br. 8. And, of course, the risk that a fire will spread to other properties is increased if businesses containing similarly combustible materials are close by. Fire prevention is ample justification for distancing shooting ranges just 100 feet from other shooting ranges, as well as 500 feet from other places where people congregate.

As for potential lead contamination, plaintiffs do not even dispute that improperly maintained shooting ranges present this potential hazard. Rather, they attempt to cast aside the NIOSH report containing this information as a "belated submission," which was not referred to by the City's designated witnesses on zoning. Ezell Br. 43. This argument is makeweight. The City relied on the report in its motion for summary judgment, and timely submitted the report to the district court, R. 223 at 19; R. 227-3 at 23. Nothing in Rule 30(b)(6) even remotely suggests that a

party is limited to the testimony of a Rule 30(b)(6) witness. The City was free to submit the same variety of relevant and admissible evidence as in any case. See Fed. R. Civ. P. 56(c). And, as United States v. Skoien, 614 F.3d 638 (7th Cir. 2010) (en banc), holds, published reports and studies are proper evidence in support of firearms regulations, id. at 634-44.

Plaintiffs attempt to dismiss the potential for lead contamination with a curt comparison to dry cleaners and gas stations "commonly found (and regulated) throughout Chicago." Ezell Br. 43. The comparison is inapt. Dry cleaners and gas stations are subject to restrictions that would not make sense for shooting ranges. Gas tanks, for example, must be stored underground, and gas stations are subject to other fire prevention requirements. See Municipal Code of Chicago, Ill. § 15-24-220. Dry cleaners using highly flammable solvents must limit the size of the dry cleaning room to 300 square feet, id. § 15-24-910, and comply with a host of other building requirements, id. §§ 15-24-920 to 980. On the other hand, it is sensible to acknowledge that ranges likely require spaces large enough to accommodate multiple patrons shooting at targets sufficiently far away, and the handling and discharge of ammunition above ground. City Council therefore soundly concluded that the better approach for ranges is to put some distance between ranges and areas where people live or congregate.

Yet plaintiffs insist that distancing is not necessary, as demonstrated by shooting ranges that are located in "virtually every major American city," in all sorts of locations, including "strip malls, next to restaurants, gyms, and department

stores, in the basements of private homes, and . . . Chicago's Federal Reserve Building." Ezell Br. 7. They point out that, in Chicago, government and private security shooting ranges – which are not open to the public – are located in "residential and commercial neighborhoods, among homes, schools, churches, parks, government buildings, and businesses of every description." Id. at 8. None of the examples of range locations in Chicago provides an appropriate model for locating a shooting range that is open to the public. The ranges plaintiffs refer to are operated by the federal government, R. 74 at 33-35 (shooting ranges for federal agencies); a private security agency, R. 74 at 33 (shooting range for Brinks); or the Chicago Police Department, see R. 76 at 17-19. The federal facilities are not subject to local regulations. See Hancock v. Train, 426 U.S. 167, 178 (1976) (under Supremacy Clause, the activities of the federal government are not subject to State regulation); James v. Dravo Contracting Co., 302 U.S. 134, 142-43 (1937) (under the Enclave Clause, the federal government has exclusive jurisdiction over property purchased with the consent of a state for the purposes of federal government functions). Similarly, the City's power to regulate private security businesses is preempted by state statute. 225 ILCS 447/50-25 (the power to regulate "private security . . . business . . . shall be exercised exclusively by the State and may not be exercised by any unit of local government, including home rule units").

As for CPD shooting ranges, they do not present the same safety concerns as ranges open to the public. They are at all times under the immediate control of highly trained, sworn police officers. Every CPD shooting range is monitored 24

hours a day, seven days a week by a sworn police officer stationed at the range

entrance. R. 75 at 56. Only Chicago police officers, CPD trainees, military

personnel, and members of outside police agencies are allowed in. R. 75 at 56. In

addition, stringent safety standards are observed. For example, CPD requires one

safety officer for every three inexperienced shooters, R. 75 at 64, or one for every 5-7

more experienced shooters, R. 75 at 68. And there are always three other officers

present – one giving commands; one providing instruction; and one controlling other

people at the range. R. 75 at 64. In short, CPD limits who has access to the range

and maintains direct control over the facility in order to ensure the highest safety

protocols are followed at all times.

As for the location of ranges outside Chicago, the City does not have to follow

the example of municipalities that choose to be less cautious. The City can, instead,

follow the example of those municipalities that have more prudently assigned

shooting ranges to manufacturing areas and/or required some distance between

shooting ranges and residential or other more populated areas.[6] See, e.g., Atlanta,

---

[6] As we explain in our opening brief, similar laws distancing firearms activity from certain uses have been upheld. City Br. 27 (citing Teixeira v. County of Alameda, No. 12-CV-03288, 2013 WL 4804756, *1 (N.D. Cal. Sept. 9, 2013); Hall v. Garcia, No. 10-03799, 2012 WL 995933, **4-5 (N.D. Cal. March 17, 2011). Plaintiffs argue that these cases did not apply intermediate scrutiny, but turned on other rulings about the scope of Second Amendment rights. Ezell Br. 51 (arguing Teixeira held that "the Second Amendment does not secure an interest in acquiring firearms"); id. (arguing Hall held that "the Second Amendment's core was limited to the home"). Not so. In Teixeira, the court applied intermediate scrutiny and ruled that "there is a reasonable fit" between the ordinance and its "important governmental objectives," 2013 WL 4804756, *7. In Hall, the court ruled that the school zone law was "substantially related to the objective of creating a safe zone around schools." 2012 WL 995933, *5.

Georgia Code of Ordinances § 14-5(e) (800 feet from any other shooting gallery, residential use, schools, parks, recreation facilities, and day care); Baton Rouge Unified Development Code, Appendix H at H-22, H-30, H-31 (300 feet from residential uses and districts); Zoning Ordinance of Charleston, South Carolina § 54-207(s) & Table of Permitted Uses (conditional use in two industrial districts and 1,000 feet from schools, parks, churches, and residential districts); Cleveland, Ohio Code of Ordinances § 695.07(e) (200 feet from schools, churches, and hospitals); City of Lawton Municipal Code § 7-29-1-2904 (allowed in four manufacturing and industrial districts); Minneapolis Code of Ordinances §§ 267.1630, 267.1750 (1,000 from school, church, and hospital); Zoning Ordinance, City of New Haven § 42, T. 3 (allowed with special exception in two industrial districts); Code of the City of Orlando, Florida, Part 1B, Tables 2B.LDC; 2D.LDC (allowed in two industrial districts); id. § 58.861 (500 feet from residential districts and another shooting range); Rochester, New York Zoning Code § 120-83(Q) (allowed as special use in manufacturing district); id. §120-148.1 (1,000 feet from residential, village center, planned development, and open space districts, and 500 feet from any commercial district); Municipal Code of the City of Rochester § 99-11(E) (1,000 feet from any school, church, and hospital); St. Paul, Minnesota Legislative Code §§ 66.521 (allowed in two industrial districts, and as a conditional use in an industrial district); id. § 65.520 (1,000 feet from residential districts, day cares, houses of worship, libraries, schools, parks and recreation centers or facilities); City of Worcester Zoning Ordinance § 3-2, Table 4.1 (General Use), No. 22 (special use in

one manufacturing district); <u>id.</u> Note 11 (1,000 feet from public school or park).[7]

Like these other municipalities, the City has taken into account the inherently dangerous nature of firearms. Plaintiffs, for their part, do not even respond to our point that this inherent danger is a sound reason to treat Second Amendment challenges to zoning differently from First Amendment claims. City Br. 29-30. Speech is not the direct cause of death and physical injury; the discharge of firearms, on the other hand, results in thousands upon thousands of shooting deaths and injuries each year. <u>Id.</u> at 31. As we explain in our opening brief, <u>id.</u> at 32, this is why the government retains the latitude to experiment with reasonable firearms regulation, particularly when regulations do not seriously interfere with the exercise of Second Amendment rights. This latitude was recognized in <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008), where the Court held that the Second Amendment "leaves [cities] a variety of tools for combating" gun violence, 554 U.S. at 636, and even presumed the constitutionality of laws prohibiting firearms in schools and government buildings, <u>id.</u> at 626-27 & n.26, without any empirical proof that such regulations would reduce gun violence. Plaintiffs emphasize that those sorts of prohibitions were "longstanding," Ezell Br. 49, as if that alone explains why they

_____

[7] These ordinances are available online at www.municode.com, except for the following: Baton Rouge, available at http://brgov.com/dept/planning/udcodeonline.asp; Cleveland, available at http://www.amlegal.com/library/oh/cleveland.shtml; Rochester, available at http://ecode360.com/8679474#8679474; and Worcester, available at http://www.worcesterma.gov/city-clerk/ordinances-regulations. This is not an exhaustive list of ordinance assigning shooting ranges to manufacturing and industrial areas, or creating similar buffers.

were presumptively constitutional.  But this court has squarely rejected that reading of Heller's footnote 26, explaining that "[i]t would be weird" to say that a law is unconstitutional when it is new, but "will become constitutional" when it has been around for 80 years, and is thus "as 'longstanding' as" laws prohibiting felons from possessing firearms that the Court considered presumptively valid in Heller. Skoien, 614 F.3d at 641; see also Friedman v. City of Highland Park, No. 14-3091, slip op. at 4 (7th Cir. Apr. 27, 2015) ("If Highland Park's ordinance stays on the books for a few years, that shouldn't make it either more or less open to challenge under the Second Amendment").  And, beyond characterizing those laws as "longstanding," plaintiffs provide no explanation about how those laws could be deemed presumptively constitutional if, as plaintiffs maintain, the government must prove with data and empirical evidence that such restrictions reduce gun violence.

C.    **Alternatively, The Zoning Provisions Should Be Upheld Because They Do Not Substantially Burden Second Amendment Rights.**

Second Amendment challenges to firearms regulations should be subject to a threshold inquiry into whether the regulations substantially burden Second Amendment activity, and under that inquiry Second Amendment claims fail if there is no such burden.  This test is appropriate in light of the tradition and purpose of the Second Amendment, which has included liberal regulation in the interest of public safety – including the location of target practice – when such regulation allows ample room for Second Amendment activity.  City Br. 26.  We therefore urge the court to reconsider its rejection of the substantial burden test, and follow the

lead of the Ninth Circuit in Nordyke v. King, 681 F.3d 1041 (9th Cir. 2012) (en banc), which upheld an ordinance regulating gun shows that burdened Second Amendment activity "only minimally and only on county property," id. at 1044; and the Second Circuit in United States v. Decastro, 682 F.3d 160 (2d Cir. 2012), which upheld a federal statute regulating the transportation of firearms that did not "substantially burden the fundamental right to obtain a firearm sufficient for self-defense, and attempts only to assist states in enforcement of their own gun laws," id. at 169.

Plaintiffs' argument against the substantial burden threshold test rests largely on the law-of-the-case doctrine. Ezell Br. 32-33. The law-of-the-case doctrine, however, "merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power." United States v. Robinson, 724 F.3d 878, 887 (7th Cir. 2013) (quoting Messinger v. Anderson, 225 U.S. 436, 444 (1912)). And the doctrine permits "a court to revisit an issue if an intervening change in the law, or some other special circumstance, warrants reexamining the claim." United States v. Thomas, 11 F.3d 732, 736 (7th Cir. 1993). For just this reason, plaintiffs' reliance on the principle that "the *same issue* presented a second time in the *same case* in the same court should lead to the *same result*," Ezell Br. 33 (quoting LaShawn A. v. Barry, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc)), is misplaced. Simply put, this appeal does not involve the "same issue" as the first appeal, and there are special circumstances that justify reexamining whether a threshold substantial burden test is appropriate for firearms

regulations.  Ezell I decided against this test for assessing the constitutionality of a complete ban on shooting ranges.  651 F.3d at 708.  That ban was immediately repealed and replaced with an ordinance that allows for, and regulates, shooting ranges.  R. 225-3.[8]  This appeal involves only three of those regulations – two zoning provisions and an age restriction.  Accordingly, it is wholly appropriate to revisit whether the substantial burden threshold test is appropriate for firearms regulation.

In addition, this court's recent decision in Friedman, provides another basis for revisiting rejection of the substantial-burden test.  In upholding Highland Park's prohibition on the possession of assault weapons and large-capacity magazines, the majority did not require empirical proof that the prohibition was effective in reducing firearms violence.  Instead, it focused on the scope of the right as historically understood, and then "whether law-abiding citizens retain adequate means of self-defense," Friedman, slip op. at 7-8.  The majority rejected the argument that the firearms choices Highland Park took off the table "substantially restrict[ ] [plaintiff's] options for armed self-defense" where so many other guns are adequate "substitutes for banned assault weapons."  Id. at 9.  And the majority held that the prohibition was constitutionally valid even if the only effect were to "make[ ] the public feel safer."  Id. at 11.  The zoning regulations here also leave ample room for the exercise of Second Amendment rights, and would serve the same purpose.

_____

[8]  This also explains why it does not matter that the City did not petition for rehearing.  With the ban repealed, any further litigation over it was moot.  "A case challenging a statute's validity normally becomes moot if the statute is repealed or invalidated."  Shepard v. Madigan, 734 F.3d 748, 750 (7th Cir. 2013).

Beyond the law of the case, plaintiffs argue that applying a substantial-burden test would be "treating the Second Amendment as a second-class right." Ezell Br. 31. Not so. As we explain in our opening brief, and which plaintiffs ignore, this sort of threshold inquiry has been used for numerous constitutional rights that are not considered "second-class." It has been applied to cases involving the First Amendment's Free Exercise Clause, City Br. 33 (citing <u>Wisconsin v. Yoder</u>, 406 U.S. 205 (1972), and <u>Sherbert v. Verner</u>, 374 U.S. 398, 403-04 (1963)); the right to enter into a marital relationship, <u>id.</u> at 34 (citing <u>Zablocki v. Redhail</u>, 434 U.S. 374 (1978)); voting rights, <u>id.</u> (citing <u>Bullock v. Carter</u>, 405 U.S. 134, 144 (1972)); and abortion, <u>id.</u> at 34-35 (citing <u>Planned Parenthood of Southeast Pennsylvania v. Casey</u>, 505 U.S. 833 (1992)). The point behind a threshold substantial-burden test is not that the right is somehow less valuable, or "second class," but that regulations that create only minor impositions and nevertheless afford ample latitude for the exercise of constitutional rights do not offend the Constitution. That should be no less true for Second Amendment rights than it is for these other significant constitutional rights. As this court recently held in upholding an assault weapons prohibition, "The central role of representative democracy is no less part of the Constitution than is the Second Amendment: when there is no definitive constitutional rule, matters are left to the legislative process." <u>Friedman</u>, slip op. at 12.

Beyond that, plaintiffs simply "incorporate by reference all that they have already argued on the topic before." Ezell Br. 36. That is improper. "[A]ppellate briefs may not incorporate other documents by reference." <u>Albrechtsen v. Board of</u>

Regents of the University of Wisconsin System, 309 F.3d 433, 436 (7th Cir. 2002).
And, as with any arguments that are not developed in an appellate brief, arguments
"incorporate[d] by reference" are waived. Parker v. Franklin County Community
School Corp., 667 F.3d 910, 924 (7th Cir. 2012). Plaintiffs have, therefore, waived
any other arguments against adopting and applying the substantial burden test
here.

As we explain in our opening brief and in Part I.A. above, the zoning
restrictions do not substantially burden Second Amendment activity. Potential
shooting range operators have thousands of acres of property to search for a place to
set up businesses where their patrons can maintain proficiency in the use of
firearms. And Robuck's experience demonstrates that appropriate locations can be
found within that space. R. 227-4 at 67. The Ordinance passes muster under a
substantial burden test.

## II.    THE AGE RESTRICTION FOR SHOOTING RANGES IS CONSTITUTIONAL.

For the safety of minors and adult patrons at shooting ranges, the City
prohibits anyone under the age of 18 from entering the shooting range facility.
Municipal Code of Chicago, Ill. § 4-151-100(d). This restriction does not run afoul of
the Second Amendment because a minor's possession and use of firearms lies outside
the scope of Second Amendment protection and, even if within the scope of the
Second Amendment, it survives intermediate scrutiny. Similarly, plaintiffs' First
Amendment claim falters because this restriction does not limit speech and, even if
shooting at a range were viewed as inherently expressive conduct, the age restriction

passes First Amendment scrutiny.

**A.    The Age Restriction Does Not Violate The Second Amendment.**

Plaintiffs' Second Amendment challenge to the age restriction is subject to the same two-step analysis as the zoning provisions.  The first inquiry is whether the regulated activity is within the Amendment's "scope" based on a "textual and historical inquiry" into the Amendment's "original meaning." Ezell I, 651 F.3d at 701-03.  This requires examination of cases, regulations, and commentary reflecting a "public understanding" of the Second Amendment "from immediately after its ratification through the end of the 19th century." Heller, 554 U.S. at 605.  If the court concludes the right is outside the scope, that will end the inquiry and the regulation will be upheld. Ezell I, 651 F.3d at 703.  If the right is within the scope, the court will apply some form of intermediate scrutiny calibrated to the degree of burden on Second Amendment rights. Id. at 703-04.

Here, plaintiffs' claim fails at step one – a minor's right to fire a gun is not within the scope of Second Amendment protection.  Regardless, it easily passes intermediate scrutiny because it is substantially related to the important objective of keeping minors and range patrons safe from death and injury by firearms and lead exposure.

**1.    The Right Of Minors To Use Firearms Is Outside The Scope Of The Second Amendment.**

The historical record demonstrates that minors do not possess a fundamental right to possess or use firearms.  To begin, Thomas Cooley, in his "massively

popular" treatise on constitutional limitations, <u>Heller</u>, 554 U.S. at 616, wrote that

States "may prohibit the sale of arms to minors" pursuant to their police power.

Thomas M. Cooley, <u>Treatise on the Constitutional Limitations</u> 740 n.4 (5th ed.

1883).  Cooley, therefore, found no conflict between state restrictions on minors'

access to firearms and the Second Amendment.  And, in fact, age restrictions for gun

possession and use have been around for centuries.  <u>See</u> Mark Anthony Frassetto,

<u>Firearms and Weapons Legislation Up to the Early Twentieth Century</u> 75 (2013),

available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2200991 (last

visited May 13, 2015) (listing States with 19th- and 20th-century age restrictions on

sale, possession, or use of firearms by minors of various ages).

These restrictions were wholly consistent with the Founding Era

understanding of the right to keep and bear arms as applying only to citizens who

were capable of exercising the right to keep and bear arms in a "virtuous manner."

Saul Cornell, <u>"Don't Know Much About History": The Current Crisis in Second</u>

<u>Amendment Scholarship</u>, 29 N. Ky. L. Rev. 657, 679 (2002).  That requirement

excluded several categories of people, including "felons, children, and the insane."

Glenn Harlan Reynolds, <u>A Critical Guide to the Second Amendment</u>, 62 Tenn. L.

Rev. 461, 480 (1995).  So the limitation to "virtuous citizens" means that "the right

to arms does not extend to minors."  <u>Id.</u>

Moreover, historically, the age of majority at common law was 21.  <u>See</u> <u>NRA v.</u>

<u>BATFE</u>, 700 F.3d 185, 201 (5th Cir. 2012).  "[B]y the end of the 19th century,

nineteen States and the District of Columbia had enacted laws expressly restricting

the ability of persons under 21 to purchase or use particular firearms, or restricting the ability of 'minors' to purchase or use particular firearms while the state age of majority was set at age 21." Id. at 202; id. n.14 (citing state statutes). And in 1878, the Tennessee Supreme Court declared such restrictions on minors to be both constitutional and imperative for public safety: "[W]e regard the acts to prevent the sale, gift, or loan of a pistol or other like dangerous weapon to a minor, not only constitutional as tending to prevent crime but wise and salutary in all its provisions." State v. Callicutt, 69 Tenn. 714 (1878).

In light of these historical restrictions on minors, state and federal appellate courts have repeatedly rejected challenges to laws restricting the access of firearms that apply to older minors – even up to the age of 21. See, e.g., NRA v. McCraw, 719 F.3d 338, 347-49 (5th Cir. 2013) (state statute prohibiting 18- to 20-year-olds from carrying guns in public is "part of a succession of 'longstanding prohibitions' . . . that are likely outside the scope of the Second Amendment"); NRA, 700 F.3d at 203 (upholding federal statute prohibiting federally licensed firearm dealers from selling handguns to persons under 21); People v. Mosley, No. 115872, 2015 WL 728095, at *12-13 (Ill. Feb. 20, 2015) (upholding Illinois statute prohibiting 18- to 20-year-olds from carrying firearms outside the home); People v. Aguilar, 2 N.E.3d 321, 329 (Ill. 2013) (upholding Illinois statute prohibiting anyone under the age of 18 from possessing concealable firearms); State v. Sieyes, 225 P.3d 995, 1004-06 (Wash. 2010) (upholding state statute prohibiting minors from possessing firearms). Given the longstanding history of outlawing minors' possession and use of firearms, the

district court properly concluded that the Second Amendment does not include a right to firearms possession or use for individuals under the age of 18.  City Br. A26.

Plaintiffs concede that "juveniles do not enjoy Second Amendment rights as that concept is understood to apply to adults," but insist that "there is a right to provide them" and a "right to receive" "instruction that will prepare them to exercise those rights when they reach the proper age."  Ezell Br. 64.  At the outset, it is not clear at what age, if not age 18, plaintiffs believe the right to target practice accrues.  Plaintiffs assert that this right exists for "at least older minors," id. at 3, but acknowledge that "[s]ome age restriction may well be appropriate," id. at 64.  In any event, plaintiffs cite no basis – either in history or constitutional law – for the notion that there is a constitutional right to prepare, at a young age, for the exercise of rights that do not exist until adulthood.  Even if there were, parents and educators are free to teach lessons in firearms safety and practice to those under the age of 18, and may even use simulators to do so.  ISRA's Executive Director, Pearson, testified that ISRA instructors do just that.  R. 74.  Students use a plastic replica of a gun, called a "blue gun," to "practice holding and aiming and holstering and all those sorts of things."  R. 74 at 163.  And instructors can provide students with "numerous types of information about gun handling and gun safety . . . before they ever hold a gun in their hand," including instruction on how to safely store, load, hold, and aim a gun.  R. 74 at 162-63.

Instead of any sort of historical record to demonstrate an understanding of Second Amendment rights, plaintiffs quote the passage from Heller, which in turn

quotes a 19th-century treatise that states: "a citizen who keeps a gun or pistol under judicious precautions, practices in safe places the use of it, and in due time teaches his sons to do the same, exercises his individual right" to keep and bear arms. Ezell Br. 62-63 (citing Heller, 554 U.S. at 619 (citation omitted)). But this passage does not say anything about what age is "due[ ] time" for such lessons, much less a public understanding that the age for such lessons was understood to be under 18.

The only other Founding-Era support plaintiffs attempt to muster is a letter in which Thomas Jefferson encouraged his fifteen-year-old nephew to let his "gun . . . be the constant companion of [his] walks" for "exercise" because it "gives boldness, enterprise, and independence to the mind." Ezell Br. 63. This reliance is misplaced. First, Jefferson was promoting carrying a gun on walks to strengthen the mind and body, not attempting to describe the publicly understood meaning of the right to keep and bear arms. The Letters of Thomas Jefferson, To Peter Carr, Paris, Aug. 19, 1785, available at http://avalon.law.yale.edu/18th_century/let31.asp. Second, even if Jefferson's advice, made in a private correspondence to a family member, reflected his understanding of the right, that would not show the public understanding of the right to keep and bear arms. It is but a single example of that understanding and entitled to no more weight than any other single individual, given the private context. A single example does not show public understanding. See Heller, 554 U.S. at 632 ("[W]e would not stake our interpretation of the Second Amendment upon a single law . . . that contradicts the overwhelming weight of other evidence . . . .").

Lacking historical support for a minor's right to target practice, plaintiffs turn

to modern day practices at ranges, and argue that, today, gun range owners frequently allow youth over the age of six to shoot. Ezell Br. 24. But, of course, that has nothing to do with the scope of the Second Amendment as it was understood in the Founding or Reconstruction Eras. It simply demonstrates range operators' willingness to lower the age to increase profit margins where state and local laws allow it.

> **2.     At Most, Intermediate Scrutiny Applies, Which The Age Restriction Readily Passes.**

If this court believes that the age restriction is within the scope of Second Amendment protection, it easily passes muster. The age restriction places a minor burden on Second Amendment activity, and so a less rigorous level of scrutiny is appropriate. The age restriction is temporary. Anyone who would like to engage in target practice must only wait until he or she is 18. As this court held in United States v. Yancey, 621 F.3d 681 (7th Cir. 2010), such a temporary restriction is far less onerous than the lifetime prohibition on the possession of firearms by felons and the mentally ill, and yet those lifetime bans are subject to no more than intermediate scrutiny, id. at 686. Moreover, the age restriction at shooting ranges does not altogether prohibit minors from all supervised gun use in Chicago. Minors are allowed to hunt under the supervision of a parent, grandparent, or guardian. 520 ILCS 5/3.1-9. And there are several designated hunting areas in Chicago, Municipal Code of Chicago, Ill. § 8-24-050, where minors can hunt as allowed by state law in open areas with fewer people around and not be exposed to lead to the

same extent as in an indoor shooting range.

Beyond the burden on minors' ability to target practice, plaintiffs also claim that the age restriction burdens Second Amendment rights because it "deprives range owners of the services of underage workers wholly unrelated to firing guns," and "deters visits" from "adults whose children can responsibly accompany them." Ezell Br. 65.[9]  Plaintiffs have absolutely no basis for asserting that a range owner's inability to hire minors, or patron's ability to have their children wait for them while they practice shooting, will have an appreciable effect on anyone's ability to maintain proficiency in the use of firearms.  Indeed, neither the plaintiffs, nor anyone who has considered opening a range in Chicago, even complained, much less adduced evidence, that the age restriction would hinder range operations or the ability of adults to find child-free time for target practice.

Plaintiffs' experts, Kramer and Giordano, expressed concern about the economic impact of excluding minors, but had no idea how much revenue is generated from youth programming; how many patrons, if any, would not be able to go to a range unless allowed to bring children; or the impact of not permitting minors to work at range.  R. 226-1 at 66-71; R. 226-2 at 6-10.  They had not studied

---

[9]  Plaintiffs point out that, under the definition of "shooting range facility" in § 4-151-010, minors are barred from "any portion of a range's premises, including the parking lot." Ezell Br. 24.  But they do not explain how the Second Amendment protects a right to access a shooting range parking lot if minors are otherwise properly excluded from the range itself.  Perhaps they mean that it burdens adults' Second Amendment rights because parents cannot have older minors drop them off or wait in the car; but there is no reason to believe those options are unavailable, at least when the minors are old enough to be left unattended in a car, since minors are not barred from the adjacent public streets.

those issues, reviewed relevant data, or discussed the impact of the provision with any potential range owners.  R. 226-1 at 66-68; R. 226-2 at 9-13.  Giordano admitted he had "no figures to back" up his concern that parents would not come to a range, R. 226-1 at 7, and had "no idea" what the effect on revenue would be, R. 226-2 at 11.

Since the age restriction does not substantially burden Second Amendment activity, plaintiffs' claims would fail on that basis alone under the substantial-burden threshold test we urge the court to adopt in Part I.C above.  Otherwise, the insubstantial burden means that age restriction is subject to no more than intermediate scrutiny.

The age restriction passes intermediate scrutiny because it is substantially related to important public safety objectives.  It is well settled that the government's interest in protecting minors is compelling.  "It is evident . . . that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling . . . even when the laws have operated in the sensitive area of constitutionally protected rights."  New York v. Ferber, 458 U.S. 747, 756-57 (1982).  The Supreme Court has long recognized "the peculiar vulnerability of children" and "their inability to make critical decisions in an informed, mature manner" as reasons why "the constitutional rights of children cannot be equated with those of adults."  Bellotti v. Baird, 443 U.S. 622, 634 (1979).  Indeed, the "hallmark features" of juveniles include "immaturity, impetuosity, and failure to appreciate risks and consequences."  Miller v. Alabama, 132 S. Ct. 2455, 2468 (2012).  Moreover, "[t]he evidence now is strong that the brain does not cease to mature until the early 20s in those relevant parts

that govern impulsivity, judgment, planning for the future, foresight of consequences, and other characteristics that make people morally culpable." Adam Ortiz, Adolescence, Brain Development, and Legal Culpability, American Bar Association, Juvenile Justice Center, at 2 (Jan. 2004), available at http://www.americanbar.org/content/dam/aba/publishing/criminal_justice_section_ne wsletter/crimjust_juvjus_Adolescence.authcheckdam.pdf (last visited May 13, 2015). So "the 'biological' age of maturity" is closer to "age 21 or 22." Id. And it is precisely because "[a]dolescent brains are still developing and are not as well equipped as adult brains to weigh choices and exercise judgment" that minors are restricted from certain activities that adults are more capable of handling responsibly – like buying and consuming alcohol or tobacco, or entering contracts, Cheryl B. Preston, Zoning the Internet: A New Approach to Protecting Children Online, 2007 B.Y.U. L. Rev. 1417, 1438-39, or buying sexually-oriented magazines, Ginsberg v. New York, 390 U.S. 629, 637-38 (1968). Surely, the handling of deadly weapons is also an activity that calls for good judgment and foresight of consequences. A regulation that prevents such activity indoors amidst other people until a child comes closer to the biological age of maturity is, therefore, substantially related to public safety.

In addition to the dangers involved with minors handling firearms, minors are more susceptible to harm from lead contamination. Exposure to lead at an indoor range can result in elevated blood lead levels. R. 227-3 at 10. Lead particulate can be inhaled or picked up on the skin when children crawl on floors or touch other surfaces. R. 227-3 at 11-12; R. 227-2 at 62. Lead exposure is particularly dangerous

for children under the age of seven because lead is toxic to the brain and can cause permanent damage. R. 227-4 at 97.

Plaintiffs ignore these safety concerns, claiming the only legitimate safety concern is "small children" who interfere with range operations, and attempting to recast Commissioner Krimbel's testimony to support that view. Ezell Br. 60. Commissioner Krimbel did not say that the City was concerned only about "small" children. The concern was about "children and guns in the same place," Ezell SA 64, or "kids running around unsupervised," id. at 65. And Commissioner Krimbel explained that the age restriction applied, not just to small children who might disturb those engaged in target practice, but to any minor "patrons of the shooting range facility." Id. at 64. To be sure, as plaintiffs further note, Commissioner Krimbel also shared her personal view that adults should start teaching their children shooting skills at a younger age, and that her son took a class at age 12. Id. at 64-65. That opinion is beside the point. It is clear that City Council did not share that view, since the Ordinance prohibits all minors at shooting ranges. That policy conclusion rests soundly on safety concerns about minors' use of firearms and exposure to lead.

Plaintiffs agree that the City may require children in gun ranges to have "close and complete supervision by a responsible adult." Ezell Br. 57. But that approach does not mean it is perfectly safe to allow children to shoot in a range, and the City does not have to presume that minors would receive close enough supervision. Even when minors are supposed to be closely supervised by an adult,

minors misuse firearms at shooting ranges, or are shot while on the premises. See, e.g., Mark Berman, Girl Who Accidentally Shot her Instructor with an Uzi Said the Gun Was Too Much for Her, Wash. Post, Sept. 2, 2014, available at www.washingtonpost.com (nine-year-old accidentally shot instructor standing next to her); see also Bucholz v. City of Sioux Falls, 91 N.W.2d 606, 607-08 (S.D. 1958) (one minor shot another minor while using gun range unsupervised); Birmingham Boys' Club, Inc. v. Transamerica Co., 325 So. 2d 167, 168 (Ala. 1976) (minor on firing range at summer camp shot by another camper); Hoffmeyer v. Hoffmeyer, 869 S.W.2d 667, 668-69 (Ct. App. Tex. 1994) (a minor shot another minor with weapon he believed was unloaded when father left the room during a shooting lesson); Dionne v. City of Trenton, 261 N.W.2d 273, 275 (Mich. App. 1977) (ten-year-old entered firing range to play and was shot by the son of police officer); Wanyek v. McMullin, 209 N.E.2d 223, 223 (Ohio Ct. App. 1965) (one minor shot another minor during Boy Scout rifle practice). The age restriction protects against these serious, sometimes deadly, consequences. The district court's judgment upholding the age restriction should thus be affirmed.

### B. The Age Restriction Does Not Violate The First Amendment.

The age restriction does not infringe the First Amendment either. Nothing about excluding minors from shooting ranges prevents any range owner, or any other educator, from any engaging in any speech about firearms safety or practice – to minors or anyone else. That speech does not need to occur inside a shooting range, where the primary activity is live-fire target practice. And, like just about

any activity, minors can be taught plenty through speech about firearms safety and practice before engaging in the activity.  For example, minors study the Rules of the Road and may practice on simulators before they are old enough to practice driving on the road.  And parents may teach their children about the dangers of alcohol abuse many years before the legal age for alcohol consumption.  So, too, parents and educators can provide lessons in firearms safety and practice to those under the age of 18, and even use simulators.  As we explain in Part II.A above, ISRA instructors do just that.  R. 74.

To be sure, the age restriction means that the type of firearms instruction that combines verbal instructions with shooting cannot occur at a shooting range before the age of 18.  But the live-fire portion of such a lesson is not inherently expressive, and so it does not fall within the ambit of the First Amendment.  The Supreme Court has "extended First Amendment protection only to conduct that is inherently expressive."  Rumsfeld v. Forum for Academic & Institutional Rights, 547 U.S. 47, 66 (2006).  Although instructors' comments before and after shooting, for corrective or explanatory purposes, may be expressive, shooting during gun training is not itself "inherently expressive."  And conduct does not become expressive by the addition of the instructor's "speech explaining it."  Id.  In Rumsfeld, the Court rejected the argument that law schools' exclusion of military recruiting to protest the government's policy on homosexuals in the military was protected "speech."  The Court explained that, although the schools' explanation of the exclusion was speech,

> [i]f combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into

> "speech" simply by talking about it. . . . Neither <u>O'Brien</u> nor its progeny
> supports such a result.

<u>Id.</u>; <u>see also</u> <u>Clancy v. Office of Foreign Assets Control</u>, 559 F.3d 595, 605 (7th Cir.

2009) (travel not "inherently expressive" even when purpose was to go to Iraq to

engage in protest).  Plaintiffs make the same error here, and their First Amendment

challenge should thus be rejected on this basis.

And this difference between speech and conduct also explains why plaintiffs'

reliance on <u>Holder v. Humanitarian Law Project</u>, 561 U.S. 1 (2010), Ezell Br. 56 , is

deeply flawed.  <u>Holder</u> rejected the government's argument that teaching a specific

skill and advising a terrorist organization involved only "conduct" because, as

"applied to plaintiffs the conduct triggering coverage under the statute consists of

communicating a message."  561 U.S. at 28.  By contrast, the age restriction here

does not cover the communication of any messages – it restricts the activity of

shooting a gun at a shooting range.

Plaintiffs' reliance on <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231 (4th Cir.

1999), is also misplaced.  <u>Edwards</u> did not hold that shooting, even during a firearms

training session, was expressive activity protected by the First Amendment.

Edwards, a police sergeant, claimed that he was punished for teaching a firearms

course because the content of those lessons was contrary to the police chief's

"personal and political zeal to oppose the 'lawful possession of firearms.'"  <u>Id.</u> at 240.

The court held that the lessons included "verbal as well as some written

instructions," <u>id.</u> at 247, and that because "<u>speech</u> . . . on a categorically public issue,

the proper method of safely carrying a concealed handgun," was protected, <u>id.</u>

(emphasis added), Edwards stated a First Amendment claim based on allegations of punishment for engaging in "speech in teaching the concealed handgun safety course," id. at 248 (emphasis added).  Plaintiffs point out that the state-mandated training required "firing at a gun range," Ezell Br. 57, but regardless whether the statute required live-fire training, the First Amendment claim was not – and could not be – based on the student's firing of the gun.  Rather, his claim was clearly based on the "speech" component of firearms training.  Moreover, to the extent Edwards can be read to recognize the act of shooting a gun during firearms training as "speech," we note that it precedes Rumsfeld, and cannot be squared with it.

In short, Rumsfeld, rather than Holder or Edwards, is the precedent that governs when the conduct regulated is not inherently expressive.  And, under Rumsfeld, it is clear that plaintiff's novel First Amendment theory stretches too far. Shooting a gun is non-expressive conduct, and is thus not protected by the Free Speech Clause.

Moreover, even if target practice at a shooting range were regarded as inherently expressive conduct, the age restriction should be upheld under United States v. O'Brien, 391 U.S. 367 (1968).  Under that test, regulations that bear on expressive conduct will be upheld if: (1) the government has the authority, under the Constitution, to regulate the subject matter; (2) the regulation furthers important or substantial government interests; (3) the government interest is unrelated to the suppression of speech; and (4) the incidental restriction on speech is "no greater than is essential to the furtherance of that interest."  Id. at 377.  The first and second

prongs are easily satisfied.  As we have explained, the City is clearly authorized to enact legislation to safeguard the public health, safety and welfare, including the well-being of minors.  See City Br. 24; supra p. 35.  Indeed, the government's interest in regulating for the well-being of minors is compelling.  Supra p. 35.  And the age restriction furthers those interests by keeping children away from an area where they risk exposure to lead contaminated surfaces, and by protecting all patrons, including minors, from accidents that could occur when minors are not closely supervised or make poor judgment calls while handling a deadly weapon.  Supra pp. 35-37.

The third and fourth prongs are also satisfied.  The City's safety objectives are clearly unrelated to the suppression of speech – the restriction applies to any activity of a minor at a shooting range, not just speech or expressive conduct.  Finally, any incidental effect the age restriction has on expression is no greater than necessary to the further the City's interest – the restriction covers only minors, who are at risk for making bad judgment calls during target practice, and most at risk for lead poisoning.  Supra pp. 35-36.

## CONCLUSION

———

The district court's invalidation of the City's M zoning for shooting ranges

should be reversed, and its judgment with respect to all other claims affirmed.

Respectfully submitted,

STEPHEN R. PATTON
Corporation Counsel
  of the City of Chicago


_/s/Suzanne M. Loose_____
SUZANNE M. LOOSE
Senior Counsel
30 North LaSalle Street, Suite 800
Chicago, IL 60602
(312) 744-8519

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)(B)(I)**

_____

In accordance with Fed. R. App. P. 32(a)(7)(C)(i), I certify that the Reply/Response Brief of Defendant-Appellant/Cross-Appellee complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2)(A)(i) because it contains 11,630 words, beginning with the words "ISSUES PRESENTED" on page 1 and ending with the words "Respectfully submitted" on page 43. In preparing this certificate, I relied on the word count of the word-processing system used to prepare the brief, which was WordPerfect 12.

/s Suzanne M. Loose_____
SUZANNE M. LOOSE, Attorney

**CERTIFICATE OF SERVICE**

_____

I certify that on May 15, 2015, I electronically filed the attached Reply/Response Brief of Defendant-Appellant/Cross-Appellee with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. Participants in this appeal are registered CM/ECF users who will be served by the CM/ECF system on May 15, 2015.

/s Suzanne M. Loose_____
SUZANNE M. LOOSE, Attorney