Nos. 14-3312, 14-3322

---

# In the United States Court of Appeals for the Seventh Circuit

---

RHONDA EZELL, WILLIAM HESPEN, JOSEPH BROWN, ACTION TARGET, INC., SECOND AMENDMENT FOUNDATION, INC., AND ILLINOIS STATE RIFLE ASSOCIATION,

Plaintiffs-Appellees/
Cross-Appellants,

v.

CITY OF CHICAGO,

Defendant-Appellant/
Cross-Appellee

---

Appeal from a Judgment of the United States District Court
for the Northern District of Illinois
The Hon. Virginia M. Kendall, District Judge
District Court No. 10-CV-5135

---

APPELLEES/CROSS-APPELLANTS' REPLY BRIEF

David G. Sigale
Law Firm of David G. Sigale, P.C.
799 Roosevelt Road, Suite 207
Glen Ellyn, IL 60137
630.452.4547/630.596.4445

Alan Gura*
Gura & Possessky, PLLC
105 Oronoco St., Ste. 305
Alexandria, VA 22314
703.835.9085/703.997.7665
*Counsel of Record

# TABLE OF CONTENTS

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.    Circuit Law and Law of the Case, Here the Same
        Thing, Foreclose the "Substantial Burden" Test. . . . . . . . . 3

    II.    Chicago's Zoning Regulations Are Subject to
        Strict Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    III.    Chicago's Zoning Restrictions Fail Any Level
        of Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    IV.    Chicago's Age Restriction Violates the
        First Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    V.    Chicago's Age Restriction Violates the
        Second Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

# TABLE OF AUTHORITIES

Cases

*Clancy* v. *Office of Foreign Assets Control*,
  559 F.3d 595 (7th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*District of Columbia* v. *Heller*,
  554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 15, 24

*Edwards* v. *City of Goldsboro*,
  178 F.3d 231 (4th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Ezell* v. *City of Chicago*,
  651 F.3d 684 (7th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 10

*Fednav Int'l Ltd.* v. *Cont'l Ins. Co.*,
  624 F.3d 834 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Fleming* v. *County of Kane*,
  855 F.2d 496 (7th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Friedman* v. *City of Highland Park*, No. 14-3091,
  2015 U.S. App. LEXIS 6902 (7th Cir. Apr. 27, 2015). . . . . . . . . 4, 5

*Hall* v. *Garcia*, No. 10-03799,
  2011 U.S. Dist. LEXIS 34081 (N.D. Cal. March 17, 2011). . . . . . 13

*McConnell* v. *FEC*,
  540 U.S. 93 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*McDonald* v. *City of Chicago*,
  561 U.S. 742 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*New Jersey* v. *T.L.O.*,
  469 U.S. 325 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*NRA* v. *BATFE*,
    714 F.3d 334 (5th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Nunn* v. *State*,
    1 Ga. 243 (1846) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Planned Parenthood of Cent. Mo.* v. *Danforth*,
    428 U.S. 52 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Rumsfeld* v. *Forum for Academic & Institutional Rights*,
    547 U.S. 47 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-20

*Safford Unified Sch. Dist. #1* v. *Redding*,
    557 U.S. 364 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Spence* v. *Washington*,
    418 U.S. 405 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*State* v. *Callicut*,
    69 Tenn. (1 Lea) 714 (1878). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Teixeira* v. *Cnty. of Alameda*, No. 12-CV-03288,
    2013 U.S. Dist. LEXIS 128435 (N.D. Cal. Sept. 9, 2013) . . . . . . 13

*Tinker* v. *Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States* v. *Miller*,
    307 U.S. 174 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States* v. *O'Brien*,
    391 U.S. 367 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*West Virginia State Bd. of Ed.* v. *Barnette*,
    319 U.S. 624 (1943). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## Constitutional Provisions

U.S. Const. amend. XXVI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## Statutes and Rules

105 ILCS 5/27-24.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

625 ILCS 5/6-107. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

625 ILCS 5/6-107.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Chi. Mun. Code § 17-5-0207. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Chi. Mun. Code § 17-9-0120. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Chi. Mun. Code § 4-151-100(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Chi. Mun. Code § 4-151-80 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Fed. R. Civ. P. 30(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7, 23

## Other Authorities

Clayton E. Cramer, Colonial Firearm Regulation,
   16 J. on Firearms & Pub. Pol'y 2004. . . . . . . . . . . . . . . . . . . . . . 25

Genessee Conservation League, http://www.gclrochester.com/
   (last visited May 28, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Mark Anthony Frassetto, Firearms and Weapons
   Legislation Up to the Early Twentieth
   Century (2013), available at http://papers.
   ssrn.com/sol3/ papers.cfm?abstract_id=
   2200991 (last visited May 29, 2015). . . . . . . . . . . . . . . . . . . . . . 26

Orlando Gun Club, https://www.orlandogunclub.com/
    (last visited May 28, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Precision Firearms & Indoor Range,
    http://www. precisionfirearm.com/range/
    (last visited May 28, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Quickshot, http://www.quickshotshootingrange.com/locations/
    charleston-south-carolina (last visited May 28, 2015) . . . . . . . . . 14

Quickshot, http://www.quickshotshootingrange.com/
    locations/atlanta-georgia (last visited May 28, 2015). . . . . . . . . . 14

Tench Coxe, "A Pennsylvanian, No. 3," Pennsylvania
    Gazette, Feb. 20, 1788. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## SUMMARY OF ARGUMENT

Chicago continues to exert substantial effort on behalf of the "substantial burden" theory rejected in virtually every circuit, and earlier in this case. But that standard would not aid Chicago, even were it available, as the regulatinos challenged here are not slight. The proper standard of review would be strict scrutiny, though even that matters little—Chicago forcefully disclaims the need to defend its laws at all, relying on vague hypotheticals and its own view of "common" sense. The City could hardly do otherwise; all of its witnesses could do no more than speculate, or even practically agree that the laws were unconstitutional. Some of that testimony, the Court is now told, was merely the "personal opinion" of the City's Rule 30(b)(6) witness.

Chicago's claims that gun firing cannot be expressive, or that practical instruction lacks First Amendment protection, are in error. The Fourth Circuit has already held that practical gun instruction carries First Amendment protection—a decision that should be followed here. Moreover, there is no need to ban all minors from all range premises to advance Chicago's lead control and accident reduction

interests. Chicago's evidence itself proves that modern lead safety standards eliminate the risk of lead poisoning to youth shooters, and the City has failed to acknowledge, much less quantify, the positive safety aspects of youth shooting instruction, let alone measure those benefits against any realistic (rather than hypothetical) potential for range accidents—a balance the City's designated witness struck against the age restriction.

For much the same reasons, Chicago's arguments against the Second Amendment challenge to the age ban fail as well, as do its claims against the very existence of any minors' Second Amendment rights. Facing only a claim that minors are entitled to obtain firearms instruction under close adult supervision, this Court need not fully delineate the scope of minors' right to arms any more than it needs to do so for adults who make a discreet Second Amendment claim. In the end, at least two propositions on the topic are certainly true: American history and tradition supports youth shooting instruction, and it does not support Chicago's overreaching and exaggerated claims about the scope of minors' Second Amendment rights.

## I. CIRCUIT LAW AND LAW OF THE CASE, HERE THE SAME THING, FORECLOSE THE "SUBSTANTIAL BURDEN" TEST.

To the extent that Chicago again asserts a "substantial burden" argument, this time in opposition to Plaintiffs' cross-appeal, a response to that argument here is fair game—especially as Chicago invokes an opinion decided after the filing of Plaintiffs' previous brief. As discussed, the law of the case doctrine bars Chicago's "substantial burden" gambit.

Chicago claims that the law of the case doctrine does not apply because "this appeal does not involve the 'same issue' as the first appeal, and there are special circumstances that justify" revisiting the argument. Appellant's Opp. Br. 24. In Chicago's view, the "same issue" must be the same generalized issue. The previous appeal involved a *de jure* range ban, this appeal involves a *de facto* range ban, and so the City can repeat its rejected legal claims.

Not so. The "law" of the case is the law governing, which is to say, rejecting, the concept of a "substantial burden" test. The "substantial burden" test was the "issue" previously rejected.

The previous appeal must mean something. It must, in some way, have narrowed the issues and focused what remained. *Of course* subsequent stages of litigation may address different claims, but the law of the case doctrine stands for the proposition that the *law* is determined but once.

Were Chicago's novel construction of the law of the case doctrine correct, parties would be condemned to an endless litigation cycle. Chicago could use its new range laws to obtain the previously-rejected legal standard, which might then permit a re-enactment of the previously struck-down law—after all, Chicago claimed that the prior law passed a substantial burden test as well. This is simply not how the doctrine works.[1]

The "special circumstances" warranting the revisiting of the "substantial burden" claim appear to be just one circumstance: the intervening decision in *Friedman* v. *City of Highland Park*, No. 14-3091, 2015 U.S. App. LEXIS 6902 (7th Cir. Apr. 27, 2015). It is unclear why *Friedman* should compel this Court to reconsider *Ezell* v. *City of*

---

[1]That Chicago chose to alter the law rather than seek rehearing, Appellant's Opp. Br. 25 n.8, is unimportant. Its choice to accept this Court's decision was voluntary.

*Chicago*, 651 F.3d 684 (7th Cir. 2011) ("*Ezell I*"). Although the *Friedman* majority failed to cite *Ezell I*, the *Friedman* majority could presumably square its decision with that case, which remains circuit law. *Friedman* apparently did so by devising a new and special test to resolve categorical prohibitions on a type of arms, to be applied instead of any means-ends scrutiny. *Friedman*, 2015 U.S. App. LEXIS 6902 at *10. That test, which "ask[s] whether a regulation bans weapons that were common at the time of ratification" or are linked to militia service, "and whether law-abiding citizens retain adequate means of self-defense," *id.*, is inherently limited to categorical prohibition cases.[2]

Otherwise, the same considerations that applied with respect to the appeal apply to the cross-appeal. The ordinances challenged in the cross-appeal, just like the M-zoning ordinance Chicago tries to resuscitate, can in no way be said to have only an insubstantial burden on Plaintiffs' rights. The distancing regulations play a crucial role in depriving range owners of a reasonable opportunity to locate in Chicago, and the age restrictions completely prohibit youth access to shooting safety instruction. These are not incidental or trivial impacts.

---

[2]It is also assuredly wrong, as Judge Manion explained.

Nor can Chicago account for the fact that virtually all other circuits to consider the matter have held, consistent with *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), that Second Amendment claims requiring means-ends scrutiny require *heightened* scrutiny.[3]

## II. Chicago's Zoning Regulations Are Subject to Strict Scrutiny.

Arguing for merely intermediate scrutiny, Chicago minimizes the prohibitive impact of its zoning regulations in various ways. None of these are compelling.

Chicago repeats its assertions that gun ranges might theoretically locate on 1,900 parcels of property, but even if true, and ignoring the question of these parcels' practical suitability, that number by itself

---

[3]Finally on this point, Plaintiffs are constrained to note that in their previous brief, as here, they have robustly developed arguments against the "substantial burden" test. Nothing is waived. With respect to Plaintiffs' referencing any further elucidation in the prior appeal, just as Chicago understates the law-of-the-case doctrine, it overstates the rule against incorporation of argument. True, "parties should not adopt briefs previously filed in support of motions *at the district court level* . . . because of the changes in the nature of the issues that inevitably occur between trial and appeal." *Fleming* v. *County of Kane*, 855 F.2d 496, 498 (7th Cir. 1988). But there is a different practical reality in facing an opponent which repeats the same argument before the same court. Plaintiffs are satisfied that their opening brief ended substantially below the word limit.

means little to the question of whether gun ranges have a reasonable opportunity to operate in Chicago. This Court has already held that a zoning regulation's constitutionality is not exclusively determined by a particular percentage of available land. Appellees' Br. 39-40.

And of course, the percentage of available *parcels* is somewhat more telling than the percentage of available land, which is probably why Chicago resisted providing that information. It is not true that this "vague accusation is wholly unsupported by the record." Appellant's Opp. Br. 11 n.2. The record indeed reveals Chicago's intransigence on the topic. R. 235-5 at 48, l. 8-50, l. 6. Steven Valenziano, Chicago's Assistant Zoning Administrator and the City's designated Rule 30(b)(6) witness on the subject of range location availability, conjured the 1,900 parcel figure. But asked for the total number of parcels in Chicago—a fairly basic fact—Valenziano could not supply even a ballpark figure. R. 235-5 at 48, l. 8-12. Valenziano admitted that "the parcel layer is on the computer system, so that number is out there," *id.* at l. 17-18, and that he could recall that information from his computer, *id.* at 49, l. 4-6. Chicago's counsel, however, demanded a formal written request. While this request would be taken "under consideration," *id.* at l. 17-18, this

was nothing more than an invitation to a discovery dispute:

> You can make a proper request. As you know, Judge Denlow said the City is not required to produce information to you that doesn't already exist, doesn't have already generated. We are not required to create things for you . . . If we haven't done it we don't have to provide it to you.

*Id.* at l. 10-17. Notwithstanding his witness's suggestion, Chicago's counsel then "disagree[d]" that the answer to the parcel question was readily available. *Id.* at 50, l. 5-6.

In other words, Chicago can readily volunteer the total number of gun range parcels, accounting for its various zoning and distance regulations involving a wide array of incompatible uses. Chicago can further refine that number by making judgment calls for parcels that strike it as impractical, either for size or shape, *id.* at 50, l. 13-21, and eliminate areas that would leave only expressways and alleyways, *id.* at 50, l. 22-52, l. 1. But as for the simple question of how many parcels Chicago contains, that "doesn't already exist," answering the question would be "creat[ing] things for you," "we don't have to provide it," and take it up with the judge.

The burden in this constitutional case, even under intermediate scrutiny, would be Chicago's. On their face, the regulations are wildly

restrictive, and Plaintiffs have established, through expert evidence and actual experience, that these regulations severely limit, if not eliminate, the ability to locate a viable commercial range in Chicago. At some point, if the City does not wish to reveal the simplest information that might help show its regulations' impact, that is not Plaintiffs' problem.

One number, however, is well-known: the total number of Chicago parcels occupied by gun ranges open to the public remains zero.

Chicago speculates as to why, with all the supposedly feasible parcels in the city, no commercial ranges have yet appeared. Range owners haven't searched hard enough for suitable property. It takes money to build a range. This litigation's pall of uncertainty over the regulatory landscape compels delays. After all, Mr. Robuck identified a single property—whose owner was reluctant to allow a gun range for fear of displeasing the City. SA 154, l. 4-10.[4]

---

[4]SAF's rental of manufacturing district parking lots for the temporary placement of its mobile range do not undercut the expert testimony that retail areas and commercial arteries help make ranges feasible. SAF's mobile range program was an emergency measure to provide training then-required to obtain a Chicago Firearms Permit, prior to the impending expiration of pre-*McDonald* firearms registrations and the handgun grandfathering period. This decidedly

But Chicago is a huge city—the nation's third largest. Happenstance, bad luck, and fate would only go so far to explain the dearth of ranges in a smaller town. A city of Chicago's size, with Chicago's unsatisfied market opportunity for gun ranges, cannot so easily detach the impact of its far-reaching zoning laws from the reality that no gun ranges have opened. And leaving that aside, the bottom line is that Chicago's zoning laws have excluded gun ranges from 97.8% of all land. SA 158, l. 22-SA 159, l. 7. Justified or, as is the case, not, that is a "severe," not a "modest" burden, *Ezell I*, 651 F.3d at 708.

This case should not turn on the specific standard of scrutiny employed, because the challenged provisions would fail even rational basis review. But the Court must employ some heightened scrutiny standard, and that standard ought to be strict scrutiny.

---

non-commercial venture would have lasted mere weeks. Of course, Chicago's not-so-veiled threats of retaliation against SAF's landlord prompted the first lease's cancellation, Appellants' Br., No. 10-3525, at 24-25, and the City complained that the second location abutted a residential area, Appellee's Br., No. 10-3525, at 8. In any event, mobile ranges cannot be parked anywhere in Chicago today because the City has banned mobile ranges, even when "located within a completely enclosed building." Chi. Mun. Code § 4-151-80.

III.   THE ZONING RESTRICTIONS FAIL ANY LEVEL OF SCRUTINY.

Chicago maintains that "[t]he zoning regulations easily pass muster under [intermediate scrutiny] because they keep ranges at a safe distance from populated areas." Appellant's Opp. Br. 10. But Chicago can point to *no evidence*—and as Chicago's designated witnesses repeatedly claimed, it is a matter of sheer speculation—that ranges have any deleterious impact requiring this type of restrictive zoning.

The parties are clearly speaking past each other. Chicago persists in denying that it needs actual evidence justifying its burdens on a fundamental right, *e.g.*, that it does not matter that its designated witnesses failed to even mention lead as a concern, that anecdotes and supposed "common sense" satisfy a form of heightened scrutiny. Plaintiffs have already exhaustively surveyed the law, which demands compelling evidence to sanction interference with fundamental rights and thus far more than what Chicago has mustered.

To the limited extent that Chicago offers new arguments in response, these are not well-developed. Confronted with the fact that numerous government and private security gun ranges already dot the City, Chicago responds that "[n]one of the examples of range locations

in Chicago provides an appropriate model for locating a shooting range that is open to the public." Appellants' Opp. Br. 19. Why not? Chicago doesn't say, though it suggests that it would shutter these ranges if it could. "The federal facilities are not subject to local regulations," and "the City's power to regulate private security businesses is preempted by state statute." *Id.* (citations omitted).

"As for CPD shooting ranges, they do not present the same safety concerns as ranges open to the public," because "[t]hey are at all times under the immediate control of highly trained, sworn police officers." *Id.* "In short, CPD limits who has access to the range and maintains direct control over the facility in order to ensure the highest safety protocols are followed at all times." *Id.* at 20. CPD ranges are safe because they are CPD ranges.

What does this have to do with the various supposed risks that gun ranges pose to the set-off land uses—fire, explosion, lead poisoning, and crime? The laws of physics, and of criminal attraction, might well apply equally to government, private security, and police ranges.

And why cannot ranges open to the public "ensure [that] the highest safety protocols are followed at all times?" A private, for-profit gun

range, like many other privately-operated facilities, might well outclass the government version. This case is not designed to test competing economic and regulatory visions, but in seeking to meet its heavy burden in targeting the exercise of Second Amendment rights, Chicago must do more than merely assert the (debatable) superiority of government gun ranges relative to the allegedly unacceptable (in virtually the entire city) nature of ranges open to the public.

Chicago repeats its reliance on *Teixeira* v. *Cnty. of Alameda*, No. 12-CV-03288, 2013 U.S. Dist. LEXIS 128435 (N.D. Cal. Sept. 9, 2013) and *Hall* v. *Garcia*, No. 10-03799, 2011 U.S. Dist. LEXIS 34081 (N.D. Cal. March 17, 2011), but adds nothing new to that discussion, to which Plaintiffs have already responded. See Appellees' Br. 51. Nor does the existence of similar laws in some other cities help Chicago's cause. First, none of these regulations appear, on their face, to be as comprehensively disabling as Chicago's. While each of these cities has one or several laws similar to Chicago's, none appear to mirror all of Chicago's restrictions. Second, in none of these cities do the laws appear to have come about as part of a comprehensive scheme designed to suppress the existence of gun ranges.

Third, none of these laws has been litigated—yet. *Some* city's gun range zoning regulations had to be the first subjected to Second Amendment scrutiny; Chicago worked hard to secure that distinction. Chief among the reasons why Chicago tempted litigation is that it lacks something possessed by many of the smaller cities Chicago identifies: at least one gun range open to the public.[5]

Notwithstanding its earlier (misplaced) reliance on First Amendment zoning cases, Chicago suggests that the First Amendment is a poor analog after all, because unlike firearms, "[s]peech is not the direct cause of death and physical injury." Appellant's Opp. Br. 22. Sadly, that assertion is highly debatable, especially in light of current events, but no matter. It is well-past time to reject First Amendment analogs for the Second Amendment, and the Supreme Court has already rejected Chicago's claim "that the Second Amendment differs

---

[5]See, *e.g.*, Quickshot, http://www.quickshotshootingrange.com/ locations/atlanta-georgia (last visited May 28, 2015) (Atlanta); Quickshot, http://www.quickshotshootingrange.com/locations/ charleston-south-carolina (last visited May 28, 2015) (Charleston); Genessee Conservation League, http://www.gclrochester.com/ (last visited May 28, 2015) (Rochester); Precision Firearms & Indoor Range, http://www. precisionfirearm.com/range/ (last visited May 28, 2015) (Baton Rouge); Orlando Gun Club, https://www.orlandogunclub.com/ (last visited May 28, 2015) (Orlando).

from all of the other provisions of the Bill of Rights because it concerns the right to possess a deadly implement and thus has implications for public safety." *McDonald* v. *City of Chicago*, 561 U.S. 742, 782 (2010). "The right to keep and bear arms . . . is not the only constitutional right that has controversial public safety implications." *Id.* at 783.

Finally, along these lines, Chicago again claims that its zoning laws are presumptively constitutional, because "the government retains the latitude to experiment with reasonable firearms regulation." Appellant's Opp. Br. 22. On this theory, all gun laws are presumptively constitutional, contrary to *Heller*'s specific instructions. *Heller*, 554 U.S. at 628 n.27. Responding to Plaintiffs' pointing out that zoning laws like Chicago's have no Framing Era roots, the City does not disagree. It merely claims (correctly) that laws do not become constitutional owing to the passage of time, missing the Supreme Court's point that longstanding laws are clues to the right's scope. These "longstanding" laws are not presumptively constitutional because they are old, but because they were allegedly known to the Framers—a status Chicago's modern enactments will never obtain.

Having spent years amassing a voluminous record, Chicago has not begun to prove the constitutionality of its zoning laws.

IV.   CHICAGO'S AGE RESTRICTION VIOLATES THE FIRST AMENDMENT.

Chicago concedes that "the age restriction means that the type of firearms instruction that combines verbal instructions with shooting cannot occur at a shooting range before the age of 18." Appellant's Opp. Br. 39.

This concession eviscerates Chicago's preceding suggestion that the concept of instruction inherently excludes any practical conduct. Neither law nor logic compels that distinction. One can no more learn to be a safe and proficient shooter without touching a gun, than learn to play the piano without actually touching the instrument. And while it is true that "minors study the Rules of the Road and may practice on simulators before they are old enough to practice driving on the road," *id.*, that does not mean that behind-the-wheel practice is not a form of learning. Indeed, Illinois does not consider minors who have practiced only on "simulators" as having learned to drive. "The course of instruction required of each eligible student at the high school level shall consist of . . . a minimum of 6 clock hours of individual

behind-the-wheel instruction in a dual control car on public roadways taught by a driver education instructor endorsed by the State Board of Education." 105 ILCS 5/27-24.2. Following a course of driver education, minors may obtain an "instruction permit" allowing them to engage in supervised driving. 625 ILCS 5/6-107.1. "[A] minimum of 50 hours of behind-the-wheel practice time, at least 10 hours of which have been at night," is then required to obtain a driver's license. 625 ILCS 5/6-107.

Shooting is similar. As with learning to drive, or play an instrument, *some* aspects of shooting instruction may be purely theoretical. But nothing in the record supports Chicago's suggestion that simulated or non-shooting activity is a complete substitute for live-fire range training—which Chicago required of gun owners not long ago, and which Illinois requires for obtaining a concealed carry permit.

Chicago nonetheless asserts that "the live-fire portion of such a lesson is not inherently expressive, and so it does not fall within the ambit of the First Amendment" per *Rumsfeld* v. *Forum for Academic & Institutional Rights*, 547 U.S. 47 (2006). Appellant's Opp. Br. 39. "Shooting a gun is non-expressive conduct, and is thus not protected by the Free Speech Clause." *Id.* at 41. Chicago errs as to the expressive

nature of live-fire instruction, and it misreads *Rumsfeld*.

While firing guns may not be very expressive in the abstract, firing guns under particular circumstances is highly expressive. A starting gun instructs runners to run. A flare gun signals for help. Warning shots, above an assailant or across a ship's bow, are inherently understood as communicative, as is celebratory gunfire. Such expressive conduct can be regulated or prohibited, for reasons too obvious to merit discussion, but it is expressive nonetheless. Symbolic speech occurs where there exists "[a]n intent to convey a particularized message . . . and in the surrounding circumstances the likelihood [i]s great that the message would be understood by those who viewed it." *Spence* v. *Washington*, 418 U.S. 405, 410-11 (1974). When a student shoots under an instructor's direction and supervision, in a class context, she is engaged in a collaborative educational activity protected by the First Amendment.

That much was the Fourth Circuit's indistinguishable holding in *Edwards* v. *City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999), extending First Amendment protection to the teaching of a course on how to carry concealed handguns, which, as state law reveals, required live fire

training. Chicago seeks to parse the verbal and practical aspects of that course, claiming that the Fourth Circuit afforded protection only to Edwards' words. But this makes no logical sense. Edwards would not have uttered the same words if he were not engaged in assisting and evaluating the firing of guns. And since his words would have differed absent the live-fire exercises, it is possible that had Edwards not been teaching that particular course, he would not have been subjected to unconstitutional retaliation.

In any event, the opinion rejects Chicago's distinction. "After examining the content, *context, and form of* Sergeant Edwards' speech . . . we have no doubt that the proper use and manner of carrying a concealed handgun in North Carolina is a subject in which 'the public or the community is likely to be truly concerned' and 'interested.'" *Edwards*, 178 F.3d at 247.

> [T]the context of Sergeant Edwards' speech, *an instructional setting* for members of the public, obviously weighs heavily in favor of concluding his speech is a matter of public concern. The same is true for the form of his speech, presumably verbal as well as some written instruction *accompanied by physical demonstrations.*

*Id.* (emphasis added).

Nothing in *Rumsfeld* suggests that the First Amendment does not

extend to practical instruction. That case concerned a claim by law schools that accommodating military recruiters was a form of compelled speech, signaling approval of military policies regarding sexual orientation. The Supreme Court rejected the notion that excluding military recruiters from campus inherently expresses anything about sexual orientation.

> An observer who sees military recruiters interviewing away from the law school has no way of knowing whether the law school is expressing its disapproval of the military, all the law school's interview rooms are full, or the military recruiters decided for reasons of their own that they would rather interview someplace else.

*Rumsfeld*, 547 U.S. at 66. In contrast, anyone observing Joseph Brown interacting with his students at a range would understand that he is teaching them a class.[6]

Indeed, *Rumsfeld* confirmed that "an incidental burden on speech is no greater than is essential, and therefore is permissible under [*United States* v. *O'Brien*, 391 U.S. 367 (1968)], so long as the neutral

---

[6]As far as *Clancy* v. *Office of Foreign Assets Control*, 559 F.3d 595, 605 (7th Cir. 2009), Plaintiffs are no more arguing that the drive to the range is First Amendment speech than they would argue that the drive to the library or political rally is First Amendment speech. Chicago's citation to *Clancy* is completely irrelevant to any issue of this case.

regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Rumsfeld*, 547 U.S. at 67 (citation omitted). Even viewing the age restriction as a neutral enactment, it would fail this formulation of the *O'Brien* test. The governmental interests are claimed to be the protection of minors from lead, and the protection of minors and others from the harms that might befall irresponsible behavior with guns.

As to the first point, to the extent Chicago introduced any evidence on the subject at all, the evidence showed that lead exposure is *not* a reason to prohibit minors from visiting gun ranges. Chicago's Exhibit 24, a report by the NIOSH on "Preventing Occupational Exposures to Lead and Noise at Indoor Firing Ranges," contained a case report of "Lead exposures of school rifle teams." R. 227-3, at 15-16. "The Alaska Public Health Program initiated a statewide review of school-sponsored rifle teams after a team coach was found to have an elevated [blood lead level]. The review initially examined six rifle teams using three indoor firing ranges." *Id.* at 15. Two teams that had "used a firing range that observed a regularly scheduled cleaning procedure and had a written protocol for maintenance of lead concentration monitoring"

did not have elevated lead levels. *Id.* at 16. Another team using a range that had not been evaluated for lead for 11 years showed "small but measurable lead exposure." *Id.* And three teams that had used a range with "extensive lead contamination" had high lead exposure, leading to the range's closure. *Id.*

In other words, stringent environmental protocols—not alien to Chicago's laws—would already secure minors from lead exposure. Moreover, there is no reason to suppose that in the absence of Chicago's age restriction, toddlers and small children would run around the firing range. And no leap of the imagination is required to understand that sixteen-year old Boy Scouts obtaining their shooting merit badges would be reliably instructed not to lick the floor or walls inside a gun range should the thought cross their minds.

As for protecting minors from accidents, considering the shooting sports' pervasive popularity in the United States, an anecdote in which a poorly-supervised child was injured shooting will possibly be found here or there. But if the goal is to reduce gun tragedies, it is purely speculative to posit that the toll from accidental injuries involving minors at gun ranges would outweigh that from depriving minors of

education in the safe and responsible use of firearms— particularly as Chicago here incredibly suggests that untrained minors be instead sent hunting in the city. Chicago's designated witness certainly did not think that the world would be a safer place if minors were deprived of gun safety education.

A word about Commissioner Krimbel. Chicago offers that

> Commissioner Krimbel also shared her personal view that adults should start teaching their children shooting skills at a younger age, and that her son took a class at age 12. That opinion is beside the point. It is clear that City Council did not share that view, since the Ordinance prohibits all minors at shooting ranges.

Appellant's Opp. Br. 37 (citation omitted). Plaintiffs did not take Commissioner Krimbel's deposition because they were interested in her "personal views." Plaintiffs deposed the Commissioner because she was the City's designated Rule 30(b)(6) witness. When the Commissioner testified that the City's law was poorly drafted, onerous, overbroad, and in dire need of revision, she did so *for the City*. And as the record amply reveals, Commissioner Krimbel was not the only designated city witness unprepared or unwilling to defend the challenged provisions.

Chicago identified compelling governmental interests. But the supposedly neutral regulation here does not promote these interests at

all, let alone in a manner that would be achieved less effectively absent the regulation.

V. Chicago's Age Restriction Violates the Second Amendment.

As Plaintiffs have noted, Chicago's declaration that minors have *no* Second Amendment rights at all is inconsistent with historical tradition. However minors' access to firearms might have been historically regulated, the Framers would have doubtless been surprised to learn that a law forbidding *all* adult-supervised youth shooting activities does not implicate the Second Amendment.

*Heller* declared that Georgia's Supreme Court "perfectly captured the way in which the operative clause of the Second Amendment furthers the purpose announced in the prefatory clause, in continuity with the English right," in describing "[t]he right of the whole people, old and *young*, men, women and *boys*, and not militia only, to keep and bear arms . . . ." *Heller*, 554 U.S. at 612 (quoting *Nunn* v. *State*, 1 Ga. 243, 251 (1846) (emphasis added)).

This does not mean that "boys" or even all the "young" enjoy a right coextensive with that of adults, but the Supreme Court recognized that the familiarity with arms necessary for the militia system's functioning

began prior to adulthood. Indeed, "[s]ixteen was the minimum age for colonial militias almost exclusively for 150 years before the Constitution. In 1650, it was not just the right but the duty of all persons aged sixteen and above in Connecticut, for example, to bear arms." *NRA* v. *BATFE*, 714 F.3d 334, 340 (5th Cir. 2013) (Jones, J., dissenting) (citing Clayton E. Cramer, Colonial Firearm Regulation, 16 J. on Firearms & Pub. Pol'y 2004, 1, 3; *see also United States* v. *Miller*, 307 U.S. 174, 180-81 (1939) (quoting Revolutionary Era New York and Massachusetts militia laws encompassing sixteen-year olds). "As Tench Coxe said, 'the powers of the sword are in the hands of the yeomanry of America from 16 to 60. . . .'" *NRA*, 714 F.3d at 339 (Jones, J., dissenting) (quoting Tench Coxe, "A Pennsylvanian, No. 3," Pennsylvania Gazette, Feb. 20, 1788).

Chicago greatly overstates the historical record with respect to minors' access to guns. Plaintiffs, too, have handy the fifth edition of Cooley's Treatise on the Constitutional Limitations. The page and note Chicago cites contains no discussion at all of the right to bear arms, only the following in a footnote to a statement regarding legislative authority to regulate property: "The State may prohibit the sale of

arms to minors, see State v. Callicut, 1 Lea, 714." The reference must be to *State* v. *Callicut*, 69 Tenn. (1 Lea) 714 (1878), which Chicago later cites independently, in which the court declined to reconsider its decision approving an indictment under an act that "makes it a misdemeanor to sell, give, or loan a minor a pistol, or other dangerous weapon, *except a gun for hunting, or weapon for defense in traveling*." *Id*. at 714 (emphasis added).

For the claim that "age restrictions for gun possession and use have been around for centuries," Chicago represented that Mark Anthony Frassetto, Firearms and Weapons Legislation Up to the Early Twentieth Century 75 (2013), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2200991 (last visited May 29, 2015), "list[ed] States with 19th- and 20th-century age restrictions" on minors' access and use of arms. Appellant's Opp. Br. 29. That list of pre-Fourteenth Amendment laws contains only two entries: an 1856 Alabama law forbidding the provision of a pistol (but not a rifle) to "any male minor" (but not to females), and an 1859 Kentucky law forbidding "any person, other than the parent or guardian" from providing various arms "which

[are] carried concealed" (again, apparently excluding rifles) to any minor, or slave, or free negro."

The footnote trail in Chicago's cited law review articles did not reveal much original support for claims that minors were categorically "unvirtuous" and thus excluded from the right to bear arms.

Ironically, Chicago turns aside evidence that children as young as six are typically allowed on range property as "ha[ving] nothing to do with the scope of the Second Amendment as it was understood in the Founding or Reconstruction Eras. It simply demonstrates range operators' willingness to lower the age to increase profit margins where state and local laws allow it." Appellant's Opp. Br. 33. But then, Chicago offers no Founding or Reconstruction Era state or local laws that imposed *any* age restrictions on accessing gun range property, nor does Chicago offer any evidence that gun range owners were less avaricious/more responsible in earlier days.

To be sure, the Second Amendment rights of minors are extremely narrow, and may only be exercised, if at all, under direct responsible adult supervision. Even if persuasive, the various cases Chicago cites approving of age restrictions for minors and even some adults are

inapposite as they all relate to activity beyond Plaintiffs' claim—a generalized right of acquisition, possession, or carriage. Plaintiffs are unaware of any case, and Chicago cites none, that approved of an age restriction as severe as that before the Court.

The fact that minors are not yet imbued with the full rights of citizens is a reason to respect those rights which they do have, *West Virginia State Bd. of Ed.* v. *Barnette*, 319 U.S. 624, 637 (1943),[7] a point especially salient when considering the safety and other benefits that adults exercising Second Amendment rights may gain by virtue of having received earlier instruction on the topic—as Chicago's Commissioner Krimble noted with respect to her own child's education.

In any event, "[m]inors, as well as adults, are protected by the Constitution and possess constitutional rights." *Planned Parenthood of Cent. Mo.* v. *Danforth*, 428 U.S. 52, 74 (1976) (citation omitted) (striking down parental veto of minor's abortion); *McConnell* v. *FEC*,

---

[7]*Barnette* answers Chicago's skepticism of "a constitutional right to prepare, at a young age, for the exercise of rights that do not exist until adulthood." Appellant's Opp. Br. 31. "That [school officials] are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." 319 U.S. at 637.

540 U.S. 93, 231 (2003) (striking down prohibition on individuals "17 years old or younger" from making contributions to candidates or political party committees); *Safford Unified Sch. Dist. #1* v. *Redding*, 557 U.S. 364 (2009) (Fourth Amendment rights of 13-year-old); *New Jersey* v. *T.L.O.*, 469 U.S. 325 (1985) (Fourth Amendment rights of 14-year-old); *Tinker* v. *Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) (First Amendment rights of 15- and 16-year-olds). Some exceptions aside, *e.g.*, U.S. Const. amend. XXVI, rights are not all-or-nothing propositions that instantly spring into existence upon one's eighteenth birthday. American history and tradition do not support that absolute bright-line rule with respect to the Second Amendment.

And Chicago says nothing about the Second Amendment right of parents to instruct their children in the use of arms.

If the age restriction implicates the Second Amendment at all—and it does—it plainly fails any level of scrutiny. It is no answer to say, as Chicago does, that the age restriction passes constitutional scrutiny because it is temporary. On that theory, minors enjoy no constitutional rights whatsoever. The argument that minors can go hunting elsewhere in Chicago echoes the City's unsuccessful argument on the

previous appeal, to the effect that Second Amendment rights may be violated in one location if they are allowed elsewhere. Moreover, hunting is not the same as learning to shoot at a range. And shouldn't minors learn how to shoot *before* they are allowed to go hunting in Chicago?

It is also far too late in the day for Chicago to introduce purported medical evidence concerning "the biological age of maturity" and brain development, Appellants' Opp. Br. 2-3, subjects on which the American Bar Association, the source of Chicago's claims, is decidedly non-expert. "It is well-settled that a party may not raise an issue for the first time on appeal." *Fednav Int'l Ltd.* v. *Cont'l Ins. Co.*, 624 F.3d 834, 841 (7th Cir. 2010) (citation omitted). "Consequently, a party who fails to adequately present an issue to the district court has waived the issue for purposes of appeal." *Id.* (citation omitted).

> Furthermore, a party has waived the ability to make a specific argument for the first time on appeal when the party failed to present that specific argument to the district court, even though the issue may have been before the district court in more general terms.

*Id.* (citation omitted).

But accepting for the sake of argument that a human brain must reach "the early 20s" to fully "govern impulsivity, judgment, planning for the future, foresight of consequences, and other characteristics that make people morally culpable," *id.* at 3 (citation omitted), where does the argument stop? Surely these are important qualifications for the exercise of various rights and duties entrusted to people younger than "the early 20s," including voting, marriage, the formation of contracts, and service on juries and in the military (the latter employing all manner of destructive weapons).

The range of traditional activities allowed below the age of majority is more constrained, but still includes other potentially dangerous activities that would benefit from maximum brain development, such as driving cars and, yes, engaging in hunting and other shooting sports. There is, of course, no record evidence that youth shooting sports are generally dangerous owing to their participants' supposed immaturity (or more dangerous than other common youth activities that sometimes lead to tragedy, such as swimming, football, and bicycle riding).

And as recounted supra, Chicago has not sought to balance the supposed dangers of youth shooting sports against the safety benefits of

providing such instruction. Plaintiffs accept a degree of regulation, because they recognize that rights must be exercised responsibly. Chicago should have likewise at least acknowledged, as *it* carries the balancing burden, that freedom is also inherently beneficial.

CONCLUSION

The District Court's judgment striking down Chicago's restriction of gun ranges to manufacturing districts, Chi. Mun. Code § 17-5-0207, should be affirmed. But the judgment upholding Chi. Mun. Code § 17-9-0120, imposing distancing restrictions on gun ranges, and the age prohibition of Chi. Mun. Code § 4-151-100(d), should be reversed.

Dated:     May 29, 2015          Respectfully submitted,

David G. Sigale                  Alan Gura*
Law Firm of David G. Sigale, P.C.  Gura & Possessky, PLLC
799 Roosevelt Road, Suite 207    105 Oronoco St., Ste. 305
Glen Ellyn, IL 60137             Alexandria, VA 22314
630.452.4547/630.596.4445        703.835.9085/703.997.7665
                                 *Counsel of Record

                         By:  /s/ Alan Gura
                              Alan Gura

                              Attorneys for Rhonda Ezell,
                              William Hespen, Joseph
                              Brown, Action Target, Inc.,
                              Second Amendment
                              Foundation, Inc., and Illinois
                              State Rifle Ass'n

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2)(C) because this brief contains 6,401 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32(b), and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionately spaced typeface using WordPerfect X4 in 14 point Century Schoolbook font.


/s/ Alan Gura_____
Alan Gura
Attorney for Plaintiffs-Appellees/Cross-Appellants
Dated: May 29, 2015

## CERTIFICATE OF SERVICE

On this, the 29th day of May, 2015, I electronically filed the attached Brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. Participants in this appeal are registered CM/ECF users who will be served by the CM/ECF system on May 29, 2015.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 29th day of May, 2015.


/s/ Alan Gura
Alan Gura